| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY, COLORADO**<br><br>Court Address:   Denver City and County Building<br>1437 Bannock Street<br>Denver, CO  80202 | DATE FILED: July 23, 2018 4:57 PM<br>FILING ID: 94A1B31DA7830<br>CASE NUMBER: 2018CV32713 |
| **Plaintiff:**  **FARMLAND PARTNERS INC.**<br><br>**v.**<br><br>**Defendants:**  **ROTA FORTUNAE (WHOSE TRUE NAME IS UNKNOWN), JOHN/JANE DOES 2–10  (WHOSE TRUE NAMES ARE UNKNOWN)** | **▲ COURT USE ONLY ▲** |
| Attorneys for Plaintiff:<br><br>Scott F. Llewellyn<br>Email: sllewellyn@mofo.com<br>Atty. Reg. #: 34821<br><br>Kyle S. Pietari<br>Email: kpietari@mofo.com<br>Atty. Reg. #: 50157<br><br>Morrison & Foerster LLP<br>4200 Republic Plaza<br>370 Seventeenth Street<br>Denver, Colorado  80202-5638<br>Telephone:  303.592.1500<br>Facsimile:  303.592.1510 | Case No.: |
| **COMPLAINT** | |

Farmland Partners Inc. ("Farmland Partners") brings this action against "Rota Fortunae" (a pseudonym) and co-conspirators John/Jane Does 2–10 (with all Defendants referred to collectively herein as "Wheel of Fortune") for its intentional and malicious scheme to manipulate the securities markets to secure a quick and illegal financial windfall by disseminating false and misleading statements about Farmland Partners.  These false and misleading statements, which have caused reputational and monetary harm to Farmland Partners, were made as part of a "short and distort" campaign to disparage Farmland Partners and profit from trades with legitimate investors as they digested the falsehoods disseminated by Wheel of Fortune.  This insidious scheme took further aim at hardworking farmers, who toil under countless pressures to maintain a noble industry that feeds our families and furthers our national goals.  While the SEC, Congress, and state legislatures grapple with how to stop this scourge on our public markets and

protect small businesses, the engine of economic growth, this lawsuit is designed to bring into the light those who attempt to wreak havoc from the shadows, and hold accountable those who seek to undermine our free markets and venerable institutions.

## PARTIES

1.   Plaintiff Farmland Partners Inc. is a corporation organized and existing under the laws of the State of Maryland, with its headquarters and principal place of business located in Denver, Colorado.

2.   Defendant Rota Fortunae, whose true name is unknown, is the anonymous author of an internet posting published on the website Seeking Alpha and comments on Twitter as @RFortunae regarding Farmland Partners.  *See* C.R.C.P. 9(a)(2).

3.   Defendants John/Jane Does 2–10, whose true names are unknown, are individuals or entities who worked with or for Rota Fortunae in connection with the false and misleading statements about Farmland Partners that Rota Fortunae made publicly in an internet posting and on Twitter, including members, partners, affiliates, employees, consultants, clients, agents, and/or counsel of or for Rota Fortunae.  *See* C.R.C.P. 9(a)(2).

## JURISDICTION AND VENUE

4.   Wheel of Fortune is subject to personal jurisdiction in Colorado under C.R.S. § 13-1-124, because the false and misleading statements about Farmland Partners made in an internet posting and on Twitter were directed at and published in the State of Colorado, which was the focal point of both the posting and the harm suffered.  The false and misleading statements concerned Farmland Partners' activities in Colorado, and caused reputational and other harm to Farmland Partners through wide circulation in Colorado.  The brunt of the injury suffered by Farmland Partners occurred in Colorado, where it is headquartered and a productive citizen.  Wheel of Fortune thus took intentional action expressly aimed at Colorado, out of which the claims asserted in this complaint arise, thereby committing an intentional and tortious act within this state.

5.   Venue is proper under C.R.C.P. 98(c)(5), because this Court sits in the county where the relevant statements were published and harm incurred, and under C.R.C.P. 98(c)(1), because, on information and belief, Wheel of Fortune is a non-resident of Colorado.

## FACTUAL BACKGROUND

6.   Farmland Partners is a publicly traded real estate investment trust (REIT) that manages and seeks to acquire both high-quality farmland and land with agricultural development potential located throughout North America.  Farmland Partners takes pride in its heritage in farming, and sees the partnership with its farmer tenants as key to its long term success. Farmland Partners works with its tenant base to lower their input costs and improve its farms, as a result increasing both their profitability and its own.

7.   Farmland Partners is publicly traded on the New York Stock Exchange under the symbol FPI.

8.   On July 9, 2018, Farmland Partners received a letter by email from Texas attorney Matthew Mitzner of the law firm Mitzner PLLC.  (Exhibit A (attached hereto).)

9.   Mr. Mitzner's letter stated that he represented a "group of investors" who "have prepared and anticipate publishing an article about the Farmland Partners Inc. ('FPI') Loan Program."  (Exhibit A at 1.)

10. Mr. Mitzner's letter stated that, "[p]rior to publishing the prepared article, by this email, we are providing your company the opportunity to respond to the main issues the article addresses, represented by our below-listed questions."  (Exhibit A at 1.)

11. Mr. Mitzner's letter listed thirty-one bullet points setting forth even more numerous questions spanning more than two pages.  (Exhibit A at 2–4.)

12. The questions in Mr. Mitzner's letter covered a broad range of topics and sought precise details about dollar values, individuals, and timeframes.  (Exhibit A at 2–4.)

13. Undermining any notion that Wheel of Fortune was genuinely interested in answers to those questions, Mr. Mitzner's letter provided Farmland Partners with only 24 hours to respond prior to publication of the "prepared article."  (Exhibit A at 1.)

14. Without any stated justification or proper purpose for the unreasonable time period provided for a response, or any acknowledgment of regulations governing the selective disclosure of material non-public information, Mr. Mitzner's letter stated that "in light of the deadline and a variety of prior obligations that have me out of the office during this period, we will neither receive nor be responding to any phone calls concerning this matter."  (Exhibit A at 1.)

15. Mr. Mitzner's letter did not attach a copy of the "prepared article" or identify the short and distort scheme that was to follow.

16. Farmland Partners did not provide responses to the questions in Mr. Mitzner's letter within the 24-hour deadline, in part given the limited time available to even ascertain whether doing so could have implicated regulations governing the selective disclosure of material non-public information, and also because of Mr. Mitzner's unavailability to discuss the questions during the limited time window he provided for a response.

17. Mr. Mitzner's letter did not provide an explanation for why the questions posed were not raised through appropriate, available investor-relations channels.

18. On July 11, 2018, Wheel of Fortune published an anonymous internet posting about Farmland Partners on the website Seeking Alpha, which identified the posting as an "Editors' Pick."

19. On its website's "About" page, Seeking Alpha states that it has 13 million visitors, which on information and belief include numerous visitors from Colorado.  (*See* https://seekingalpha.com.)

