## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CASE NO. 1:18-cv-02351-KLM

FARMLAND PARTNERS, INC.,

      Plaintiff,

v.

ROTA FORTUNAE (WHOSE TRUE NAME IS UNKNOWN), JOHN/JANE
DOES 2-10 (WHOSE TRUE NAMES ARE UNKNOWN),

      Defendants.

---

**DECLARATION OF** ████████████████████ **AKA "ROTA FORTUNAE"**

---

I, ████████████████ , declare that I am over 18 years of age, am competent to testify,

and if called as a witness, would testify as follows:

1.     I am an individual living in the State of Texas.

2.     I own real property in Texas.

3.     I am registered to vote in Texas.

4.     My car is registered in Texas.

5.     I have a Texas driver's license.

6.     I am the sole author of the article about Farmland Partners, Inc. ("FPI"), which was

published on *seekingalpha.com* on July 11, 2018 under the pseudonym "Rota Fortunae." A true

and correct copy of that article is attached here as Exhibit 1.

7.     Seeking Alpha is a New York-headquartered media outlet for financial market

analysis, whose tag line is "Read. Decide. Invest."

{00625987.DOCX / 1 }

**EXHIBIT A**

8.      Attached as Exhibit 2 is a true and correct copy of an excerpt from the comments to the article, specifically a comment made by me as "Rota Fortunae."

9.      I also provided my article on FPI to the Securities and Exchange Commission (SEC) whistleblower hotline prior to submitting the article to Seeking Alpha.

10.     I am the sole author of tweets about FPI under the Twitter name "RFortunae."

11.     I do not conduct any business in Colorado.

12.     I do not conduct any business with residents of Colorado.

13.     I do not own any property in Colorado.

14.     I do not have any cars registered in Colorado.

15.     I am not registered to vote in Colorado.

16.     I do not have a Colorado driver's license.

I swear or affirm under penalty of perjury under the laws of the United States that the foregoing is true and correct.

██████████████████████████

██████████████ aka Rota Fortunae

**EXHIBIT A**

# Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible

Rota Fortunae   Jul. 11, 2018 8:30 AM ET

We believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up.

FPI has neglected to disclose that the majority of its loans have been made to two members of the management team, including Jesse Hough, CEO Paul Pittman's long-time business partner.

A UCC shows "Pittman Hough" pledged shares of FPI for a loan then FPI's stock fell 30%, and two weeks after reaching an all-time low, FPI began lending to Hough.

Four board members and FPI's president have resigned since FPI began lending to Hough, and in March, FPI dismissed its auditor.

We found evidence that strongly supports FPI has significantly overpaid for properties; under normal circumstances, we estimate FPI is worth $4.85/share, but we think the shares are uninvestible.

***Please read the full disclaimer at the end of the report before reading further. This report represents the opinion of the author. Investors should do their own due diligence and come to their own conclusions.***

**EXHIBIT 1**

*"We are not going to engage in a window-dressing process for Wall Street. We have great value in our assets... the market is going to figure this out and the roughly 10% short in our stock are going to get killed, and I'll be cheering the day it happens." - CEO, Paul Pittman on 1Q2018 Call*

## Introduction

Chapter five of <u>Financial Shenanigans</u> teaches investors the methods companies use to artificially increase revenues. One technique is to sell a product to a friendly customer who has no real obligation to pay. Such a transaction is said to lack economic substance. And how do you trick the auditor? Draft a normal sales contract but have a secret "side agreement" that modifies the terms. We think this is happening at Farmland Partners.

Farmland Partners (<u>FPI</u>) is a highly levered farm REIT whose cash flow does not cover its dividend and whose non-GAAP earnings have drifted miles away from economic reality. Yet, despite evidence that rents have fallen across key geographies, FPI just posted its largest ever same-property revenue (i.e. same-store sales) increase and notched its longest stretch of positive revenue surprises. To be blunt, we do not believe the numbers.

When we started looking into FPI, we found it was playing classic accounting games like capitalizing part of the expense to lease CEO Paul Pittman's personal jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency.

**Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as**

**rent and interest revenue. We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.**

**And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other.**

While FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported the purchase as a loan and then lent him an additional $61,800 the day after he signed a lease with FPI for $61,750.

Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's properties, which FPI then acquired two weeks before the loan matured and leased back to him just days before FPI lent him another $5.25 Million, this time as the president of an inactive entity that corporate records show he has no affiliation with, and that is secured by land that deed records show he does not own.

Our opinion that FPI appears to be playing accounting games is further bolstered by a Colorado UCC filing that shows "Pittman Hough" pledged

shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. He was wrong. Instead the stock tanked, and two weeks after hitting an all-time low, FPI made its first loan to Jesse Hough.

**While shareholders have expressed concern about <u>FPI's ability to maintain its dividend</u>, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency.**

And it appears that we are not the only concerned party. Since making its first loan to Jesse Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed PWC for EKS&H (auditor for <u>MusclePharm</u> and <u>Heska</u>).

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside. We found evidence that suggests FPI has significantly overpaid for properties. We estimate that under normal circumstances FPI would be worth $4.85 per share (45% below the current stock price). But there is never just one cockroach, and we have no confidence in FPI's financials. Accordingly, we think FPI is uninvestible.

*Note: We reached out to FPI's management with a list of questions (located at the end of this report). The company did not respond.*

*Note that while the related parties discussed herein may fail to meet the SEC's definition, we believe they meet the <u>more stringent definition</u> set out*

Farmland Partners: Loans To Related-Party Tenants Introduce Signific...ares Uninvestible - Farmland Partners Inc (NYSE:FPI) | Seeking Alpha          7/18/18, 9:24 PM

*by <u>audit rules</u>, and more importantly, we think the relationships would be considered material information to most investors.*

## FPI's Capital Market Hamster Wheel

From its IPO through 2017, FPI generated *negative $3.2 Million* in cumulative free cash flow (operating cash flow - depletion/depreciation - preferred dividends). And this figure excludes an additional $69 Million in capital expenditures that <u>FPI says are all growth related</u>, an incredulous statement given the lack of organic growth.

And FPI ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred "B" shares, which at 6% of par value is higher than the companies <u>blended cap rate of 4.25% (pg. 13)</u>. Accordingly, AFFO has drifted miles away from free cash flow as the recession in the ag economy has deepened.



*Source: Chart By Author, Using SEC Financials*

In simple terms, millions in executive pay (including $0.5 Million for leasing <u>Pittman's personal jet</u>) and $27 Million in dividends has been funded, not by profits, but by a hamster wheel of dilutive debt and equity raises.

**The fact that FPI generates no cash is very important to remember. If our thesis is correct, the related-party loans are being "paid off" by FPI, and capital from new investors is funding the related revenues.**

That makes this accounting maneuver particularly hard to detect because, unlike channel stuffing, there is no build up in receivables or decline in operating cash flow to forewarn investors. No, in this case, the red flags came in the form of hard-to-believe numbers that we could not reconcile with reality.

## Something Is Not Adding Up

For years, Paul Pittman has been making incredulous statements about the prospects for flat-to-increasing rents even though farm (i.e. tenant) incomes have been declining since 2013. On the 2Q2015 call, he said:

> We're not really very worried about this rent roll issue. I mean, our perspective is that we will have, **virtually under any economic scenario**, we will either have flat or increasing rents in those discussions. And it comes back to the fact that the farmer takes a long-term view, right?

And in the beginning of 2017, Pittman said:

> We've probably seen a portfolio-wide, same-store sales basis, and this will surprise a lot of people, but about 1.5% to 2% increase across the board... there are a few regions of the country... particularly in Illinois and eastern Nebraska... those rents are generally coming down...,you're seeing them come down but not massively, but their off in the 5-ish percent kind of range.