20. Wheel of Fortune represented that it had significant knowledge about Farmland Partners' business, yet the Wheel of Fortune posting contained numerous false and misleading statements about Farmland Partners purportedly based on information that was already in the public domain, not on new information.

21. The Wheel of Fortune posting falsely and misleadingly asserted that Farmland Partners "faces a significant risk of insolvency." Not surprisingly, the posting did not refer to the actual definitions of insolvency or how those well-accepted concepts could apply to Farmland Partners' financial condition (they do not apply).

22. The Wheel of Fortune posting falsely and misleadingly asserted that Farmland Partners "ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred 'B' shares."

23. The Wheel of Fortune posting falsely and misleadingly asserted that Farmland Partners "is artificially increasing revenues by making loans to related-party tenants."

24. The Wheel of Fortune posting falsely and misleadingly asserted that Farmland Partners failed to properly disclose the financial impact of its Loan Program.

25. The Wheel of Fortune posting falsely and misleadingly asserted that directors and an officer of Farmland Partners have left the company, and a Farmland Partners auditor was dismissed due to disputes with the company, based on issues raised in the posting. The posting stated that "it appears that we are not the only concerned party. Since making its first loan to [a non-party] . . . four board members and FPI's president have resigned. And in March, FPI dismissed PWC."

26. The Wheel of Fortune posting falsely and misleadingly asserted that Paul Pittman, Farmland Partners' Chairman and CEO, pledged some of his shares.

27. The Wheel of Fortune posting also took aim at Paul Pittman, Farmland Partners' Chairman and CEO, personally, by repeatedly attacking his public statements regarding Farmland Partners' valuations and financial health and his business dealings with Farmland Partners. Among other things, in the context of the posting's false and misleading assertions, Wheel of Fortune displayed malice by attacking Mr. Pittman's defense of Farmland Partners with respect to short sellers, evincing an intent to punish Mr. Pittman for stating that "the roughly 10% short in our stock are going to get killed, and I'll be cheering the day it happens."

28. The Wheel of Fortune posting displayed further malice by stating that Rota Fortunae "think[s] the shares [of Farmland Partners' stock] are uninvestible."

29. On information and belief, Wheel of Fortune's statement that the company's stock is "uninvestible," like the posting's unsupportable statement that Farmland Partners "faces a significant risk of insolvency" (and many other statements described herein), was included in the posting specifically to drive the price of Farmland Partners' stock down so that Wheel of Fortune could profit quickly before the falsity of its statements could be revealed.

30. The Wheel of Fortune posting stated that readers "should assume" that Rota Fortunae's "members, partners, affiliates, employees, and/or consultants" and "clients" had short positions in Farmland Partners' stock as of the date of the posting's publication.

31. On information and belief, at the time Wheel of Fortune published its internet posting, there were investors with substantial short positions and/or put options in Farmland Partners' stock that were soon going to expire.

32. Short selling can be a legitimate investment strategy, if done appropriately and in compliance with applicable laws, and can in some circumstances improve market efficiency and liquidity.

33. But there is a cottage industry of illegitimate short sellers who, through coordinated campaigns, anonymously publish intentionally false and misleading information about publicly traded companies, frame it as a well-researched and legitimate report, and spread that information online to cause panic selling for the purpose of lowering stock prices so that illegitimate short sellers can make a profit by closing their short position while the price is low. This type of "short and distort" scheme violates numerous securities laws and permits traders engaging in deceptive practices to profit at the expense of legitimate investors and to undermine confidence in our public markets.  The scourge of "short and distort" online posting market manipulation schemes not only hurts investors, but also typically involves leveling unfair, egregious allegations about a company that can smear its reputation and those of individuals associated with the company, causing various types of monetary harm and lost business opportunities.

34. Wheel of Fortune achieved its nefarious goal because soon after Wheel of Fortune published its internet posting, Farmland Partners' stock price dropped by approximately 39%.

35. On information and belief, Wheel of Fortune profited from any related short positions it held when Farmland Partners' stock price dropped.

36. Later on July 11, 2018, Farmland Partners issued a press release denying several of the more spurious allegations in the Wheel of Fortune internet posting.  (Exhibit B.)

37. Also on July 11, 2018, based on statements made in the Wheel of Fortune internet posting and repeated by Wheel of Fortune and other individuals who further disseminated the same falsehoods, a class action lawsuit was filed against Farmland Partners in the United States District Court for the District of Colorado, alleging violation of federal securities laws.  That suit, which essentially regurgitates Wheel of Fortune's posting, is without merit and will be vigorously defended.

38. On July 11 and 12, 2018, Rota Fortunae posted more false and misleading statements on Twitter regarding Farmland Partners, using the Twitter handle @RFortunae, repeatedly characterizing the false information in the Wheel of Fortune internet posting as "facts."

39. On July 16, 2018, the Twitter handle @RFortunae posted further false and misleading statements on Twitter about Farmland Partners, again characterizing the false information in the Wheel of Fortune internet posting as "facts."

40. @RFortunae's false and misleading statements on Twitter also took aim at Paul Pittman, Farmland Partners' Chairman and CEO, personally, by, among other things, attacking his public statements regarding Farmland Partners' Loan Program and responding to Farmland Partners' July 11, 2018, press release by threatening additional postings that would focus specifically on Mr. Pittman.

41. On information and belief, Wheel of Fortune intended for its internet posting and related Twitter statements to be read by members of the public, including current and prospective shareholders and business partners of Farmland Partners, and members of the public did so.

42. On July 17, 2018, Farmland Partners issued a second statement ("July 17 Statement") further rebutting the false and misleading statements in the Wheel of Fortune internet posting.  (Exhibit C.)

43. Farmland Partners' July 17 Statement responded to specific false and misleading statements in the Wheel of Fortune internet posting, including the following:

    a) Farmland Partners faces no material risk of insolvency;

    b) Farmland Partners did not exclude dividends on the Company's Series B Participating Preferred Stock from Adjusted Funds From Operations ("AFFO"), as the inclusion of such dividends in the AFFO calculation is clearly explained in Farmland Partners' disclosures;

    c) Farmland Partners did not make undisclosed loans to related parties;

    d) Farmland Partners did not fail to properly disclose the financial impact of the Loan Program;

    e) No director or officer has left Farmland Partners due to a dispute with the company;

    f) No auditor has been dismissed due to a dispute with the company; and

    g) Farmland Partners' Chairman and CEO has never pledged any of his shares.  (Exhibit C.)

44. Farmland Partners notified Seeking Alpha regarding the false and misleading statements in the Wheel of Fortune internet posting through Seeking Alpha's "dispute an article" process, but Seeking Alpha refused to withdraw Wheel of Fortune's internet posting, based in part on Wheel of Fortune's "correction" published on July 19, 2018.

45. Wheel of Fortune's July 19 "correction" was published that day without changing the original July 11, 2018, date and continued to identify the posting as a "Jul[y] 11" "Editors' Pick."