Pittman's comments do not jive with well-publicized industry data. The
<u>Illinois Society of Professional Farm Managers and Rural Appraisers (pg. 49)</u>
shows Illinois cash rents are down approximately 25% from 2013 (pg. 49).
And the 2017 <u>Nebraska Farm Survey (pg. 50)</u> shows cash rents on irrigated
cropland across Nebraska are down 24% since 2013 and down 18% in eastern
Nebraska.

**So, we were not surprised when, in the 1Q2017, average annual
rent per acre fell off a cliff when FPI's <u>original three-year leases
rolled over</u>. But we were surprised when the number began to
improve throughout the year and when, in the 4Q2017, FPI
stopped disclosing the figure completely and simply reported that
rents on row crops were <u>"flat to slightly lower" (pg. 52)</u>.**



*Source: Chart By Author, Using SEC Filings (Search: "same-property")*

On the 2Q2017 conference call, management said the improvement was due
to leases moving from straight cash rent to cash plus crop share and farmers
locking in prices during the run up over the summer. Perhaps, but this must
assume that FPI's tenants had the foresight to sell the vast majority of their

crops in the short period of time when prices peaked because shortly after prices fell, and average prices for row crops ended down for the year.



*Source: Bigcharts.com*

And given that prices were hitting fresh lows in early 2018, we doubt farmers were willing to sign leases that allowed FPI to report +15% same-property revenue growth in the 1Q2018 (FPI's highest ever year-over-year gain).

We think the first quarter surge was, in part, due to how FPI defines "same property" as those that are "owned and operated" for the entirety of both periods. Only including "operated" farms means that FPI can exclude properties that are not leased, which skews the financial picture of the entire portfolio.

And sure enough that is exactly what we found FPI doing. The chart below shows that in the 1Q2018, FPI excluded 6.5% of the properties owned for the

entirety of 1Q2017 (note FPI does not provide figures in 10-Ks to make the fourth quarter calculations).

| Same-Property Acres | 1Q2017 | 2Q2017 | 3Q2017 | 1Q2018 |
|---|---|---|---|---|
| Current Year Acres | 74,420 | 107,206 | 110,828 | 109,270 |
| Comparable Period Acres | 74,267 | 107,052 | 110,675 | 116,424 |
| Implied Non-Operating Acres | 153 | 154 | 153 | -7,154 |
| % Of Total Same-Property Acres | 0.2% | 0.1% | 0.1% | -6.5% |

*Source: Chart By Author, Using SEC Filings and IR Investor Presentations*

But it was not until we reviewed hundreds of deed records across the country that came to believe FPI is using its mortgage lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest revenue.

### *The FPI Loan Program*

In August 2015, Farmland Partners introduced the FPI Loan Program to "address a market need created by short term cash flow pressure on farmers who otherwise *maintain solid balance sheets*" but cannot get traditional funding. The press release promoted FPI's quick underwriting abilities and *conservative loan-to-value criteria*. Further disclosure given in the 3Q2015 10-Q (pg. 21) states "the company intends to make loans to *third-party* farmers (both tenant and non-tenant)."

Below we present a chart of the loan program's originations (in boxes), the borrower (where known) and the ongoing balances.



*Source: Chart By Author, Using SEC Filings, Deed Records and FactSet*

Off the bat, this struck us as an accountant's version of the devil's playpen. How are investors to know whether FPI is making loans to struggling tenants so they can pay rent they otherwise would be unable to pay. And we noticed that FPI has missed revenue estimates only once in a quarter when it also originated a loan.

And then, we found that FPI has neglected to disclose that $9.2 Million (out of a total of $15.4 Million) in loans have been made to Ryan Niebur and Jesse Hough, who are both members of FPI's management team. We believe these loans lack economic substance and have been used to artificially increase revenues.

Publicly available documents show that FPI has engaged in a pattern of transactions where it makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and days later lends more money to the borrower/new tenant.

## The Ryan Niebur Loans (Loans #2 & #4)

On October 30th, 2015 (recorded in deed records and SEC filings as November 16th, 2015), FPI lent $980 Thousand (Loan #2) to a tenant farmer (pg. 51). The only other disclosure (pg. F-23) was that the loan was

collateralized by a first mortgage on farm real estate and that the first year of interest was due up front (allowing FPI to report immediate interest revenue).

What was not disclosed was that the loan was made to <u>Ryan Niebur</u> and that it was not used for farming operations but rather to pay off part of an existing mortgage.



*Source: Washington County, CO Deed Records*

Niebur's loan remained unchanged until the <u>1Q2017 10-Q (pg. 16)</u> when FPI disclosed that it "renegotiated" the loan while simultaneously entering into a new $2.194 Million loan (Loan #4) collateralized by two additional properties.

| ($ in thousands) | | Principal Outstanding as of | | Maturity |
| Loan | Payment Terms | March 31, 2017 | December 31, 2016 | Date |
|---|---|---|---|---|
| Mortgage Note | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note | Principal & interest due at maturity | 240 | 980 | 3/16/2022 |
| Mortgage Note | Principal & interest due at maturity | 2,194 | - | 3/16/2022 |
| Total outstanding principal | | 4,234 | 2,780 | |
| Points paid, net of direct issuance costs | | (3) | (4) | |
| Interest receivable (net prepaid interest) | | 16 | 67 | |
| Total notes and interest receivable | | $ 4,247 | $ 2,843 | |

(1) In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. The Company is currently in negotiations to extend the terms with the borrower.

(2) The original note was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

*Source: FPI 1Q2017 10-Q (pg. 16)*

**But this is not the real story. FPI did not disclose that on March 16th, 2017, it acquired the Andersons Farm from Niebur which was collateral for Loan #2, and in which the deed specifically states that Niebur was in default on the loan and obligated to pay a remaining balance of $240 Thousand (Loan #2's balance as of 1Q2017).**



*Source: Washington County, CO Deed Records & Appraisal*

Farmland Partners: Loans To Related-Party Tenants Introduce Signific...ares Uninvestible - Farmland Partners Inc (NYSE:FPI) | Seeking Alpha          7/18/18, 9:24 PM

## District

Then, in January 2018, <u>Neibur filed for bankruptcy</u>, a material fact that we could not find in FPI's SEC filings. Court records shows that the remaining $240,000 owed is collateralized by a property worth $192,000, resulting in a loan-to-value ratio of 125%. We hardly call this conservative.



*Source: Pacer - Case #1:2018bk10568 - Document #17 Schedule A/B*

We believe the transactions with Niebur show FPI's willingness to make loans outside of the programs stated parameters and stabilize rental income by making risky loans to struggling tenants. But, more importantly, we believe the loans show that FPI has misstated its SEC filings and used the loan program to artificially increase revenues.

## Loan #4 Was An Acquisition, Not A Loan

It turns out that the new $2.194 Million loan to Niebur was not actually a loan, but an acquisition of three properties, all on March 16th, 2017. As shown above, FPI acquired one of the properties collateralizing Niebur's original loan for $801,800. The other two are the same properties that purportedly collateralize the new loan. Deed records show FPI acquired these

properties for $1.392 Million.

Low and behold, the total acquisition price is $2.194 Million (= 0.802 + 1.392), the same amount as Loan #4. Further proof that there was no new loan, is the fact that Niebur did not list Loan #4 in his bankruptcy, only the remaining $240,000 of Loan #2.



*Source: Kit Carson County & Washington County, CO Deed Records*

So, in fact, FPI reported a loan on its financial statements when it actually was an acquisition. But that is not all. After Neibur defaulted and on the same day FPI acquired his properties, FPI lent him an additional $61,800 that we believe was used to immediately pay rent on a new FPI lease.