46. Wheel of Fortune's July 19 "correction" conceded that Wheel of Fortune made material misstatements on July 11 and attempted to change portions of its original posting, but it did not correct all the false and misleading statements Farmland Partners specifically identified in its press release, and the "correction" was published long after the decline in Farmland Partners' stock price resulting from Wheel of Fortune's original posting on July 11, 2018.

47. The Wheel of Fortune posting falsely stated that Farmland Partners had not contacted Seeking Alpha or Rota Fortunae.  The former statement is false.  Farmland Partners disputed the posting on Seeking Alpha.  The latter is misleading.  Rota Fortunae is represented by counsel, Mr. Mitzner.  Farmland Partners, through counsel, contacted Mr. Mitzner. Mr. Mitzner retained counsel who replied to Farmland Partners' counsel.

## CLAIMS FOR RELIEF

48. Based on the preceding paragraphs, Farmland Partners brings the following claims for relief, reserving the right to add claims against Rota Fortunae, John/Jane Does 2–10, and/or other individuals or entities working with or for Rota Fortunae, including members, partners, affiliates, employees, consultants, clients, agents, and/or counsel of or for Rota Fortunae, as new information is discovered related to the events giving rise to the claims below:

## FIRST CLAIM FOR RELIEF
### (Defamation/Defamation by Libel Per Se)

49. Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

50. Wheel of Fortune maliciously published false and defamatory written statements about Farmland Partners that held Farmland Partners up to contempt or ridicule.

51. On information and belief, Wheel of Fortune knew that its written statements about Farmland Partners were false, or made those statements with reckless disregard as to their veracity, by, for example, personal attacks on Paul Pittman, Farmland Partners' Chairman and CEO, among other things.

52. On information and belief, Wheel of Fortune knew that its written statements about Farmland Partners would hold Farmland Partners up to contempt or ridicule.

53. Wheel of Fortune's false and defamatory written statements published about Farmland Partners were read by members of the public, including holders of Farmland Partners' stock, and current and prospective business partners of Farmland Partners.

54. Wheel of Fortune's false and defamatory written statements published about Farmland Partners implied the existence of undisclosed defamatory factual predicates.

dn-200220

55. Wheel of Fortune's false and defamatory written statements on Twitter implied that both the internet posting and statements made on Twitter about Farmland Partners were based on undisclosed defamatory factual predicates.

56. On information and belief, Wheel of Fortune's false and defamatory written statements about Farmland Partners were understood to be assertions of fact or based on undisclosed factual predicates by members of the public, including holders of Farmland Partners' stock, and current and prospective business partners of Farmland Partners.

57. Farmland Partners suffered harm to its reputation, loss of business, and other monetary harm as a result of Wheel of Fortune's publication of false and defamatory written statements.

58. Wheel of Fortune's false and defamatory written statements are defamation per se, because they wrongly impute professional misconduct by Farmland Partners that is incompatible with Farmland Partners' business.

## SECOND CLAIM FOR RELIEF
### (Disparagement)

59. Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

60. Wheel of Fortune published false and disparaging statements about Farmland Partners.

61. Wheel of Fortune published false and disparaging statements about Farmland Partners in a manner that ensured third parties would read them.

62. Wheel of Fortune's false and disparaging statements published about Farmland Partners were read by members of the public, including holders of Farmland Partners' stock and current and prospective business partners of Farmland Partners.

63. On information and belief, Wheel of Fortune understood and intended that its false and disparaging statements about Farmland Partners would have the effect of preventing others from doing business with Farmland Partners and interfering with and disrupting Farmland Partners' business relationships.

64. Wheel of Fortune's false and disparaging statements about Farmland Partners were and are derogatory to Farmland Partners' business.

65. Wheel of Fortune published false and disparaging statements about Farmland Partners intending to obtain financial gain by causing harm to Farmland Partners' pecuniary interest.

66. On information and belief, Wheel of Fortune published false and disparaging statements about Farmland Partners with malice, with knowledge of the statements' falsity or reckless disregard for their truth, intending to cause financial harm to Farmland Partners, by, for

8

example, personal attacks on Paul Pittman, Farmland Partners' Chairman and CEO, among other things.

67. Farmland Partners suffered substantial damages, including a drop in its stock price, lost business opportunities, and defense costs, as a direct and proximate result of Wheel of Fortune publishing false and disparaging statements about Farmland Partners.

## THIRD CLAIM FOR RELIEF
### (Intentional Interference with Prospective Business Relations)

68. Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

69. Farmland Partners is a publicly traded company whose stock is purchased and owned by various shareholders, with whom Farmland Partners has business relations.

70. The purchase and holding of Farmland Partners' stock by shareholders confers a benefit upon Farmland Partners that was expected to continue prospectively.

71. Farmland Partners had prospective business relations with many third parties, including, but not limited to, current and potential investors, lenders, property owners, and farmers.

72. Having represented that it had significant knowledge about Farmland Partners' business, Wheel of Fortune knew or should have known about Farmland Partners' prospective business relations with many third parties, including, but not limited to, current and potential investors, lenders, property owners, and farmers.

73. Wheel of Fortune intentionally induced Farmland Partners shareholders to sell their shares by making false, misleading, defamatory, and/or disparaging statements about Farmland Partners, thus interfering with prospective business relations that Farmland Partners anticipated would confer benefits upon it in the future.

74. On information and belief, Wheel of Fortune intentionally induced potential Farmland Partners shareholders and other potential business partners to decide not to purchase Farmland Partners shares or engage in other business activities with Farmland Partners by making false, misleading, defamatory, and/or disparaging statements about Farmland Partners, thus interfering with prospective business relations that Farmland Partners anticipated would confer benefits upon it in the future.

75. On information and belief, Wheel of Fortune intentionally and improperly prevented the formation of contracts between Farmland Partners and current and/or potential shareholders and/or other business partners.

76. Farmland Partners suffered direct harm from Wheel of Fortune's intentional interference with Farmland Partners' prospective business relations, including a drop in its stock price and the loss of business opportunities.

9

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

77. Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

78. On information and belief, Wheel of Fortune realized a benefit at Farmland Partners' expense.

79. On information and belief, Wheel of Fortune caused Farmland Partners' stock price to decline through the deceitful, misleading act of publishing false, misleading, defamatory, and/or disparaging information about Farmland Partners.

80. On information and belief, Wheel of Fortune had a short position in Farmland Partners, and thus realized gains when the price of Farmland Partners' stock declined following Wheel of Fortune's publication of its false, misleading, defamatory, and/or disparaging information about Farmland Partners.

81. Wheel of Fortune's gains were at Farmland Partners' expense, because they were realized as a result of Farmland Partners being harmed by false, misleading, defamatory, and/or disparaging information in multiple ways, including a decline in its stock price, harm to its reputation, and the loss of business opportunities.

82. It would be unjust under the circumstances for Wheel of Fortune to retain the gains it realized at Farmland Partners' expense without just compensation to Farmland Partners.

## FIFTH CLAIM FOR RELIEF
### (Deceptive Trade Practice in Violation of the Colorado Consumer Protection Act)

83. Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

84. Wheel of Fortune engaged in a deceptive trade practice by publishing false and misleading representations of fact that disparaged the services, property, and business of Farmland Partners.