### *Niebur's Loan For Rent*

Looking at the cash flow statement below, 'Principal Receipts On Notes Receivable' of $801,000 is the partial repayment (rounded down) of Loan #2 that was funded by the $801,800 received for the acquisition of the property collateralizing Loan #2. But this repayment would leave a balance of $178,200 vs. the reported $240,000.

The $61,800 difference is the same as the difference (rounded) between the $2.255 Million Issuance of Note Receivable reported in the cash flow statement and the $2.194 Million Loan #4.

| CASH FLOWS FROM INVESTING ACTIVITIES | | |
|---|---|---|
| Real estate acquisitions, net of cash acquired | (79,220) | (93,187) |
| Real estate and other improvements | (3,947) | (698) |
| Principal receipts on notes receivable | 801 | — |
| Issuance of note receivable | (2,255) | — |
| Net cash used in investing activities | (84,621) | (93,535) |

*Source: FPI 1Q2017 10-Q*

So, after Niebur defaulted on Loan #2 and on the same day FPI acquired his properties, allowing him to partially repay, FPI lent Niebur an additional $61,800. And according to records in Niebur's bankruptcy, FPI entered into a lease on March 15th, 2017, that stated the first annual rent payment of $61,750 was due on March 16th, 2017, the day FPI lent him the money.



FPI Signs Lease With Ryan Niebur For $61,750 Due On The Day FPI Loans Him $61,800

FARM LEASE – NIEBUR KIT CARSON COUNTY FARM

THIS LEASE AGREEMENT (the "**Agreement**") is made and entered into as of the date of the last signature (the "**Effective Date**") by and between FPI Burlington Farms LLC, a Delaware limited liability company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 (the "**Landlord**"), and Ryan D. Niebur and Stacie K. Niebur whose address is [redacted] (the "**Tenant**").

The parties agree to the following:

1. **Description of the Property.** Landlord leases to Tenant, for the purpose of producing agricultural crops only, the real property described in Exhibit A together with all improvements thereon ("**Improvements**"), all appurtenances and all hereditaments (collectively the "**Farm**"). This Agreement is for 334.4 tillable acres. Landlord shall have the right to lease or sell a portion of the Farm for non-farming purposes. In case of such sale or lease of acreage, Landlord will reimburse Tenant for any lost crop revenues for the year in which such reduction occurs and will reduce rents on future years on a pro rata per acre basis.

2. **Term of Agreement.** The lease period begins on March 16, 2017 and ends on November 30, 2022, unless terminated earlier in accordance with Section 11 of Exhibit B or otherwise provided in this Agreement.

3. **Rental Payments.** The annual rent for the Farm shall be $41,750 for farming plus $20,000 for a building totaling $61,750 due and payable in full for each calendar year during the term of the Agreement. The first year's rent will be due on March 16, 2017 and rent shall be due on March 15th of each subsequent year of the Agreement. Although the last year of this lease ends on November 30 which is less than a full calendar year Tenant shall pay $61,750 for the period of March 15 to November 30, 2022. In the event the cash rent is not paid in full by the due date(s), Tenant agrees to pay interest on the amount of unpaid rent at an interest rate equal to the higher of ten percent (10%) per annum or two percent (2%) above the prime interest rate then published by the Wall Street Journal but not to exceed the highest rate permitted by law. The first year's rent in the amount of $61,750 shall be paid on March 16, 2017 from proceeds of Tenant's real estate sale on March 16, 2017.

*Source: Pacer - Case #1:2018bk10568 - Document #90-2*

We know this was a mountain of numbers, so below is a picture showing the three transactions.



*Source: Chart By Author, Using SEC Filings & Deed Records*

There are two important takeaways:

1. **The partial payoff of Loan #2 was funded by FPI's acquisition of a property collateralizing the loan. We believe this means the loan lacked economic substance and is akin to a bank paying full price to acquire a home securing a defaulted mortgage and then calling the loan money good when the borrower uses the sale proceeds to pay off the loan.**
2. **Second, because Niebur was already in default when FPI lent him the additional $61,800 on the same day he owed $61,750 in rent, we think this transaction artificially increased revenues by allowing a defaulted tenant/borrower to pay his rent.**

Given the evidence that FPI has used the loan program to prop up a struggling tenant and, we believe, issue a loan to artificially increase revenues, shareholders should be concerned with the similar pattern of transactions with Jesse Hough.

## Who Is Jesse Hough?

Paul Pittman and Jesse Hough have been business partners since at least January 2012 when, according to SEC filings (pg. F-50), Pittman-Hough Farms, LLC was formed as a merger of their personal farmland holdings. They were also partners in a web of businesses that FPI hired for service before and after the IPO.

Two of the entities are Astoria Farms and Hough Farms, which were FPI's first tenants (pg. 17), are currently controlled by Jesse Hough (pg. 20) and, as of December 2017, still lease 4% of FPI's acres (pg. F-19). Another entity was

PHS Holdings, which <u>leased land and equipment to FPI (pg. F-63)</u>, but has not been mentioned in FPI's SEC filings in years.

After the IPO, Jesse Hough became an <u>FPI consultant</u>, but according to an <u>August 2016 investor presentation</u>, he is considered part of the management team (we found no newer investor presentations that removed his name).

## The Jesse Hough Loans (Loan #6)

On July 25th, 2017, FPI made a $100,000 loan to Jesse Hough through PHS Holdings. Like the original loan to Ryan Niebur (Loan #2), we think this loan was likely paid off with the proceeds from FPI acquiring the property. Deed records show FPI acquired the <u>property</u> on January 12th, 2018, two weeks before the <u>January 31st, 2018 maturity date (pg. 17)</u>.



*Source: Butler County, NE Deed Records*

While we cannot be sure that the acquisition paid off the loan, **an inconsistency in FPI's SEC disclosure bolsters our opinion that details are**

being misreported. The 1Q2018 10-Q (pg. 16) states the loan was fully settled "on the maturity date of January 1, 2018," (before the acquisition closed) but the disclosure listed right above states the original maturity date of January 31st, 2018.

As of March 31, 2018 and December 31, 2017, the Company had the following notes receivable:

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
|---|---|---|---|---|
| | | March 31, 2018 | December 31, 2017 | |
| Mortgage Note | Principal & interest due at maturity | $  1,800 | $  1,800 | 1/15/2017 |
| Mortgage Note | Principal & interest due at maturity | 240 | 240 | 3/16/2022 |
| Mortgage Note | Principal due at maturity & interest due monthly | 2,194 | 2,194 | 3/16/2022 |
| Mortgage Note | Principal & interest due at maturity | 1,647 | 1,647 | 4/27/2018 |
| Mortgage Note | Principal & interest due at maturity | - | 100 | 1/31/2018 |
| Mortgage Note | Principal due at maturity & interest paid in advance | - | 669 | 2/15/2018 |
| Mortgage Note | Principal due at maturity & interest paid in advance | - | 2,700 | 1/29/2018 |
| Mortgage Note | Principal & interest due at maturity | 5,250 | - | 8/19/2020 |
| Total outstanding principal | | 11,131 | 9,350 | |
| Points paid, net of direct issuance costs | | (1) | (6) | |
| Interest receivable (net prepaid interest) | | 609 | 461 | |
| Provision for interest receivable | | (91) | (45) | |
| Total notes and interest receivable | | $  11,648 | $  9,760 | |

(1)  In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity.  On July 28, 2017, the Company notified the borrower of default under the Promissory Note.  The Company currently believes that collectability is reasonably assured as the fair value of the mortgaged farm is greater than the amount owed under the loan.
(2)  The original note was renegotiated and a second note was entered into simultaneously with the borrower during the three months ended March 31, 2017.  The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.
(3)  The note was fully settled and outstanding amounts paid on the maturity date of January 1, 2018.
(4)  The note was fully settled and outstanding amounts paid on the maturity date of February 2, 2018.
(5)  The note was fully settled and outstanding amounts paid on the closing of an acquisition in North Carolina, which was completed on January 12, 2018.
(6)  On April 17, 2018, the Company amended the loan to extend the term of the loan through March 1, 2020 and increased the interest rate to 7.5% per annum.