85. On information and belief, Wheel of Fortune works in the field of securities trading as part of its business, vocation, or occupation.

86. Wheel of Fortune makes public statements about financial markets in the course of its business, vocation, or occupation.

87. Wheel of Fortune made false and misleading representations of fact about Farmland Partners in the course of its business, vocation, or occupation.

88. Wheel of Fortune's false and misleading representations of fact about Farmland Partners did and do significantly impact the public as actual or potential consumers of published information about financial markets.

89. Wheel of Fortune's false and misleading representations of fact about Farmland Partners did and do significantly impact the public by harming purchasers, prospective purchasers, and shareholders of Farmland Partners' stock.

90. Wheel of Fortune's false and misleading representations of fact about Farmland Partners did and do significantly impact the public by harming consumers of Farmland Partners' services who have past, present, or future business relationships with Farmland Partners, including its current or potential tenant farmers and business partners.

91. Farmland Partners, in the course of its business, suffered an injury in fact to its legally protected interests, including the right not to have its stock price wrongly manipulated by unethical short sellers through disparagement and defamation.

92. Farmland Partners' injury in the course of its business was a result of Wheel of Fortune's deceptive trade practice.

## SIXTH CLAIM FOR RELIEF
### (Civil Conspiracy)

93. Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

94. On information and belief, John/Jane Does 2–10 are individuals or entities who worked with or for Rota Fortunae in connection with the false and misleading statements about Farmland Partners that Rota Fortunae made publicly in an internet posting and on Twitter, including members, partners, affiliates, employees, consultants, clients, agents, and/or counsel of or for Rota Fortunae.

95. Mr. Mitzner's letter to Farmland Partners stated that there is "a group of investors" behind the "prepared article," rather than an individual.

96. The Wheel of Fortune internet posting repeatedly indicated that there were multiple individuals involved in creating the posting, by repeated use of the word "we" and references to Rota Fortunae's "members, partners, affiliates, employees, and/or consultants" and "clients."

97. On information and belief, Rota Fortunae and John/Jane Does 2–10 shared the object to be accomplished of improperly profiting from short positions by causing Farmland Partners' stock price to decline.

98. On information and belief, Rota Fortunae and John/Jane Does 2–10 had a meeting of the minds on the object to be accomplished, agreeing to cause Farmland Partners' stock price to decline so they would profit illegally from short positions through a "short and distort" scheme involving the publication of Wheel of Fortune's internet posting and related Twitter comments regarding Farmland Partners.

99. On information and belief, Rota Fortunae and/or John/Jane Does 2–10 undertook the unlawful overt act of publishing a false, misleading, defamatory, and/or

disparaging internet posting about Farmland Partners and related comments on Twitter, for purposes of causing a decline in Farmland Partners' stock price.

100.    Farmland Partners was proximately harmed by the publication of the Wheel of Fortune internet posting and the @RFortunae statements on Twitter.

## **PRAYER FOR RELIEF**

WHEREFORE, Farmland Partners requests that the Court grant the following relief:

1.     Enter Judgment in favor of Farmland Partners, and against Defendants, on all Claims for Relief Farmland Partners asserts in this Complaint;

2.     Award Farmland Partners damages incurred as a result of Wheel of Fortune's false, defamatory, and derogatory statements about Farmland Partners;

3.     Award Farmland Partners attorney fees and costs, as available;

4.     Award Farmland Partners injunctive relief to prevent further, irreparable harm from Rota Fortunae's false, defamatory, disparaging, and derogatory statements about Farmland Partners;

5.     Award Farmland Partners prejudgment and post-judgment interest;

6.     Award Farmland Partners all other relief to which it may be entitled.

Farmland Partners reserves the right to make amendments to this Complaint as it discovers new information, including but not limited to (a) amending the Complaint to reflect the true identity of Rota Fortunae and/or John/Jane Does 2–10, (b) adding new claims, (c) adding a claim for exemplary damages following appropriate disclosures and further proceedings, and/or (d) adding new defendants, including those working with or for Rota Fortunae, such as members, partners, affiliates, employees, consultants, clients, agents, and/or counsel of or for Rota Fortunae.

Plaintiff demands a trial by jury for all issues so triable.

Dated:  July 23, 2018

Respectfully submitted,


S/ Scott F. Llewellyn
_____
        Scott F. Llewellyn (Reg. No. 34821)
        Kyle S. Pietari (Reg. No. 50157)

        Morrison & Foerster LLP

        Attorneys for Plaintiff
        Farmland Partners Inc.

Address of Plaintiff:

Farmland Partners Inc.
4600 South Syracuse Street
Suite 1450
Denver, Colorado 80237

DATE FILED: July 23, 2018 4:57 PM
FILING ID: 94A1B31DA7830
CASE NUMBER: 2018CV32713

# EXHIBIT A



MATTHEW M. MITZNER

214.810.1488

matthew@matthewmitzner.law

PO Box 38036

Dallas, Texas 75238

www.matthewmitzner.law

# MITZNER PLLC

July 9, 2018

Farmland Partners Inc.
4600 South Syracuse Street, Suite 1450
Denver, Colorado 80237-2766
luca@farmlandpartners.com
legal@farmlandpartners.com
paul@farmlandpartners.com

      Re:     **Questions for Management of Farmland Partners Inc.**

To Whom it May Concern:

      We represent a group of investors who have been analyzing publicly available information about your company and, noting a series of concerns, they have prepared and anticipate publishing an article about the Farmland Partners Inc. ("FPI") Loan Program—specifically concerning the loans made to Ryan Niebur and Jesse Hough, the disclosures surrounding those loans, and the details of the loans as the may pertain to FPI's reported financials.

      Prior to publishing the prepared article, by this email, we are providing your company the opportunity to respond to the main issues the article addresses, represented by our below-listed questions.

      If you would like to respond, we request that you please do so within 24 hours of this email.

      Please respond via email so that any responses or answers can be understood as accurately as possible. Please be aware that, in light of the deadline and a variety of prior obligations that have me out of the office during this period, we will neither receive nor be responding to any phone calls concerning this matter.

      Sincerely,

Matthew M. Mitzner

**General Questions**

- Has FPI disclosed to shareholders that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough?  If so, where?

- Has FPI used the loan program to artificially increase revenues by lending money to Ryan Niebur, Jesse Hough or other tenants who roundtrip the cash back to FPI as rent and interest?

- Has FPI misstated its financials in relation to any loans the company has made under the FPI Loan Program?

- Has FPI signed leases with above-market rents with Jesse Hough, Ryan Niebur or any of the previously reported related-party tenants?

**Ryan Neibur Loans**

- Did FPI disclose to shareholders that Ryan Niebur was the borrower on the $980,000 loan originated by FPI on October 30th, 2015?  If so, where?

- Did FPI disclose to shareholders that Ryan Niebur used the $980,000 to pay off an existing mortgage instead of for farming operations?  If so, where?