*Source: 1Q2018 FPI 10-Q*

## If the acquisition paid off the loan, we think this would qualify as a loan that lacks economic substance.

But there is another important similarity to the Niebur transactions. Deed records show that PHS Holdings entered into a lease agreement with FPI as

part of the acquisition agreement.

June 14th, 2018 Subordination Agreement (Butler County, NE) Shows FPI Enters Lease With PHS Holdings

SUBORDINATION AGREEMENT

WITNESSETH

PHS HOLDINGS LLC

*Source: Butler County, NE Deed Records*

And just six days after the property was acquired (and presumably the lease went into effect), FPI lent $5.25 Million to Hough under circumstances that, in our opinion, are highly irregular.

## The Jesse Hough Loans (Loan #9)

On January 18th, 2018 (pg. 16), FPI made a $5.25 Million loan to Siffring Farms. Nebraska corporate records show that Siffring Farms is an inactive LLC whose president is Duane R. Siffring. However, the deed of trust for the loan was signed by Jesse Hough as President of Siffring Farms.



*Source: Butler County, NE Deed Records (Search: Siffring Farms)*

And Butler County appraisal records (search: Siffring Farms) show that Siffring Farms has owned the properties for years.

**We ask, why is Jesse Hough signing on a loan for an inactive entity, that corporate records show he has no affiliation with, and that is collateralized by land that deed records show he does not own?**

Based on the circumstances in which this loan was made and the fact that it was made just days after FPI entered into a lease with Jesse Hough (through PHS Holdings), we think there is a significant probability that part of the $5.25 Million was used to pay PHS Holdings' annual rent payment.

We also think there is a significant probability that part of the proceeds was used to roll over another loan made to Jesse Hough.

### The Jesse Hough Loans (Loan #7)

Go back to August 25th, 2017, and FPI made a $669,000 loan to Jesse Hough

through Hough Farms.



*Source: Butler County, NE Deed Records*

According to the 10-Q disclosure above, this loan was paid-off on February 2nd, 2018 (we note that again the original maturity date of February 15th does not match this disclosure). In any event, the loan was paid off just weeks after FPI gave Hough the $5.25M loan through Siffring Farms, which introduces the possibility that this loan was simply rolled into a new loan.

We also note that we could not find any filed reconveyances in the deed records, which is the normal public filing a bank uses when a borrower pays off a loan.

## Are The Borrowers/Tenants Paying Above-Market Rents?

When Ryan Niebur sold his properties to FPI, he entered into two lease agreements. The first agreement, previously discussed, had an annual rent payment of $61,750 for 334.4 tillable acres or $185 per acre. This is 29%

above the $143 average cash rent per acre for irrigated farmland cited in this
2017 Colorado Farm Land Values & Rents Survey (in line with what the
USDA reported in its annual survey.)

We note that the lease includes $20,000 for a building, which if you exclude
would bring the lease rate to $125 per acre, or less than the average. However,
we think this is the incorrect way to look at the lease. First, farms often come
with buildings and equipment, that is why survey's report average rent.

Second, FPI's second lease also appears to be above market. The lease has an
annual rent payment of $26,160 for 628.3 acres or $42 per acre.

FPI Signs Lease With Ryan Niebur For $26,160 Due On The Day FPI "Renegotiates" Loan #2

**FARM LEASE - NIEBUR WASHINGTON COUNTY FARM**

THIS LEASE AGREEMENT (the "**Agreement**") is made and entered into as of the date of the last
signature (the "**Effective Date**"), by and between FPI Burlington Farms LLC, a Delaware limited liability
company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 (the "**Landlord**"),
and Ryan B. Niebur and Stacie K. Niebur whose address ██████████████████████ (the
"**Tenant**").

The parties agree to the following:

1. **Description of the Property.** Landlord leases to Tenant, for the purpose of producing agricultural
   crops only, the real property described in Exhibit A together with all improvements thereon
   ("Improvements"), all appurtenances and all hereditaments (collectively, the "**Farm**"). This
   Agreement is for 628.3 tillable acres. Landlord shall have the right to lease or sell a portion of the
   Farm for non-farming purposes. In case of such sale or lease of acreage, Landlord will reimburse
   Tenant for any lost crop revenues for the year in which such reduction occurs and will reduce rents
   in future years on a pro rata per acre basis.

2. **Term of Agreement.** The lease period begins on March 16, 2017 and ends on November 30, 2021,
   unless terminated earlier in accordance with Section 11 of Exhibit B or otherwise provided in this
   Agreement.

3. **Rental Payments.** The annual rent for the Farm shall be $26,160 due and payable in full for each
   calendar year during the term of the Agreement. The first year's rent will be due on March 16, 2017
   and rent shall be due on March 15th of each subsequent year of the Agreement. Although the last
   year of this lease ends on November 30 which is less than a full calendar year, Tenant shall pay
   $26,160 for the period of March 15 to November 30, 2021. In the event the cash rent is not paid in
   full by the due date(s), Tenant agrees to pay interest on the amount of unpaid rent at an interest rate
   equal to the higher of ten percent (10%) per annum or two percent (2%) above the prime interest
   rate then published by the Wall Street Journal but not to exceed the highest rate permitted by law.
   The first year's rent in the amount of $26,160 shall be paid on March 16, 2017 from proceeds of
   Tenant's real estate sale on March 16, 2017.

*Source: Pacer - Case #1:2018bk10568 - Document #90-1*

As evidenced in the <u>Washington County Deed Records</u> (Search: FPI Burlington Farms), this land is coded "DF" or "dry-farmland." The abovementioned survey and USDA data both say average cash rents for non-irrigated farmland in Colorado are $30 per acre. This suggests FPI's lease is 40% above average market.

We also believe that, on the <u>1Q2015 conference</u> call, Paul Pittman admitted to charging above-market rents to related-party tenants (most likely Astoria Farm and Hough Farms):

> *the only real renewals we had last fall were with a related party. So, what we gave was basically a 1% rent increase in an environment, in which rents are flat to slightly down on the group of properties.*

And looking at what Astoria Farms and Hough Farms paid per acre (disclosed in 10-K's), there is evidence that they were paying above-market rents. Originally, Astoria and Hough Farms leased Pittman and Hough's legacy properties in Nebraska and Illinois. The table below shows a significant jump in rent per acre in 2016. We believe this jump was not all increases, but largely dropping the leases in Nebraska (which we think get picked up by other Hough entities) and maintaining the leases in Illinois, a state with significantly higher lease rates. Additionally, the 7,026 acres in Illinois are very close to the legacy Illinois acreage.

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Total FPI Acres | 46,460 | 74,267 | 115,489 | 159,983 |
| % Lease To Astoria/Hough | 62.30% | 20.10% | 6.08% | 4.00% |
| Acres Leased To Astoria/Hough | 28,945 | 14,928 | 7,026 | 6,399 |
| Rent Paid | $2,474,839 | $2,720,758 | $2,464,905 | $2,000,000 |
| Implied Rent per Acre | $86 | $182 | $351 | $313 |

*Source: Chart By Author, Using SEC Filings*

If our assumption is correct, the $351 per acre is 8% higher than cash rents on the top-third of "excellent" farmland reported in the 2017 Illinois Farmland Values and Lease Trends Report (pg. 46). We note that the difference may be that FPI is getting cash plus crop share, but we found no evidence that is the case.