- Did FPI disclose to shareholders that Ryan Niebur defaulted on the $980,000 loan?  If so, where?

- On March 16th, 2017 did Ryan Niebur sell the Andersons Farm to FPI for $801,800 and then use those proceeds to pay off $801,800 of the $980,000 loan?

- In the first quarter 2017 10-Q, and in subsequent SEC filings, did FPI misstate its financials by reporting the March 16th, 2017 acquisition of three properties from Ryan Niebur as a new $2.194 Million loan?

- Did FPI disclose to shareholders that Ryan Niebur is in bankruptcy?  If so, where?

- On March 16th, 2017 did FPI loan Ryan Niebur an additional $61,800 and add it to the remaining balance of the original $980,000 loan thus making the new balance $240,000?

- On March 16th, 2017 did Ryan Niebur make an annual lease payment for $61,750?

- Were the leases signed by Ryan Niebur on March 15th, 2017 at above-market rents?

*Jesse Hough Loans*

- Did FPI disclose to shareholders that it leant Jesse Hough $100,000 thru PHS Holdings on July 25th, 2017?  If so, where?

- Did FPI disclose to shareholders that it acquired the Linwood Farm from PHS Holdings and that the farm was collateral for the $100,000 loan between FPI and PHS Holdings?  If so, where?

- Did Jesse Hough/PHS Holdings use the proceeds from the sale of the Linwood Farm to pay off the $100,000 loan between FPI and PHS Holdings?

- Is, or was Jesse Hough ever the president of Siffring Farms?

- Has Jesse Hough ever had an interest in or management/director role in Siffring Farms?

- Does Jesse Hough have an ownership interest in the properties that secure the $5.25 Million loan to Siffring Farms originated by FPI on January 18th, 2018?

- If Jesse Hough is not the President of Siffring Farms and does not hold an ownership interest in the land securing the loan to Siffring Farms, why did he sign as the president of Siffring Farms on the January 18th, 2018 deed of trust?

- Is Siffring Farms an inactive LLC?

- Did Jesse Hough use proceeds of the Siffring Farm loan to make lease payments on the Linwood Farm or any other lease between Jesse Hough, entities he controls and FPI?

- Did FPI disclose to shareholders that it leant Jesse Hough $669,000 thru Hough Farms on August 25th, 2017?  If so, where?

- Did Jesse Hough use the proceeds from the Siffring Farm loan to pay off the $669,000 loan to Hough Farms that FPI originated on August 25th, 2017?

- Does H-KO Land & Cattle Company lease property from FPI?

- Are any of the leases with Jesse Hough (or any of the entities he controls) at above market rents?

### *Justice Farms Loan*

- In the first quarter 2018 10-Q, FPI disclosed that a loan was settled by the January 12th, 2018 acquisition of a property in NC.  Was this loan between Justice Farms of North Carolina or a party affiliated with the Justice family?  If so, was this disclosed to shareholders?  If so, where?

- Was the subsequent lease signed with Justice Farms of North Carolina at an above market rents?

### *Hough Holdings FPI Share Pledge*

- Did Jesse Hough, thru Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?

- Did Paul Pittman, thru Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?

- Why did Paul Pittman convert 531,827 shares of FPI operating partnership units to common shares on July 19th, 2017?  Was it to provide collateral for the Bank of the West loan?

DATE FILED: July 23, 2018 4:57 PM
FILING ID: 94A1B31DA7830
CASE NUMBER: 2018CV32713

# EXHIBIT B



## Farmland Partners Inc. Responds to Unfounded Allegations

Company Release - 07/11/2018 17:54

DENVER, July 11, 2018 /PRNewswire/ -- Farmland Partners Inc. (NYSE: FPI) (the "Company") is the subject of an article published anonymously on an unregulated website by the holder of a short position in the Company's stock, alleging that the Company failed to meet its responsibilities of fair and full disclosure and intentionally misled investors with its financial reporting. Those allegations are false.

The Company expects to issue a more detailed response in the coming days. In the meantime, the Company believes it is appropriate to draw attention to certain facts about the Company's loan program that the article omitted and/or misrepresented:

- The total notes and interest receivable under the Company's loan program was $11.6 million, or 1.0% of the Company's total assets, as of March 31, 2018.
- The program generated $0.5 million in net revenues, or 1.1% of total revenue, in the year ended December 31, 2017.
- The program is directed at farmers, including, as previously disclosed, tenants. It was publicly announced in August 2015, and included in the Company's public disclosures since then. None of the borrowers under the program as of March 31, 2018 were related parties, or have other business relationships with the Company, other than as borrowers and, in some cases, tenants.

"It is horrifying the amount of damage that this self-interested, anonymous party's false allegations caused today to the Company's stockholders," said Paul A. Pittman, the Company's Chairman and CEO. "We are evaluating what avenues are available to the Company and its stockholders to remedy the damage inflicted."

### About Farmland Partners Inc.

Farmland Partners Inc. is an internally managed real estate company that owns and seeks to acquire high-quality North American farmland and makes loans to farmers secured by farm real estate. As of the date of this release, the Company owns or has under contract over 166,000 acres in 17 states, including Alabama, Arkansas, California, Colorado, Florida, Georgia, Illinois, Kansas, Louisiana, Michigan, Mississippi, Nebraska, North Carolina, South Carolina, South Dakota, Texas and Virginia. We have approximately 30 crop types and over 100 tenants. The Company elected to be taxed as a real estate investment trust, or REIT, for U.S. federal income tax purposes, commencing with the taxable year ended December 31, 2014.

C View original content:http://www.prnewswire.com/news-releases/farmland-partners-inc-responds-to-unfounded-allegations-300679768.html

SOURCE Farmland Partners Inc.

DATE FILED: July 23, 2018 4:57 PM
FILING ID: 94A1B31DA7830
CASE NUMBER: 2018CV32713

# EXHIBIT C



## Farmland Partners Provides Rebuttal to Inaccurate, Misleading and Anonymous Internet Posting on Seeking Alpha

Company Release - 07/17/2018 09:05

DENVER, July 17, 2018 /PRNewswire/ -- Farmland Partners Inc. (NYSE:FPI) ("FPI," the "Company," "we," or "us") today provided a rebuttal to a "short and distort" attack on the Company on July 11, 2018.  The Company's response is below.

**Introduction**

On July 11, 2018, the Company was the subject of an organized, coordinated, anonymous and extremely damaging attack by the holder or holders of a short position in the Company's stock, which drove our stock price down by approximately 39% in one day.  The internet posting was released on Seeking Alpha anonymously under the pseudonym Rota Fortunae ("RF"), which translates into "Wheel of Fortune" and, based on current information, was prepared with the aid and assistance of Matthew M. Mitzner, Esq. and his law firm, Mitzner PLLC (together with RF, "Wheel of Fortune").