**What is interesting though is that the implied cost per acre paid by Hough Farms and Astoria Farms actually decreased 11% in 2017. This flies in the face of Pittman's comments that lease rates in Illinois are down in the "5-ish range."**

And while this fact may appear to refute our thesis, remember FPI is now leasing properties in Nebraska to Jesse Hough through PHS Holdings, a fact that we could not find in FPI's SEC filings. And we also believe there is another entity Jesse Hough may be using.

On January 9th, 2018, eight days before he received the $5.25 Million Siffring Farm loan, Hough incorporated H-KO Land & Cattle Company in Nebraska. And the address listed on the corporate records is the same address the Butler County appraisal records have for the Siffring Farm properties.



*Source: Nebraska Secretary of State & Butler County, NE Deed Records (Search: Siffring Farms)*

We also note that Paul Pittman recently called out Nebraska and Colorado

(the two states where Niebur and Hough loans were made) as "very difficult locations."

But the loans to Niebur and Hough are not the only ones that concern us.

## Potential Loan To Large Shareholder

In the 4Q2017 (pg. F-21), FPI made a $2.7 Million loan, which in the 1Q2018 (pg. 16) FPI disclosed was "settled on the closing of a property in North Carolina on January 12, 2018."

We found the acquisition in Pasquotank County, NC (search Grantee: FPI Carolinas) with Justice Farms of North Carolina. This leads us to believe the loan was made with James C. Justice III, son of a billionaire governor and, according to SEC filings, owner of 7.3% of FPI as of February 3rd, 2017.

But the most important detail of Loan #8 is the fact that it was settled through the acquisition of a property, which again introduces the risk that the loan lacked economic substance. And again, we see a pattern similar to the Niebur and Hough transactions.

Deed records show that on December 20th, 2017 (the same day FPI and PHS Holdings entered into a similar agreement), FPI and Justice Farms entered into a "Real Estate Purchase and Farmland Lease Agreement."

**Subordination Agreement Shows FPI Enters Lease With Justice Farms**



*Source: Pasquotank County, NC Deed Records*

**This means that after FPI made the loan, it acquired a property which settled the loan and at the same time entered into a new lease. While this transaction is missing the post-acquisition loan, it is very similar to the pattern exhibited in the Niebur and Hough transactions.**

Furthermore, we estimate Loan #8, which was outstanding only for a few months, allowed FPI to record $250 Thousand in fees and interest during the 1Q2018 (pg. 37), just over the $200,000 that FPI beat revenue estimates by and represented over 6% of 1Q2018 operating income.

## Do The Property Acquisitions Count as Economic Substance?

The only legitimate argument we can think to describe away the issues of economic substance with these loans is that, in the end, FPI receives a property in lieu of cash? But we do not think this argument would hold up.

First, the intent of any loan is to be repaid in principal and interest. So, if the loans are to be settled through property acquisitions, they need to be disclosed as such. Furthermore, we think a reasonable investor would want to know if FPI was acquiring properties it also lent against, as it may signal an underperforming property or tenant.

But more importantly, these transactions leave an incredible amount of room for games to be played in non-arm's length transactions. For instance:

1. FPI could overpay for the property to fund the principal and interest payments that are due when the loan is repaid
2. FPI could overpay and the parties could split the excess proceeds without anyone knowing about it
3. FPI could overpay to fund lease payments to the seller/tenant
4. FPI could be taking dog properties off the borrowers' hand in return for helping FPI improve its financial picture

## Adding It All Up

We believe FPI lent Ryan Niebur money to pay rent after he had already defaulted on an FPI loan. Whether or not Jesse Hough used the money (directly or indirectly) to pay rent is for each investor to decide, but we think, taken together, all the evidence suggests a high probability that he did. If we are right, the question is how much did FPI benefit from the loan program in 2017?

One way to estimate that figure is to adjust full-year 2017 same-property revenues to be in line with the drop seen earlier in the year. Below is a table showing the potential revenue benefit based on same-property revenue dropping 15-35%, an average of the -43% reported in the 1Q and the -8% reported for the full year.

Using this method, we estimate up to 6% of 2017 revenues could be the result of the loans. And assuming the revenue is all incremental, it would represent 75% to 310% of reported 2017 net income and 74% to 303% of 2017 cash flow from operations.

| | Reported | | Scenario #1 | Scenario #2 | Scenario #3 | Scenario #4 | Scenario #5 |
|---|---|---|---|---|---|---|---|
| | | 2017 | 2017E | 2017E | 2017E | 2017E | 2017E |
| Reported Same-Property Revenue | 10.60 | 9.70 | 9.01 | 8.48 | 7.95 | 7.42 | 6.89 |
| Same-Property Revenue Decline | | -8.5% | -15% | -20% | -25% | -30% | -35% |
| Revenue from Loans vs. Reported | | | 0.69 | 1.22 | 1.75 | 2.28 | 2.81 |
| % of 2017 Total Revenue | | | 1.5% | 2.6% | 3.8% | 4.9% | 6.1% |
| % of 2018 Net Income | | | 76.1% | 134.5% | 192.9% | 251.4% | 309.8% |
| % of 2018 Cash Flow From Operations | | | 74.3% | 131.3% | 188.4% | 245.4% | 302.5% |

*Source: Chart By Author, Using SEC Filings*

**And this is just 2017. In the 1Q2018, FPI reported it largest ever same-property gain, which coincides with originating its largest ever loan (the $5.25 Million loan to Siffring Farms).**

Our opinion that FPI appears to be playing accounting games is further bolstered by what we consider to be another major red flag.

### *"Pittman Hough" Get A Loan Against FPI Shares*

According to a February 13th, 2017, Colorado UCC filing, Hough Holdings put up its equity interest in Farmland Partners for a bank loan. But notice, at the bottom of the document is a line that states **"Optional filer reference: (Bank of the West)/Pittman Hough."** Being that Pittman-Hough Farms disclosed in a 2016 Form 4 that it distributed its shares to its members, we think the UCC filings is referring to Pittman and Hough personally. We note that the UCC filing also uses FPI's corporate address.

1. DEBTOR'S NAME.

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **HOUGH HOLDINGS LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| **4600 S SYRACUSE STREET, SUITE 1450** | **DENVER** | **CO  80237** | **USA** |

2. DEBTOR'S NAME.

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **HOUGH HOLDINGS, LLC** | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| **4600 S SYRACUSE STREET, SUITE 1450** | **DENVER** | **CO  80237** | **USA** |

3. SECURED PARTY'S NAME

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BANK OF THE WEST** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| **13220 CALIFORNIA STREET** | **OMAHA** | **NE  68154** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL OF DEBTOR'S ESTATE, RIGHT, TITLE, AND INTEREST IN THE FOLLOWING:**

**(A) ALL SHARES OR OTHER EQUITY INTERESTS IN FARMLAND PARTNERS, INC. OWNED BY DEBTOR AND HELD IN THAT CERTAIN ACCOUNT WHICH IS SUBJECT TO THE SECURITIES ACCOUNT CONTROL AGREEMENT BY AND AMONG PERSHING LLC, DEBTOR, AND SECURED PARTY; AND**
**(B) ALL PROCEEDS THEREFROM.**

**BOTW/PITTMAN HOU...** UCC Financing Statement - 20170014011  Colorado Secretary of State - Page 3 of 3

*Source: Colorado UCC Filings*

The timing of this loan is interesting because just days later, on February 18th, 2017, FPI entered into a termination agreement with Prudential as part of its acquisition of AFCO. And on the 1Q2017 conference call, Pittman stated:

*We frankly expected substantial stock price appreciation based on the AFCO acquisition and the termination of Prudential and all of that, and*

*frankly none of which we got.*

Instead of going up, FPI's stock price declined 30% over the following months. And shortly after the stock reached a new low, FPI made its first loan to Hough.