The Wheel of Fortune internet posting is both false and materially misleading in numerous respects.  While the Company's investigation into Wheel of Fortune's misconduct continues, this release updates investors with respect to the following:

1. The background of this anonymous and misleading "short and distort" attack on the Company;
2. A further response to the most significant allegations made in Wheel of Fortune's internet posting; and
3. The actions we are taking to pursue legal remedies from the parties responsible for the attack.

We believe Wheel of Fortune intentionally misled the market with sweeping, unfounded assumptions, misleading facts and suggestive language for the sole purpose of causing the stock price to decline dramatically in order to profit on their short position. Those false and materially misleading statements led to panic selling and very high daily volume.  As a consequence, on July 11, 2018, FPI's common stock closed at $5.28, a 39% decline over the prior day's close, and FPI's Series B Participating Preferred Stock closed at $18.15, a 26% decline over the prior day's close.

Our view is that, as a publicly listed company, shareholders, analysts and others certainly have the right to and will criticize the Company from time to time.  We welcome an open and honest dialogue.  Nothing prevented Wheel of Fortune from participating in such a discussion with members of FPI's senior management in a manner that would afford FPI a reasonable opportunity (not the 24 hours demanded by Mitzner PLLC) to address each of Wheel of Fortune's allegations.  We also understand that short selling is a legitimate investment strategy. However, posting demonstrably false and misleading information in order to profit from the panic that ensues may constitute illegal market manipulation.  Accordingly, we are working with the relevant law enforcement agencies and have asked them to investigate Wheel of Fortune's conduct.

We have not undertaken in this press release to refute every single unsubstantiated claim that Wheel of Fortune made in their internet posting.  Rather, we will respond to the main points and questions presented.

As a threshold matter, however, investors should rest assured that the Company does not have a material risk of insolvency.  If the Company had such a risk, our financial disclosures would be required to include a going concern qualification in our financial statements. This qualification has never been placed in our financial statements.

**The Set-Up Through the Mitzner Law Firm**

On July 9, 2018, the Company received a letter from Matthew M. Mitzner of Mitzner PLLC on behalf of his clients, purportedly "a group of investors."  The letter referred to and threatened the release of an article (which ultimately became Wheel of Fortune's anonymous posting) unless the Company responded to a lengthy list of questions within 24 hours, an unreasonable amount of time in light of the detailed questions posed by Mitzner on behalf of Wheel of Fortune.  Further showing the intent to cause injury for personal gain, Mitzner "demanded" a response in writing and refused to discuss either the proposed article or the questions posed,

which appear at the end of Wheel of Fortune's anonymous internet posting. In the letter, Mitzner specifically noted he would be unavailable for a phone conversation prior to the publication of what became the Wheel of Fortune posting. As a lawyer purporting to advise investors, Mitzner certainly knew, or should have known, that public companies cannot respond to such requests because doing so is likely to be an impermissible selective disclosure of non-public information. Thus, upon the advice of our outside legal counsel, we did not respond.

We know that we are not the only company to be victimized by these types of attacks, including prior attacks by RF (including at least one company that ultimately was vindicated after RF sought to discredit the company and its management team), and call upon the Securities and Exchanges Commission ("SEC"), Congress and state legislatures to do more to protect the integrity and efficiency of the markets and shield shareholders and small businesses from this kind of misconduct in the marketplace. For now, we have taken the following steps:

1. We have reported these events to the SEC, offering our full cooperation in any investigation into the Company, but more importantly into the false allegations made and the resulting potentially illicit gains of these short sellers.
2. We have retained counsel and intend to commence legal proceedings.

We suggest that any FPI shareholders who sold FPI stock at a loss as a result of Wheel of Fortune's false allegations consult with their legal counsel and evaluate potential recovery of their losses from the responsible parties.

This press release attempts to address the most significant allegations made in the Wheel of Fortune internet posting. Most of the rebuttal is based on existing public disclosures; however, in certain instances in this press release, we have provided additional information, not because our earlier disclosures were deficient, but to provide further insight into the questions and issues contained in the Wheel of Fortune internet posting.

**Company's Rebuttal to the Main Points of the Wheel of Fortune Internet Posting**

### 1. The Company's Presentation of AFFO Does Not Exclude Preferred Dividends

Wheel of Fortune claims that the Company excludes dividends on the Company's Series B Participating Preferred Stock from Adjusted Funds From Operations ("AFFO"). The claim is patently false, as the inclusion of such dividends in the AFFO calculation is clearly explained in the Company's disclosures. For example, see page 41 of the Company's Quarterly Report on Form 10-Q for the first quarter of 2018.

### 2. The Company Did Not Make Loans to Related Parties

Neither Ryan Niebur nor Jesse Hough are "related parties" as defined by applicable rules of the SEC and the Financial Accounting Standards Board ("FASB") and were not "related parties" at the time of any loan made to them. Wheel of Fortune, unencumbered by rules or regulations and, it appears, good faith, uses their own definition of related party to suit a false narrative. As a public company, we are a regulated entity and must abide by the legal definitions of certain terms. Wheel of Fortune intentionally creates confusion by suggesting that, by conducting business with "related parties" in the common English sense of those words (i.e., parties known to us with whom we have other business relationships), the Company has not satisfied the disclosure requirements imposed by relevant regulations. We have only made loans to parties we know, which we believe is an appropriate business practice and is in the best interest of the Company and its shareholders. Borrowers under the Loan Program have always been tenants, non-tenant farmers we know, and/or parties with whom we previously have done business, and these are good, hardworking farmers who create jobs and care for families by making an honest living producing food, unlike anonymous short sellers engaging in illegal market manipulation. Our tenants and borrowers do not deserve to be disparaged so that an anonymous short seller can profit from his misdeeds.

Furthermore, Wheel of Fortune's discussion of Ryan Niebur Loans #2 and #4 asserts that, by collecting the first year of interest up front, FPI is able to "report immediate interest revenue." That is another false statement. We report the recognition of interest revenue in accordance with U.S. GAAP, which requires that this type of interest be recognized on a straight-line basis over time.

#### a. Background on the FPI Loan Program

In 2015, the Company announced the launch of the FPI Loan Program in a press release dated August 27, 2015, and began disclosures regarding the program in its public filings (for example, see page 21 of the Company's Quarterly Report on Form 10-Q for the third quarter of 2015). Under the FPI Loan Program, we make asset-based loans secured by agricultural real estate. These loans are underwritten primarily on the basis of the value of the underlying collateral rather than the borrower's financial health. As a non-traditional agricultural lender, we can and do originate higher loan-to-value ("LTV") loans and can close more quickly than traditional agricultural lenders. And as is customary, we receive higher than traditional fees and interest on our

loans. Absent an affirmative obligation to do so, we will not, and do not believe it is appropriate to, disclose the identities of individual borrowers. We will, however, provide the following information.

Loans made by the Company generally fall under one of two different collateral structures:

1. Loans secured by mortgages; or
2. Loans secured by recorded deeds on agricultural property, with the borrower retaining the option to repurchase the collateral at a price equal to the loan's outstanding principal balance and accrued and unpaid interest rather than the collateral's market value. This structure gives the Company a stronger position than a traditional mortgage lender. In these cases, the county records will show the Company as the owner. However, these transactions are required to be reported as loans in accordance with U.S. GAAP.