Our opinion that Pittman pledged his shares is further bolstered by the fact that on July 19th, 2017, he converted 531,827 operating partnership shares (OP units) to common shares. July 19th (a Sunday) came after FPI's stock closed at the new all-time low that Friday. Seeing that Pittman has not sold any shares, we question why he would be willing to convert OP Units, whose primary purpose is to delay having to pay capital gains taxes. We think the bank may have required the conversion of OP units because it wanted liquid collateral.

And, based on his comments in quarterly conference calls, Paul Pittman seems to have become highly focused on FPI's stock price. On the 1Q2018 conference call, Pittman stated:

*What I don't control is the stock price. I wish I did, but I don't"*

And the stock price is one of the reasons that FPI is not lowering its dividend despite the fact that it is not covered by cash flow:

*The next point I want to make, and we've studied this, if you go look at purely what happens when somebody reduces a dividend, it does not lead to a stock price increase, it leads to a stock price decrease... we searched the topic. Dividend decreases do not lead to higher stock prices, they lead to lower stock prices.*

But we do not think FPI's dividend being cut is the largest risk.

## Insolvency Risk

While shareholders have expressed concern about <u>FPI's ability to maintain its dividend</u>, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but faces a significant risk of insolvency.

And we do not appear to be the only concerned party.

### *Insider Departures & Auditor Dismissal*

Since the first loan to Jesse Hough in July 2017, four board members and FPI's president have announced resignations. Below we detail each of the departures.

| Date | Name | Position | Reason |
|------|------|----------|--------|
| 8/28/17 | John Conrad | Director; Forsythe Farms nominee | Personal reasons |
| 12/5/17 | Dixon Boardman | Director, former Chairman of AFCO | Pursue other business interests |
| 1/18/18 | Darell Sarff | Director, father of FPI VP | Pursue other business interests |
| 3/19/18 | Thomas Gimbel | Director, former CEO of AFCO | Pursue other business interests |
| 4/10/18 | Robert Cowan | President, former President AFCO | Pursue other business interests |

Three of the directors and the president came from FPI's two largest acquisitions (Forsythe Farms and American Farmland Company). These are individuals with significant experience in farmland investing, who sold their holdings to FPI, gained board membership, and have now resigned.

In the case of Forsythe, the <u>2018 proxy states (pg. 14)</u> the Forsythe Sellers

own 23.59% of the diluted shares and have to right to a nominate a board seat as long as they own 10%. In August, their representative resigned and Forsythe has yet to nominate another, which may indicate the intention to liquidate their stake below 10%.

In the case of AFCO, its former Chairman and hedge fund manager, Dixon Boardman, had already sold the majority of his position by the time he resigned in December 2017.

Then on March 10th, 2018, FPI dismissed PWC as its independent auditor. The same day, the company engaged EKS&H, who investors may recognize from MusclePharm and Heska. Muscle Pharm's founder resigned in 2016 after the SEC charged the company with accounting and disclosure violations. Heska was written up on SA for alleged related-party transactions.

Taken together, we think the resignations overlaid with the facts detailed in this report paint an ominous timeline.

| Date | Event Description |
|------|-------------------|
| 2/12/17 | "Pittman/Hough" pledges stock for loan |
| 2/18/17 | FPI terminates Prudential contract |
| | |
| | |
| 5/8/17 | Pittman states he thought stock would go up |
| 7/7/17 | FPI stock closes at new all time low |
| 7/9/17 | Pittman converts 531,827 OP Units |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

= Related-party transactions
= Executive, board or auditor events

*Source: Chart By Author, Using SEC Filings & Deed Records*

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares are significantly overvalued.

## Evidence That FPI Has Overpaid For Properties

Paul Pittman spends time on each conference call trying to convince shareholders that FPI is worth $11.50 to $12.50 per share based on his calculation of net asset value (NAV). On the most recent call, his calculation

was based on what FPI paid for the assets and adjusted for modest increases and decreases in value across different regions of the portfolio.

The problem with Pittman's calculation is that he ignores the old adage that "you make your money when you buy" and so what matters most is not what prices do after you buy but what price you paid.

And we think shareholders should be concerned with Pittman's preferred method of property valuation. From the 1Q2016 conference call:

> *I don't put a lot of stock in annual appraisals... not because appraisers are bad, but you have to understand, they are forced to perform a certain process and their charge is to do a process based on that set of rules and regulations. It is not really answering the question what farms are worth, it's actually answering a question of what farms are worth under this very mechanical valuation approach, which has a whole set of errors embedded in it.*

He then states:

> *Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgement of value."*

**We think these comments are absurd. First, we have many reasons to question the claim that all acquisitions were arm's length. Second, Pittman apparently thinks the appraisal process is a poor judgement of value, despite its widely accepted use across the real estate industry and <u>its use by a direct competitor</u>. Third, he thinks what he pays, even if he overpays, is the safest judgement of value.**

This is akin to saying that if someone paid $1 Million for a house in a

neighborhood filled with $500,000 houses, that all of the properties would see a commensurate $500,000 increase in value just because one person was willing to overpay. And in fact, we have evidence that suggests FPI has overpaid for properties.

## Telfair County, GA

FPI acquired two Telfair County, GA farms in 2015 and one in 2017. Based on what FPI paid for the properties versus what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the 2016 / 2017 USDA Farm Land Surveys), FPI appears to have acquired these properties for 68% above market value (assuming the previous sale was market value).

| Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|------|---------------|------|-------|-------|-----------|--------------------------|-------------------------------|----------------------|
| Selph Farm | Telfair, Georgia | 5/4/12 | Ernest Selph | 116 | $1,724 | | | |
| | | 12/17/15 | FPI Properties | | $4,537 | 163% | 0.3% | 162.3% |
| Mobley Farm | Telfair, Georgia | Throughout 2012 | Brad Mobley | 3,069 | $2,154 | | | |
| | | 10/9/15 | FPI Properties | | $3,460 | 61% | 0.3% | 60.2% |
| Dorminey Farm | Telfair, Georgia | Throughout 2012 | Carlton Dorminey | 47 | $2,150 | | | |
| | | 4/25/17 | FPI Properties | | $3,809 | 77% | 8.9% | 62.6% |
| | | | Adjusted Overpayment % | | | | 68% | |

*Source: SEC Filings & Telfair County, GA Deed Records (Search: FPI Properties)*

While we cannot be sure what improvements, if any, were made to these properties during the sellers' ownership, we note the following:

- Google Street View shows that as far back as 2008 Selph Farm was irrigated farm land.
- The deed record map shows that between 2010 and 2013, part of the Mobley Farm was converted from timberland to farmland, which may explain part of the property value increase.
- The deed record map shows Dorminey Farm had already been cleared of timber before the seller acquired it.

## Yell County, AR

FPI acquired two Yell County, AR farms in 2014. Based on what FPI paid for the properties versus what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the 2017 USDA Farm Land Survey), FPI appears to have acquired these properties for 17% above market value (assuming the previous sale was market value).

| | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Ruder Farm | Yell, Arkansas | Throughout 2013 | Ruder Properties | 819 | $2,329 | | | |
| | | 9/24/14 | FPI Coloardo | | $3,301 | 42% | 5.5% | 34.3% |
| Ballymore Farm | Yell, Arkansas | 4/3/13 | Ballymore Properties | 1,281 | $3,120 | | | |
| | | 10/24/14 | FPI Arkansas | | $3,588 | 15% | 5.5% | 9.0% |
| | | | Total Adjusted Overpayment % | | | | | |

*Source: SEC Filings & Yell County, AR Deed Records (Search: FPI Colorado, FPI Arkansas)*

We are unsure if any improvements were made to Ruder Farm or Ballymore Farm during the sellers' ownership.