The Company occasionally makes bridge loans to prospective property sellers in the context of an acquisition transaction under contract to give the property sellers effective access to a portion of the sale proceeds before the Company completes due diligence and other work on a pending acquisition. In these cases, the loan is generally secured by a mortgage on the property being acquired by the Company and as, appropriate, by additional collateral, in order to ensure an LTV consistent with the Company's lending standards.

We believe that all of our loans are made on terms that reflect the circumstances under which the loans are originated, including factors identified during our underwriting process. We believe that in most, if not all, cases we are able to charge our borrowers relatively high interest rates and up-front points as a fair compensation for our asset-based underwriting criteria and speed of execution. As an asset-based lender, we are generally not concerned about the borrower's use of proceeds. Rather, as previously stated, we primarily focus on the value of the underlying collateral.

Contrary to the author's misleading statements, all of our outstanding loans have economic substance and we fully expect them to perform well for the Company consistent with our underwriting criteria.

As of March 31, 2018, FPI's Loan Program is comprised of the notes outlined in the table on page 16 of the Company's Quarterly Report on Form 10-Q for the first quarter of 2018. Based on recent analyses derived from a combination of external appraisals and internal analysis, the weighted average LTV of the loans, including outstanding interest, on March 31, 2018 was under 75%.

    b. Additional Disclosures Related to Ryan Niebur, Jesse Hough and the Loan to the Seller of North Carolina Property

Ryan Niebur was and is a tenant of the Company and he worked part-time for the Company as a farm manager from September 2015 to December 2017. Ryan Niebur was never a member of the Company's senior management team and never had corporate decision-making authority. He is not a "related party" under applicable SEC and FASB rules. We continue to believe the loans made to Ryan Niebur are good loans and will perform well for the Company.

Jesse Hough was not a "related party" under applicable SEC and FASB rules at the time loans were made. Mr. Hough is a tenant and a borrower of the Company. From April 16, 2014 through April 16, 2018, Mr. Hough was a consultant of the Company. He was a business partner of FPI's Chairman and CEO, Paul Pittman, prior to the Company's initial public offering and during the first couple of years subsequent to the initial public offering. During the period Mr. Hough and Mr. Pittman remained business partners, the Company appropriately disclosed Mr. Pittman's relationship with Mr. Hough under the related party transactions disclosures in the Company's public filings (see, for example, "Note 4–Related Party Transactions" on page F-17 of the Company's Annual Report on Form 10-K for the year ended December 31, 2015). Mr. Hough never had decision-making authority over any matters or transactions involving the Company. Mr. Hough's historic and current involvement with the Company has been properly disclosed in our filings. In accordance with the Sarbanes-Oxley Act of 2002, the Company has never made loans to any officers of the Company or entities controlled or affiliated with any officers of the Company.

Regarding the loan for the North Carolina property referred to by Wheel of Fortune, we made a short-term bridge loan in exchange for a substantial fee to the seller of a large North Carolina farm that we acquired in the first few weeks of 2018. There is nothing improper about this loan. It was made in the following context: The seller needed funds before December 31, 2017 and, due to title work and other due diligence requirements, the closing could not be completed by year end. Therefore, in exchange for a security interest in a different property, we made a short-term bridge loan that was subsequently paid off by applying the outstanding principal and interest on the loan to reduce our purchase price of the large North Carolina property.

    **3. The Company Did Not Fail to Properly Disclose the Financial Impact of the Loan Program**

Wheel of Fortune's implication that FPI's overall financial performance was materially swayed by its Loan Program is untrue. FPI's Loan Program is a very small portion of our business. As of March 31, 2018, the total outstanding principal and interest receivable under the Loan Program was $11.6 million, or 1.0% of the Company's total assets (see page 16 of the Company's Quarterly Report on Form 10-Q for the first quarter of 2018). In the year ended December 31, 2017, the Loan Program generated $0.5 million in net revenues, or 1.1% of total revenue (see page 51 for a narrative description under "Other Revenue" and page F-3, in each case in the Company's Annual Report on Form 10-K for the year ended December 31, 2017). While we continue to believe that the loans we have made are good investments on their own merits and that the Loan Program is neither a significant portion of the Company's investment portfolio nor a significant contributor to the Company's profitability, we also believe the Loan Program provides a valuable service to our tenants and other farmers, particularly during periods of distress in their businesses.

### 4. FPI Charges Appropriate Rents For Our Properties

FPI's rents are appropriate and fair taking into consideration the actual farm, market conditions, and other unique factors related to a given property or tenant. Wheel of Fortune's claim that FPI's rents are above USDA state averages and, therefore, not consistent with market rents, is, like so many statements in the internet posting, misinformed and wrong. A responsible analyst or investor would take the time to understand the company in which it invests, and engage in dialogue with other investors and the company in the ordinary course before making statements about the company. A short seller looking to manipulate the market and profit by causing a short-term price decline, however, has a different agenda. As investors and the public know, farmland is different and rents will vary dramatically across a given state or region. To claim all farm rents in a state are or should be the same is like saying office rents in mid-town Manhattan should equal the New York state average for office rents. For example, the Washington County farm cited by Wheel of Fortune is a dryland farm with good soils and located in Eastern Colorado. As a result, it is more productive than the average dryland farm in the state.

### 5. FPI Has Not Intentionally Overpaid For Acquisitions

The Company does not believe it systematically overpays for acquisitions and does not enter into acquisition transactions with the belief that it is overpaying for assets.

For example, Wheel of Fortune's anonymous posting cited three properties in Telfair County, GA (the Selph, Mobley and Dorminey farms) as an example of the Company allegedly overpaying by purchasing the property for substantially more than the prior purchaser had paid. Regarding these farms, Wheel of Fortune's allegations that we overpaid are, again, false. While we do not know all of the details of transactions that pre-date our purchases, the Selph and Mobley farms were appraised at the approximate time of the purchase at a weighted average value of 12.7% above purchase price. Dorminey was not appraised since it was only a $179,000 purchase.

In the case of the American Farmland Company ("AFCO") acquisition, we of course paid more than the cover buyer, which is typically what it takes to win an auction process. The price we paid is supported by our own valuation work, the fairness opinion rendered by the investment banking firm hired by the Company's board of directors, and independent third-party appraisals. Furthermore, those farms had a higher value to us because, as an existing farmland REIT, we did not have to maintain the cost of AFCO's management structure.

As the Company's press release that went out this Monday, July 16, 2018 indicates, we recently sold four farms located in Illinois and one in Texas for a collective gain of $0.8 million, or 10% higher than the Company's book value for these assets. As we have disclosed in prior public filings, if we believe it is in the best interests of our stockholders, we may elect to sell one or more of our properties in a manner consistent with our investment objectives. Like other public REITs, we will consider the sale of assets where we believe we can recycle capital into other assets, particularly when we can realize a gain on sale.