## McDonough County, IL

On July 15th, 2015, FPI acquired the Tomasek Farm from Paul Pittman (disclosed on pg. 49). According to SEC filings and deed records (search: PH Holdings), FPI acquired Pittman's property for 2.5% above what he paid for it in 2014. However, in December 2015, FPI acquired the Howe Farm, also in McDonough County, for a 15% discount to Pittman's Tomasek Farm.

| | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Comp | Avg. Land Appreciation (USDA) | Avg. Land Appreciation (USDA) |
|---|---|---|---|---|---|---|---|---|
| Tomasek Farm | McDonough, Illinois | 2/20/14 | Paul Pittman | 58 | $11,700 | | | |
| | | 12/17/15 | PH Holdings | | $11,991 | 2% | 0.02% | 2.5% |
| Howe Farm | McDonough, Illinois | 12/1/15 | PH Holdings | 78 | $10,449 | 15% | 0.02% | |

*Source: SEC Filings & McDonough County, IL Deed Records (Search: PH*

*Holdings)*

## American Farmland Company

Perhaps the biggest overpayment (in dollar terms) was FPI's acquisition of American Farmland Company (AFCO). The merger proxy (pg. 57) provides a background of the sale process.

The chart below shows that, of the seven preliminary bids, FPI's offer was 12% above the average. The only bid that was higher (Company E) dropped out during diligence because of pricing. A comparable bid (Company F) also dropped out during due diligence.

The only other party to put in a second bid (Company G) lowered its price after getting *independent appraisals*. In the end, FPI paid 15% above the only other bidder.

| AFCO Proposals | Preliminary Bids | Secondary Bids | Deal Notes |
|---|---|---|---|
| Company A | $6.61 | - | AFCO declined due to price |
| Company C & D | $6.75 | - | AFCO declined due to price |
| Company E | $8.82 | - | Dropped out because of "pricing a corporate level transaction" |
| Company F | $8.20 | - | Dropped out during due diligence |
| Company G | $7.72 | $7.13 | Lowered offer to $7.13 after getting independent appraisals |
| Company H | $8.00 | - | AFCO declined because would not alleviate challenges |
| Company J | $6.00 | - | AFCO declined |
| Average | $7.44 | $7.13 | |
| Farmland Partners | $8.35 | $8.23 | |
| Premium To Avg. | 12% | 15% | |

*Source: AFCO/FPI Merger Proxy*

To be clear, we do not believe that FPI overpaid for every property it purchased. However, we think it is highly likely that, in aggregate, FPI has paid an average of 5-15% above market price for its farms. Additionally, we think FPI has seen another 5% decrease across its portfolio, a reasonable

assumption given Illinois land values (25% of FPI acres) have fallen approximately 15% (pg. 9) since 2014 and Nebraska farmland is down 24% over the same time.

### *Valuing FPI*

Finally, Pittman's valuation calculation assumes a buyer would purchase the entire company at net asset value. Given that only one other player was willing to acquire AFCO (which was less than half FPI's size), and that potential acquirer's offer was a 29% discount to AFCO's reported NAV (pg. 27), we think this assumption is highly unlikely.

More likely is a liquidation scenario, which would include transaction costs, operating expenses and capital expenditures during the liquidation. Evidence that these costs are very real and very material is the fact that the AFCO merger proxy (pg. 67) stated its investment bankers calculated the value of the company under a liquidation scenario. Their value was between $7.12 and $7.33 or 20% less than the $8.98 book value per share reported in the final 10-Q.

**Notably, the only other offer for AFCO was at the low end of this range.**

We think the best way to value FPI is to take book value per share, which represents what FPI actually paid for the properties (land has no depreciation) and make the following adjustments based on a liquidation scenario:

1. Add appreciation for the legacy properties (on the 1Q2017 call, Pittman stated the difference between book value and his NAV estimate is largely "30-ish" million dollars for the legacy properties, many of which Pittman acquired in the mid-2000s).

2. Subtract overpayment on the remainder of the portfolio (under four escalating scenarios)
3. Subtract 5% reduction in property values
4. Subtract transaction costs of 5% on the disposition of the portfolio
5. Subtract $30 Million in operating expenses and capital expenditures incurred during liquidation period (approximate 2 years)
6. Discount NAV back 1 year at 7.75% (assumes steady sales over 2 years)

Below is our valuation calculation under four scenarios: a 15%, 10%, 5% and 0% overpayment for the post-IPO acquisitions. Using an average of the four scenarios, and assuming normal circumstances, we think FPI would be worth $4.85 per share (*note, diluted share count is based on 1Q2018 Supplemental Package pg. 1 2*).

**And even if we assume FPI did not overpay for properties, FPI would still only be worth $6.39.**

| NAV Calculation | Scenario #1 (15% Overpay) | Scenario #2 (10% Overpay) | Scenario #2 (5% Overpay) | Scenario #3 (No Overpay) |
|---|---|---|---|---|
| Land Value at Cost | 975,107 | 975,107 | 975,107 | 975,107 |
| - Legacy Propert Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| Post IPO Acquisitions at Cost | 936,692 | 936,692 | 936,692 | 936,692 |
| - Overpayment | -140,504 | -93,669 | -46,835 | 0 |
| Market Value of Post IPO Acquisitions (when purchased) | 796,188 | 843,022 | 889,857 | 936,692 |
| - 5% Reduction in Value | 39,809 | 42,151 | 44,493 | 46,835 |
| Today's Market Value of Post IPO Acquisitions | 756,378 | 800,871 | 845,364 | 889,857 |
| + Legacy Properties at Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| + Legacy Property Appreciation | 30,000 | 30,000 | 30,000 | 30,000 |
| Market Value of FPI Land Portfolio | 824,794 | 869,287 | 913,780 | 958,272 |
| - 5% Transaction Costs | -41,240 | -43,464 | -45,689 | -47,914 |
| - Operating Expenses Over 2 Years | -30,000 | -30,000 | -30,000 | -30,000 |
| Net Value of FPI Land Portfolio After Dispotion | 753,554 | 795,822 | 838,091 | 880,359 |
| Book Value As of 1Q2018 | 357,350 | 357,350 | 357,350 | 357,350 |
| - Net Value After Dispotion vs. Land Value at Cost | -221,553 | -179,285 | -137,016 | -94,748 |
| Post Disposition NAV | 135,797 | 178,065 | 220,334 | 262,602 |
| Post Disposition NAV (Discounted 1.5 yrs @ 7.5%) | 126,323 | 165,642 | 204,961 | 244,281 |
| Post Disposition NAV / Share | $3.31 | $4.34 | $5.37 | $6.39 |
| Diluted Share Count | 38,200 | 38,200 | 38,200 | 38,200 |

*Source: Chart By Author, Using Author Estimates*

## Conclusion

We valued FPI under normal circumstances, but we think FPI's financials are anything but normal. As the old saying goes, there is never just one cockroach. We have no faith that FPI's financials are showing investors the true picture. Accordingly, we think FPI's shares are uninvestible.

### *Questions For Management*

### *General Questions*

- Has FPI disclosed to shareholders that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough? If so, where?

- Has FPI used the loan program to artificially increase revenues by lending money to Ryan Niebur, Jesse Hough or other tenants who roundtrip the cash back to FPI as rent and interest?
- Has FPI misstated its financials in relation to any loans the company has made under the FPI Loan Program.
- Has FPI signed leases with above-market rents with Jesse Hough, Ryan Niebur or any of the previously reported related-party tenants?