### 6. No Director or Officer Has Left the Company, Nor Has Any Auditor Been Dismissed, Due to a Dispute With the Company.

Wheel of Fortune's statements about the reasons for directors or officers resigning or not standing for re-election are false. In no case has the departure of any director or officer been a result of concerns with the Loan Program, and the Company appropriately and truthfully disclosed in its public filings that the decisions were not the result of any disagreements between directors or officers and the Company.

Wheel of Fortune also misrepresented the reasons for a change in our independent auditor. As previously disclosed by the Company in a Current Report on Form 8-K filed on March 13, 2018, the appointment of EKS&H LLLP as our independent auditor was to allow the Company to maintain a high quality auditor while achieving its objective of reducing costs. This decision was not the result of any disagreement between the Company and PricewaterhouseCoopers LLP ("PwC") on any matter of accounting principles or practices,

financial statement disclosure, or auditing scope or procedure. In addition, as noted in the Current Report on Form 8-K filed March 10, 2018:

> "during the fiscal years ended December 31, 2017 and December 31, 2016, as well as during the subsequent interim period preceding March 10, 2018, there were no (i) "disagreements" (as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and related instructions) between the Company and PwC with respect to any matter relating to accounting principles or practices, financial statement disclosure or auditing scope or procedures which, if not resolved to the satisfaction of PwC, would have caused PwC to make reference to the subject matter of the disagreement in its reports on the Company's financial statements with respect to such periods; or (ii) "reportable events" (as that term is defined in Item 304(a)(1)(v) of Regulation S-K and the related instructions)."

PwC confirmed the foregoing with a letter addressed to the SEC dated March 12, 2018, which was filed as an exhibit to the Form 8-K.

### 7. Our Same-Property Rent Disclosures Are Appropriately Calculated and Materially Accurate

Wheel of Fortune claims that the Company stopped disclosing same-property rents per acre and omits certain farms from the calculation, thereby presenting a misleading picture to investors. This is not true. The Company stopped disclosing same-property rent increases or decreases on a per acre basis when the expansion of the portfolio into multiple regions and crop types made the average per acre rent on a nationwide basis not meaningful to investors. With a portfolio that includes properties that have some rents per acre measured in the thousands of dollars and other rents per acre under fifty dollars, the nationwide average provides investors less useful information upon which to assess the Company's performance, not more.

Wheel of Fortune also suggests that we are arbitrarily excluding properties to make the same-property rent numbers look better. This is simply not true. Unlike other real estate asset classes, vacancy rates in quality U.S. farmland are virtually zero. In addition, annual rents are typically determined and paid for the entire crop year rather than the specific months or days during which a lease was in place. As a result, including in our calculation properties that did not contribute to revenues calculated in accordance with U.S. GAAP for the entirety of the periods presented in the same-property comparison would skew the comparison - positively or negatively - even though such properties are expected to generate cash rents for the entirety of those periods and historically have done so. This issue is particularly significant in the first quarter of the year, when row crop properties whose leases have expired, especially in the northern part of the U.S., might not have yet a new lease in place.

The Company believes that same-property portfolio rent comparisons on less than a full year basis are not indicative of the portfolio's true performance. This is due to the multiple types of lease structures we use that have significant variance in the annual timing of revenue recognition. However, we are required to make this disclosure in accordance with U.S. GAAP rules.

Wheel of Fortune also refers to substantial increases and decreases in reported same-property rents between Q4 2016 and Q1 2017 and then between Q1 2018 and Q1 2017. As fully disclosed in our filings and public comments, a major cause of this was the termination payments made by a tenant in the fourth quarter of 2016, which materially increased U.S. GAAP recognized revenue in that quarter and the subsequent relative decline into Q1 2017 that did not include those termination payments. When comparing Q1 2018 to Q1 2017, the increase in same-property rents looks quite large due to Q1 2017 being so low.

### 8. Paul Pittman Has Never Pledged Any Shares

Despite the misleading statements in the Wheel of Fortune internet posting, FPI's Chairman and CEO, Paul Pittman, has never pledged any of his shares to date. More importantly, as indicated in the Company's most recent proxy statement, as of March 16, 2018, he held a 6.7% interest in the Company on a fully diluted basis and has been a significant and repetitive buyer of additional shares as indicated in his Form 4's. If it weren't for the Company's insider trading policy and its current black-out period, the Company, Mr. Pittman and other members of management would buy additional shares right now.

**Conclusion**

These malicious, self-interested and misleading "short and distort" attacks against the Company are very unfortunate and have caused serious financial and reputational harm to the Company, its management and its common and preferred shareholders. We intend to pursue all legal avenues to redress these wrongs, but more importantly, we are firmly committed to seeing that over time, the Company's stock price more accurately reflects the actual underlying value of our portfolio. We are committed to increasing revenue from our farms through the active management of our farms, including rental increases and property improvements.

**About Farmland Partners Inc.**

Farmland Partners Inc. is an internally managed real estate company that owns and seeks to acquire high-quality North American farmland and makes loans to farmers secured by farm real estate. As of the date of this release, the Company owns or has under contract over 165,000 acres in 17 states, including Alabama, Arkansas, California, Colorado, Florida, Georgia, Illinois, Kansas, Louisiana, Michigan, Mississippi, Nebraska, North Carolina, South Carolina, South Dakota, Texas and Virginia. We have approximately 30 crop types and over 100 tenants. The Company elected to be taxed as a real estate investment trust, or REIT, for U.S. federal income tax purposes, commencing with the taxable year ended December 31, 2014.

**Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of the federal securities laws. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "should," "could," "would," "predicts," "potential," "continue," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates" or similar expressions or their negatives, as well as statements in future tense. Although the Company believes that the expectations reflected in such forward-looking statements are based upon reasonable assumptions, beliefs and expectations, such forward-looking statements are not predictions of future events or guarantees of future performance and our actual results could differ materially from those set forth in the forward-looking statements. Some factors that might cause such a difference include the following: general volatility of the capital markets and the market price of the Company's common stock or Series B participating preferred stock, changes in the Company's business strategy, availability, terms and deployment of capital, the Company's ability to refinance existing indebtedness at or prior to maturity on favorable terms, or at all, availability of qualified personnel, changes in the Company's industry, interest rates or the general economy, adverse developments related to crop yields or crop prices, the degree and nature of the Company's competition, the timing, price or amount of repurchases, if any, under the Company's share repurchase program, the ability to consummate acquisitions under contract and the other factors described in the section entitled "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, and our other filings with the Securities and Exchange Commission. Any forward-looking information presented herein is made only as of the date of this press release, and we do not undertake any obligation to update or revise any forward-looking information to reflect changes in assumptions, the occurrence of unanticipated events, or otherwise.

View original content:http://www.prnewswire.com/news-releases/farmland-partners-provides-rebuttal-to-inaccurate-misleading-and-anonymous-internet-posting-on-seeking-alpha-300682107.html

SOURCE Farmland Partners Inc.