### *Ryan Neibur Loans*

- Did FPI disclose to shareholders that Ryan Niebur was the borrower on the $980,000 loan originated by FPI on October 30th, 2015? If so, where?
- Did FPI disclose to shareholders that Ryan Niebur used the $980,000 to pay off an existing mortgage instead of for farming operations? If so, where?
- Did FPI disclose to shareholders that Ryan Niebur defaulted on the $980,000 loan? If so, where?
- On March 16th, 2017, did Ryan Niebur sell the Andersons Farm to FPI for $801,800 and then use those proceeds to pay off $801,800 of the $980,000 loan?
- In the first quarter 2017 10-Q, and in subsequent SEC filings, did FPI misstate its financials by reporting the March 16th, 2017 acquisition of three properties from Ryan Niebur as a new $2.194 Million loan?
- Did FPI disclose to shareholders that Ryan Niebur is in bankruptcy? If so, where?
- On March 16th, 2017, did FPI loan Ryan Niebur an additional $61,800 and add it to the remaining balance of the original $980,000 loan thus making the new balance $240,000?
- On March 16th, 2017, did Ryan Niebur make an annual lease payment for $61,750?

- Were the leases signed by Ryan Niebur on March 15th, 2017, at above-market rents?

## *Jesse Hough Loans*

- Did FPI disclose to shareholders that it lent Jesse Hough $100,000 through PHS Holdings on July 25th, 2017? If so, where?
- Did FPI disclose to shareholders that it acquired the Linwood Farm from PHS Holdings and that the farm was collateral for the $100,000 loan between FPI and PHS Holdings? If so, where?
- Did Jesse Hough/PHS Holdings use the proceeds from the sale of the Linwood Farm to pay off the $100,000 loan between FPI and PHS Holdings?
- Is, or was Jesse Hough ever the president of Siffring Farms?
- Has Jesse Hough ever had an interest in or management/director role in Siffring Farms?
- Does Jesse Hough have an ownership interest in the properties that secure the $5.25 Million loan to Siffring Farms originated by FPI on January 18th, 2018?
- If Jesse Hough is not the President of Siffring Farms and does not hold an ownership interest in the land securing the loan to Siffring Farms, why did he sign as the president of Siffring Farms on the January 18th, 2018 deed of trust?
- Is Siffring Farms an inactive LLC?
- Did Jesse Hough use proceeds of the Siffring Farm loan to make lease payments on the Linwood Farm or any other lease between Jesse Hough, entities he controls and FPI?
- Did FPI disclose to shareholders that it lent Jesse Hough $669,000 through Hough Farms on August 25th, 2017? If so, where?
- Did Jesse Hough use proceeds from the Siffring Farm loan to pay off the $669,000 loan to Hough Farms that FPI originated on August 25th,

2017?

- Does H-KO Land & Cattle Company lease property from FPI?
- Are any of the leases with Jesse Hough (or any of the entities he controls) at above market rents?

### Justice Farms Loan

- In the first quarter 2018 10-Q, FPI disclosed that a loan was settled by the January 12th, 2018 acquisition of a property in NC. Was this loan between Justice Farms of North Carolina or a party affiliated with the Justice family? If so, was this disclosed to shareholders? If so, where?
- Was the subsequent lease signed with Justice Farms of North Carolina at above-market rents?

### Hough Holdings FPI Share Pledge

- Did Jesse Hough, through Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?
- Did Paul Pittman, through Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?
- Why did Paul Pittman convert 531,827 shares of FPI operating partnership units to common shares on July 19th, 2017? Was it to provide collateral for the Bank of the West loan?

**Disclosure:** I am/we are short FPI.

I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.

**Additional disclosure:** IMPORTANT - Please read this Disclaimer in its entirety before continuing to read our research opinion. Investors are

encouraged to conduct their own due diligence into these factors. This article represents the opinion of the author as of the date of this article. This article expresses the author's investment opinions, which are based upon interpretation of certain facts and observations, all of which are based upon publicly available information. The information set forth in this article does not constitute a recommendation to buy or sell any security. This article contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "think," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This article is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this article and undertakes no duty to update its contents. You should assume that as of the publication date the author (possibly along with or through our members, partners, affiliates, employees, and/or consultants) and clients have a short position in all stocks (and are long/short combinations of puts and call options of the stock) covered herein, including without limitation Farmland Partners, Inc. and therefore stand to realize significant gains in the event that the price of its stock declines. The author may also cover his/her short position at any point in time without providing notice. The author encourages all readers to do their own due diligence.

with a bunch of tendentious arguments 4) People panic, algos kick in, shorts pounce 5) Our short seller dude cashes in and laughs all the way to the bank.

Atta boy Rota whatever...you screwed a bunch of farmers and other old dudes who were happily collecting the dividend. Hope you feel good about yourself, lol. Glad I had gotten out of this on time.

13 Jul 2018, 11:06 PM

**Beyond Saving, Contributor**
"And FPI ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred "B" shares," - No, AFFO does not exclude the preferred dividends.

14 Jul 2018, 08:03 AM

**Rota Fortunae, Contributor**
Author's reply »  Beyond savings is correct, it is FFO that excludes preferred, not AFFO. Thanks for pointing out. As he stated in a private message to us, this is immaterial to the thesis and doesnt change the wide discrepancy between FCF and AFFO.

As for the other commentators critical of our research and short sellers, there is more to this story. Stay tuned...

14 Jul 2018, 12:00 PM

**Gridbird**
I need to thank you Rota. I am basically one who only invests in preferreds. You had preferred shares being tossed out the window after your article. I bought at 18.20 and sold at 22.14 yesterday. That was easy money!

14 Jul 2018, 12:14 PM

**Gridbird**
Got my last lot sold today at 22.36 as they were impounded until today....If you can come up with another good story on FPI, maybe there might be one more bite of that apple.

16 Jul 2018, 10:36 AM

**New Low Observer, Contributor**
When a company declines -16% from 2014 to July 9,2018, on a total return basis, something was bound to come

**EXHIBIT 2**

up. Holding a losing position for so long needed to be examined and justified.

14 Jul 2018, 02:09 PM

**Rota Fortunae, Contributor**
Author's reply »   Investors need to understand that selling farms (I.e. revenue) makes covering the dividend even
more of a stretch.

16 Jul 2018, 10:57 AM

> **JBTC Capital**
> Rota, I agree generally with the concerns you raised on FPI and the durability (or more accurately lack
> thereof) of their dividend, but I would qualify your current assessment that selling farms makes covering
> the dividend even more of a stretch depends on what they do with the proceeds. They could use the
> proceeds to pay down debt which reduces interest expense (i.e., decline in revenue is offset by decline in
> costs), or they could redeploy the proceeds into more accretive assets. Given management's track record,
> I wouldn't place a high likelihood in them using the proceeds wisely, but I do think it is important to note
> that selling farms in and of itself does not necessarily reduce dividend coverage if a prudent use of
> proceeds is pursued.
>
> 16 Jul 2018, 12:07 PM

> **ocean 2026**
> Rota please respond in detail to today's FPI release.
>
> 17 Jul 2018, 11:23 AM

**Rota Fortunae, Contributor**
Author's reply »   Assuming they were making a positive spread on the properties, debt pay down will not be a net
positive. More accretive deals, of course, would help but as you suggest history is not on investors side.

16 Jul 2018, 01:30 PM

> **BermudaHigh, Contributor**
> This makes no sense - reducing debt will of course be a net positive in an environment where overall
> perception of riskiness (diligently stoked by short sellers like you) dominates. BTW, did you already get a
> call from the good folks at the SEC? Asking for a friend.
>
> 17 Jul 2018, 10:17 AM