# EXHIBIT O

Message

**From:** [RF] [RF] [RF]
**Sent:** 7/2/2018 3:52:50 PM
**To:** [Person A] [Person A]
**Subject:** New [RF] Research
**Attachments:** FPI v14.docx

[Person A]

Please find the attached new research from [RF] As always, call me with questions.

**RF**

*********************************************************************************************************************************************************
****
NOTICE: This e-mail does not represent an offer to purchase or a solicitation of securities by [RF] Such an offer can only be made by obtaining appropriate offering documents. Any past performance provided is for illustrative purposes only and is not indicative of future investment results.

THIS COMMUNICATION DOES NOT CONSTITUTE AN INTENTION BY THE SENDER TO CONDUCT A TRANSACTION OR MAKE ANY AGREEMENT OR CONTRACT BY ELECTRONIC MEANS. NOTHING CONTAINED HEREIN OR IN ANY ATTACHED ELECTRONIC FILE SHALL SATISFY THE REQUIREMENTS FOR A WRITING, NOR CONSTITUTE A CONTRACT OR AN ELECTRONIC SIGNATURE, AS THOSE TERMS ARE DEFINED IN OR CONTEMPLATED BY THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE, 15 U. S. C. SECTION 7000 ET SEQ. OR ANY VERSION OF THE UNIFORM ELECTRONIC TRANSACTION ACT ADOPTED BY ANY STATE OR ANY OTHER STATUTE GOVERNING ELECTRONIC TRANSACTIONS.

# Farmland Partners Mortgage Lending Scheme - Part I: Sham Loans To Members Of Management Team Make Shares Uninvestible

*Summary*

- *Our research leads us to believe FPI is using its mortgage lending program to artificially increase revenues thru sham loans to related-party tenants who return the cash to FPI as above market rents*

- *We think the loans lack economic substance because whenever they come do FPI either acquires the property collateralizing the loan or just happens to issues the borrower a new, larger loan.*

- *FPI has neglected to disclose that the majority of the loans have been made to Jesse Hough, CEO Paul Pittman's long-time business partner, FPI's co-founder and an FPI consultant.*

- *A UCC filing shows "Pittman Hough" pledged FPI shares for a bank loan days before FPI signed a deal Pittman thought would drive the price higher; after the stock fell FPI began loaning to Hough*

- *Four directors and a president have resigned since FPI began loaning money to Jesse Hough and in March FPI dismissed PWC for EKS&H (auditor for MusclePharm and Heska)*

***Please read the full disclaimer at the end of the report before reading further. This report represents the opinion of the author. Investors should do their own due diligence and come to their own conclusions.***

*Introduction*

Chapter five of [ HYPERLINK "https://www.amazon.com/Financial-Shenanigans-Accounting-Gimmicks-Reports/dp/0071703071/ref=sr_1_2/135-7795443-5659836?ie=UTF8&qid=1530312458&sr=8-2&keywords=financial+shenanigan" ] teaches investors the methods companies use to record bogus revenues. One technique is to sell a product to a friendly customer who has no real obligation to pay. Such a transaction is said to lack economic substance. And how do you trick the auditor? Draft a normal sales contract but have a secret "side agreement" that modifies the terms. We think this is happening at Farmland Partners.

Farmland Partners (NYSE: FPI) is a highly levered farm REIT whose cash flow does not cover its dividend and whose non-GAAP earnings have drifted miles away from economic reality. Yet, despite evidence that rents have fallen across key geographies, FPI just posted its largest same-store sales increase ever and notched its longest stretch of positive revenue surprises. To be blunt, we do not believe the numbers.

When we started looking into FPI, we found it was playing classic accounting games like excluding farms from its same-property rent number. And on further inspection, we found that the 2017 same-property figures literally do not add up. But it was after we reviewed hundreds of deed records in dozens of counties across the country that we figured out how we think this ship is staying afloat.

**Our research leads us to believe that FPI is using its mortgage lending program to artificially increase revenues by making sham loans to related-party tenants who return the cash to FPI as**

RF005652

**above market rent and interest revenue. We believe these loans lack economic substance because whenever they come due FPI either acquires the property collateralizing the loan or just happens to issue the borrower a new, larger loan. In total, we believe up to 11% of 2017 revenues could be the result of transactions that are just moving money from one side of the desk to the other.**

FPI has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and [ HYPERLINK "http://ir.farmlandpartners.com/Cache/1001212949.PDF?Y=&O=PDF&D=&FID=1001212949&T =&IID=4426904" ]). Ryan Niebur is a now bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported it as a loan and then leant him an additional $61,800 the day after he signed a lease with FPI for $61,750.

Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837015001594/fpi-20150630ex105eacd5f.htm" ]. In July 2017, FPI made a loan against one of Hough' properties, which it then acquired and leased back to just days before FPI leant Hough $5.25 Million as the president of an inactive entity, that corporate records show he was never the president of, and that is secured by land that deed records show he does not own.

And we think there is a motive to play accounting games. A Colorado UCC filing shows "Pittman Hough" pledged shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. Instead the stock tanked, and two weeks after hitting an all-time low, FPI made the first loan to Jesse Hough.

**While shareholders have expressed concern about [ HYPERLINK "https://seekingalpha.com/article/4147265-farmland-partners-wait-dividend-cut" ], we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend, but faces a significant risk of insolvency.**

And it appears that we are not the only concerned party. Since making its first loan to Jesse Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed its Big 5 auditor for a smaller, local outfit.

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside. We found evidence that lead us to believe FPI has significantly overpaid for properties. We estimate FPI is worth $4.85 per share or 45% below the current stock price.

But even though we provide a valuation, we would be uncomfortable buying shares at any price. The evidence that FPI has misstated its financials is indisputable, and, as we will discuss in Part II, we think we have just scratched the surface on FPI's lending scheme. Stay tuned...

*Note: We have provided the details of this report and other findings to the Securities and Exchange Commission and FPI's new auditor. We also plan to share it with FPI's independent directors.*

***FPI's Capital Market Hamster Wheel***

[ PAGE ]

RF005653

From its IPO thru 2017, FPI generated *negative $11.8 Million* in cumulative free cash flow (operating cash flow – preferred dividends – depletion/depreciation).  And this figure excludes an additional $69 Million in capital expenditures that [ HYPERLINK "https://seekingalpha.com/article/4172577-farmland-partners-inc-fpi-ceo-paul-pittman-q1-2018-results-earnings-call-transcript?part=single" ], an incredulous statement given the lack of organic growth.

Of course, FPI ignores real expenses like preferred dividends and acquisition costs when it promotes adjusted funds from operations (AFFO), which has drifted miles away from free cash flow as the recession in the ag economy has deepened.



*Source: Chart By Author, Using SEC Financials*

In simple terms, millions in executive pay (including $0.5 Million for leasing [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018001471/fpi-20171231x10k.htm" ]) and $27 Million in dividends has been funded, not by profits, but by a hamster wheel of debt and equity raises.

**The fact that FPI generates no cash is very important to remember.  If our thesis is correct, the FPI loans are being "paid-off" and the related revenues are being funded by new investor capital.**

That makes this flavor of bogus revenue reporting particularly hard to detect because, unlike channel stuffing, there is no build up in receivables to forewarn investors.  No, in this case the red flags came in the form of hard to believe numbers that we could not reconcile with reality.

### *Something Is Not Adding Up (Literally)*

For years, Paul Pittman has been making incredulous statements about the prospects for flat to increasing rents even though [ HYPERLINK "https://www.ers.usda.gov/topics/farm-economy/farm-sector-income-finances/highlights-from-the-farm-income-forecast/" ].  On the [ HYPERLINK "https://seekingalpha.com/article/3387915-farmland-partners-fpi-ceo-paul-pittman-on-q2-2015-results-earnings-call-transcript?part=single" ] he said:

> *"We're not really very worried about this rent roll issue.  I mean, our perspective is that we will have, virtually under any economic scenario, we will either have flat or*

RF005654

*increasing rents in those discussions.  And it comes back to the fact that the farmer takes a long-term view, right?"*

And in the [ HYPERLINK "https://seekingalpha.com/article/4049082-farmland-partners-fpi-ceo-paul-pittman-q4-2016-results-earnings-call-transcript?part=single" ], Pittman said:

> *"We've probably seen a portfolio-wide, same-store sales basis, and this will surprise a lot of people, but about 1.5% to 2% increase across the board... there are a few regions of the country... particularly in Illinois and eastern Nebraska... those rents are generally coming down... you're seeing them come down but not massively, but their off in the 5-ish percent kind of range."*

Pittman's comments do not jive with well-publicized industry data.  The [ HYPERLINK "https://ispfmra.org/wp-content/uploads/2018/03/2018-Illinois-Farmland-Values-Lease-Trends-for-web1.pdf" ] shows Illinois cash rents are down approximately 25% from 2013 (pg. 49). And the 2017 [ HYPERLINK "https://agecon.unl.edu/research/2017-nebraska-farm-real-estate-report.pdf" ] shows cash rents on irrigated cropland in eastern Nebraska are down 19% since 2013.

**So were not surprised when, in the 1Q2017, average annual rent per acre fell off a cliff after FPI's legacy leases rolled-over. But we were surprised when the number began to improve throughout the year and when, in the 4Q2017, FPI stopped disclosing the figure and stated rents on row crops were** [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018001471/fpi-20171231x10k.htm" ]



*Source: Chart By Author, Using SEC Filings (Search: "same-property")*

On the 2Q2017 conference call, management said the improvement was due to leases moving from straight cash rent to cash plus crop share and farmers locking in prices during the short-term run up over the summer.  Perhaps, but this must assume that FPI's tenants had the foresight to sell the vast majority of their crops when prices peaked because average prices for row crops ended down for the year.

RF005655



*Source: Bigcharts.com*

And given that prices were hitting fresh lows in early 2018, we doubt farmers were willing to sign leases that allowed FPI to report +15% same-property revenue grwoth in the 1Q2018 (by far FPI's highest year-over-year gain).

We think the first quarter surge was, in part, due to how FPI defines "same property" as those that are "owned and operated" for the entirety of both periods. Only including "operated" farms means that FPI can exclude properties that are not leased, which skews the financial picture of the entire portfolio.

And sure enough that is exactly what we found FPI doing. The chart below shows that in the 1Q2018, FPI excluded 6.5% of the properties owned for the entirety of 1Q2017 (note FPI does not provide figures in 10-Ks to make the fourth quarter calculations).

| Same-Property Acres | 1Q2017 | 2Q2017 | 3Q2017 | 1Q2018 |
|---|---|---|---|---|
| Current Year Acres | 74,420 | 107,206 | 110,828 | 109,270 |
| Comparable Period Acres | 74,267 | 107,052 | 110,675 | 116,424 |
| Implied Non-Operating Acres | 153 | 154 | 153 | -7,154 |
| *% Of Total Same-Property Acres* | *0.2%* | *0.1%* | *0.1%* | *-6.5%* |

*Source: Chart By Author, Using SEC Filings and 1Q2018 Investor Presentation*

But that only explains part of the issue. Upon further review, we noticed that in 2017 the same-property revenues literally stopped adding up. The chart below compares the first nine months of same-property revenue to the full year (note FPI does not report 4Q same-property revenue). As expected, in 2015/2016 the full year figure exceeds the first nine months. But in 2017, the full year is less than the first nine months.

[ PAGE ]

RF005656



*Source: Chart By Author, Using SEC Financials*

This is mathematically impossible and makes us think FPI is fudging the numbers during the year when its financials are not audited.  So we began reviewing deed records across the country and found evidence that leads us to believe FPI is using its mortgage lending program to artificially increase revenues by making sham loans to related parties who return the cash to FPI as above market rents.

### The FPI Loan Program

In                              [                              HYPERLINK
"https://www.sec.gov/Archives/edgar/data/1591670/000110465915062043/a15-
18603_1ex99d1.htm" ], Farmland Partners introduced the FPI Loan Program to "address a market need created by short term cash flow pressure on farmers who otherwise *maintain solid balance sheets*" but cannot get traditional funding.  The press release promoted FPI's quick underwriting abilities and *conservative loan-to-value criteria*.  Further disclosure given in the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837015002606/fpi-20150930x10q.htm" ] states "the company intends to make loans to *third-party* farmers (both tenant and non-tenant)."

Below we present a chart of the loan program's originations (in boxes), the borrower (where known) and the ongoing balances.

| FPI Loans | Borrower | 3Q2015 | 4Q2015 | 1Q2016 | 2Q2016 | 3Q2016 | 4Q2016 | 1Q2017 | 2Q2017 | 3Q2017 | 4Q2017 | 1Q2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan #1 | Boersen Land Co. | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Loan #2 | Ryan Niebur | | 980,000 | 980,000 | 980,000 | 980,000 | 980,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| Loan #3 | ? | | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan #4 | Ryan Niebur | | | | | | | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 |
| Loan #5 | ? | | | | | | | 1,647,000 | 1,647,000 | 1,647,000 | 1,647,000 | |
| Loan #6 | Jesse Hough | | | | | | | | 100,000 | 100,000 | 100,000 | 0 |
| Loan #7 | Jesse Hough | | | | | | | | 669,000 | 669,000 | 0 | |
| Loan #8 | Justice Farms (?) | | | | | | | | | | 2,700,000 | 0 |
| Loan #9 | Jesse Hough | | | | | | | | | | | 5,250,000 |
| Revenue Beat / Miss | | BEAT | BEAT | MISS | MISS | BEAT | BEAT | MISS | BEAT | BEAT | BEAT | BEAT |

*Source: Chart By Author, Using SEC Filings and Deed Records*

Off the bat, this struck us as an accountants version of the devils playpen.  How are investors to know whether FPI is making loans to struggling tenants so they can pay rent they otherwise would be unable to pay.

[ PAGE ]

RF005657

We also noticed that FPI has only missed revenues estimates once in a quarter when it originated a loan. And then we found that $9.2 Million (out of a total of $15.4 Million) in loans have been made to Ryan Niebur and Jesse Hough who are both [ HYPERLINK "http://ir.farmlandpartners.com/Cache/1500078342.PDF?Y=&O=PDF&D=&FID=1500078342&T=&IID=4426904" ].

As laid out in publicly available documents, we will show that FPI has engaged in a pattern of transactions where it makes a loan against a property and when the loans come due, it acquires the property collateralizing the loan, enters into a lease with the seller and then lends more money to the seller/tenant.

*Note: For brevity, many of deed records referenced in this report have been organized into Appendices at the end of the article.*

### The Ryan Niebur Loans (Loans #2 & #4)

On November 16th, 2015, just three months after introducing the loan program, FPI leant $980 Thousand (Loan #2) to a [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837016004168/fpi-20151231x10k.htm" ]. The only other [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837016004168/fpi-20151231x10k.htm" ] was that the loan was collateralized by a first mortgage on farm real estate and the first year of interest was due up front (allowing FPI to report immediate interest revenue).

What was not disclosed was that the loan was made to [ HYPERLINK "https://www.linkedin.com/in/ryan-niebur-49947711a/" ] and that it was not used for farming operations but rather to pay off part of an existing mortgage (see Addendum A-1).

Niebur's loan remained unchanged until the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837017004040/fpi-20170331x10q.htm" ] when FPI disclosed that it "renegotiated" the loan while simultaneously entering into a new $2.194 Million loan (Loan #4) collateralized by two additional properties.

*($ in thousands)*

| Loan | Payment Terms | Principal Outstanding as of March 31, 2017 | | Principal Outstanding as of December 31, 2016 | | Maturity Date |
|---|---|---|---|---|---|---|
| Mortgage Note[1] | Principal & interest due at maturity | $ | 1,800 | $ | 1,800 | 1/15/2017 |
| Mortgage Note[1] | Principal & interest due at maturity | | 240 | | 980 | 3/16/2022 |
| Mortgage Note[2] | Principal & interest due at maturity | | 2,194 | | - | 3/16/2022 |
| Total outstanding principal | | | 4,234 | | 2,780 | |
| Points paid, net of direct issuance costs | | | (3) | | (4) | |
| Interest receivable (net prepaid interest) | | | 16 | | 67 | |
| Total notes and interest receivable | | $ | 4,247 | $ | 2,843 | |

(1) In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. The Company is currently in negotiations to extend the terms with the borrower.

(2) The original note was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

*Source:* [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837017004040/fpi-20170331x10q.htm" ]

[ PAGE ]

RF005658

But this is not the whole story.  FPI did not disclose that on March 16th, 2017 it acquired a property from Niebur that was collateral for Loan #2.  And the deed specifically states that Niebur was in default on the loan and obligated to pay a remaining balance of $240 Thousand, Loan #2's new balance as of 1Q2017 (Appendix A-2)

Then in January 2018, [ HYPERLINK "https://www.docketbird.com/court-cases/Ryan-b-Niebur-and-Stacie-k-Niebur/cob-1:2018-bk-10568" ], a material fact that has not been disclosed in FPI's SEC filings.  Court records shows that the remaining $240,000 owed is collateralized by a property worth $192,000, resulting in a loan-to-value ratio of 125%.  We hardly call this conservative.



*Source: Pacer – Case #1:2018bk10568 – Document #17 Schedule A/B*

We believe these transactions with Niebur show FPI's willingness to make loans outside of the programs stated parameters and stabilize rental income by making risky loans to struggling tenants.  But, more importantly, we believe the loans show that FPI has misstated its SEC filings and used the loan program to artificially increase revenues.


### Loan #4 Was An Acquisition, Not A Loan

It turns out that the new $2.194 Million loan to Niebur was not actually a loan, but an acquisition of three properties.  As mentioned above, FPI acquired one of the properties collateralizing Niebur's original loan for $801,800 (Addendum A-2).  The other two are the same properties that purportedly collateralize the new loan.  Deed records show FPI acquired these properties for $1.392 Million (Addendum A-3).

Low and behold, the total acquisition price is $2.194 Million (= 0.801 + 1.392), the same amount as Loan #4.  Further proof that there was no loan, is the fact that Niebur did not list Loan #4 in his bankruptcy.

So in fact, FPI reported a loan on its financial statements when it actually was an acquisition.  But that is not all.  After Neibur defaulted and FPI acquired his property, FPI leant him an additional $61,800 that we believe was used to immediately pay rent on a new lease.


### Niebur's Loan For Rent

Looking at the cash flow statement below, 'Principal Receipts On Notes Receivable' of $801,000 is the partial repayment (rounded down) of Loan #2 that was funded by the $801,800 received for the acquisition of the property collateralizing loan #2 (addendum A-2).  But the repayment would leave a balance of $178,200 vs. the reported $240,000.

[ PAGE ]

The $61,800 difference is the same as the difference (rounded) between the $2.255 Million Issuance of Note Receivable reported in the cash flow statement and the $2.194 Million Loan #4.

| CASH FLOWS FROM INVESTING ACTIVITIES | | |
|---|---|---|
| Real estate acquisitions, net of cash acquired | (79,220) | (93,187) |
| Real estate and other improvements | (3,947) | (698) |
| Principal receipts on notes receivable | 801 | 50 |
| Issuance of note receivable | (2,255) | — |
| Net cash used in investing activities | (84,621) | (93,835) |

*Source:* [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837017004040/fpi-20170331x10q.htm" ]

So after Niebur defaulted on Loan #2 and FPI acquired his properties, allowing him to partially repay, FPI leant Niebur an additional $61,800.

And according to records in Niebur's bankruptcy, FPI entered into a lease on March 15th, 2017 that stated the first annual rent payment of $61,750 was due on March 16th, 2017, the day FPI leant him the money (Appendix A-4).

We know this was a mountain of numbers, so below is a picture showing the three transactions.



*Source: Chart By Author, Using SEC Filings & Deed Records*

There are two important takeaway:

1. **The partial payoff of Loan #2 was funded by the acquisition of a property collateralizing the loan. This is akin to a bank buying a house at full price after the borrower defaults and then calling the loan money good when the borrower uses the proceeds to pay off the loan.**

2. **Second, because Niebur was already in default when FPI leant him the additional $61,800 on the same day he owed $61,750 in rent, we believe this transaction was entered into for the purpose of artificially increasing revenues.**

[ PAGE ]

RF005660

And we believe the rental rate was above market.  The $61,750 rent (on 334.4 tillable acres) is $185 per acre or 29% above [ HYPERLINK "http://www.pfisterlandco.com/news/pfister-news-blog/post/colorado-farm-land-values-rents-2017" ] for average rent per acre on irrigated farm land in 2017.  To be sure, the property does include a building, which the lease says is $20,000 of the payment.

Given the evidence that FPI has used the loan program to prop up a struggling tenant and, we believe, issue sham loans to artificially increase revenues thru above market rents, shareholders should be concerned with the similar pattern of loans made to Jesse Hough.

### Who Is Jesse Hough

Paul Pittman and Jesse Hough have been business partners since at least January 2012 when, according to [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000104746914006321/a2220721zs-11a.htm" ], Pittman-Hough Farms, LLC was formed as a merger of their personal farmland holdings. They were also partners in a web of entities that were engaged by FPI before and after the IPO (note Pittman-Hough Farms was restructured in March 2016, which we will discuss in Part II).

Included on the list are Astoria Farms and Hough Farms, which were [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837015000260/fpi-20141231x10k.htm" ], are currently [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837016004168/fpi-20151231x10k.htm" ] and, as of December 2017, [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018001471/fpi-20171231x10k.htm" ]. Another entity was PHS Holdings, which [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000104746914006407/a2220909z424b4.htm" ], but have not been mentioned in SEC filings in years.

After the IPO, Jesse became an [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837015000849/fpi-20150331ex104b661d0.htm" ],who according to a [ HYPERLINK "http://ir.farmlandpartners.com/Cache/1500078342.PDF?Y=&O=PDF&D=&FID=1500078342&T=&IID=4426904" ] is considered part of the management team.

### The Jesse Hough Loans (Loan #6)

On July 25th, 2017 FPI made a $100,000 loan to Jesse Hough thru PHS Holdings (Addendum B-1).  Like the original loan to Ryan Niebur (Loan #2), we think this loan was likely paid off with the proceeds from FPI acquiring the property.

Deed records show FPI acquired the property on January 17th, 2018 (Addendum B-1).  SEC disclosures state the maturity date was January 31st, 2018, two weeks after FPI acquired the property.  And while we cannot be sure that the acquisition paid off the loan, an inconsistency in recent SEC disclosure bolsters our opinion that details are being misreported.

RF005661

The [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018004644/fpi-20180331x10q.htm" ] states the loan was fully settled "on the maturity date of January 1, 2018," (before the acquisition closed) but disclosure listed right above states the original maturity date of January 31st, 2018, two weeks after the property was acquired.

As of March 31, 2018 and December 31, 2017, the Company had the following notes receivable:

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
| | | March 31, 2018 | December 31, 2017 | |
|---|---|---|---|---|
| Mortgage Note (1) | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note (2) | Principal & interest due at maturity | 240 | 240 | 3/16/2022 |
| Mortgage Note (2) | Principal due at maturity & interest due monthly | 2,194 | 2,194 | 3/16/2022 |
| Mortgage Note (2) | Principal & interest due at maturity | 1,647 | 1,647 | 4/27/2018 |
| Mortgage Note (3) | Principal & interest due at maturity | - | 100 | 1/31/2018 |
| Mortgage Note (4) | Principal due at maturity & interest paid in advance | - | 669 | 2/15/2018 |
| Mortgage Note (5) | Principal due at maturity & interest paid in advance | - | 2,700 | 1/29/2018 |
| Mortgage Note (6) | Principal & interest due at maturity | 5,250 | - | 8/19/2020 |
| Total outstanding principal | | 11,131 | 9,350 | |
| Points paid, net of direct issuance costs | | (1) | (6) | |
| Interest receivable (net prepaid interest) | | 609 | 461 | |
| Provision for interest receivable | | (91) | (45) | |
| Total notes and interest receivable | | $ 11,648 | $ 9,760 | |

(1)   In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. On July 28, 2017, the Company notified the borrower of default under the Promissory Note. The Company currently believes that collectability is reasonably assured as the fair value of the mortgaged farm is greater than the amount owed under the loan.

(2)   The original note was renegotiated and a second note was entered into simultaneously with the borrower during the three months ended March 31, 2017. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

(3)   The note was fully settled and outstanding amounts paid on the maturity date of January 1, 2018.

(4)   The note was fully settled and outstanding amounts paid on the maturity date of February 2, 2018.

(5)   The note was fully settled and outstanding amounts paid on the closing of an acquisition in North Carolina, which was completed on January 12, 2018.

(6)   On April 17, 2018, the Company amended the loan to extend the term of the loan through March 1, 2020 and increased the interest rate to 7.5% per annum.

*Source: 1Q2018 FPI 10-Q*

**If the acquisition paid off the loan, we think the loan again represents a transaction that lacks economic substance.**

But there is another, more important, similarity to the Niebur loans. Deed record shows that PHS Holdings entered into a lease agreement with FPI as part of the acquisition (Addendum B-2). And just six days after the property was acquired, FPI leant $5.25 Million to Hough under circumnutates that, in our opinion, are highly irregular.

### *The Jesse Hough Loans (Loan #9)*

On [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018004644/fpi-20180331x10q.htm" ] FPI made a $5.25 Million loan to Siffring Farms (Addendum B-2). We searched corporate filings and found that [ HYPERLINK "https://www.nebraska.gov/sos/corp/corpsearch.cgi?acct-number=0131334" ] whose president is Duane R. Siffring. However, the deed of trust was signed by Jesse Hough as President of Siffring Farms. And [ HYPERLINK "https://butler.gisworkshop.com/" ] show that Siffring Farms has owned the properties for years.

[ PAGE ]

RF005662



*Source:* [ HYPERLINK "http://nebraskadeedsonline.us/search.aspx?county=25" ]

Based on the circumstances in which this loan was made and the fact that it was made just days after FPI entered into a lease with Jesse Hough (thru PHS Holdings), we think it is highly likely that part of the $5.25 Million was used to pay PHS Holdings annual rent payment.

We also think it is highly likely that part of the proceeds were used to roll-over another loan made to Jesse Hough.

### The Jesse Hough Loans (Loan #7)

Go back to August 25th, 2017, and FPI made a $669,000 loan to Jesse Hough thru Hough Farms (Addendum B-3). According to the 10-Q disclosure above, this loan was paid off on February 2nd, 2018 (we note that again the original maturity date of February 15th does not match this disclosure). In any event, the loan was paid off just weeks after FPI gave Hough the $5.25M loan thru Siffring Farms, which introduces the possibility that it this loan was simply rolled over into a new loan.

### How To Use The Loans To Increase Revenues

In addition to the evidence that suggests FPI charged Ryan Niebur above market rents, management admitted FPI has charged above market rents to related party tenants (Astoria Farm and Hough Farms).

On the [ HYPERLINK "https://seekingalpha.com/article/3148646-farmland-partners-fpi-ceo-paul-pittman-on-q1-2015-results-earnings-call-transcript?part=single" ], Pittman stated:

> *"the only real renewals we had last fall were with a related party. So, what we gave was basically a 1% rent increase in an environment, in which rents are flat to slightly down on the group of properties."*

**What is interesting though is that according to the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018001471/fpi-20171231x10k.htm" ], the implied cost per acre paid by Hough Farms and Astoria Farms actually decreased 15%. This flies in the face of Pittman's comments that lease rates in Nebraska are down in the "5-ish range."**

And while this may appear to refute our thesis, remember FPI is now leasing properties to Hough under entities that are not being disclosed. We already discussed PHS Holdings, but we also believe there is another entity Jesse Hough may be using.

On January 9th, 2018, eight days before he received the $5.25 Million, Hough incorporated [ HYPERLINK "https://www.nebraska.gov/sos/corp/corpsearch.cgi?acct-number=10255658" ] in Nebraska. And the address listed on the corporate records is the same address the Butler County appraisal records have for the Siffring Farm properties.

RF005663

*Source:* [ HYPERLINK "https://www.nebraska.gov/sos/corp/corpsearch.cgi?acct-number=10255658" ] *&* [ HYPERLINK "http://nebraskadeedsonline.us/" ]

Based on all the foregoing evidence, we believe there is a significant probability that FPI is replacing existing tenants in Nebraska with Jesse Hough, who is paying above market rents. Further supporting our thesis is that Pittman recently called out Nebraska and Colorado (the two states where Niebur and Hough loans were made) as [ HYPERLINK "https://seekingalpha.com/article/4152869-farmland-partners-fpi-ceo-paul-pittman-q4-2017-results-earnings-call-transcript?part=single" ] geographies.

But the loans to Niebur and Hough are not the only ones that concern us.

*Potential Loan To Large Shareholder*

In the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018001471/fpi-20171231x10k.htm" ], FPI made a $2.7 Million loan (Addendum C-1), which in the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018004644/fpi-20180331x10q.htm" ] it disclosed was "settled on the closing of a property in North Carolina on January 12, 2018."

We found the acquisition in [ HYPERLINK "http://216.27.81.171/pasquotanknc/disclaimer.asp" ] (search Grantee: FPI Carolinas) with Justice Farms of North Carolina. This leads us to believe the loan was made with James C. Justice III, son of a [ HYPERLINK "https://en.wikipedia.org/wiki/Jim_Justice" ] and, [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465917008559/a17-4259_1sc13ga.htm" ], owner of 7.3% of FPI. If true, this would be a undisclosed related-party loan.

But the most important detail of Loan #8 is the fact that it was settled through the acquisition of a property, which again introduces the risk that the transaction lacked economic substance. And again, we see a pattern similar to the Niebur and Hough loans.

Deed records show that on December 20th, 2017 (the same day FPI and PHS Holdings entered into an agreement) FPI and Justice Farms entered into a "Real Estate Purchase and Farmland Lease Agreement" (Addendum C-1).

**This means that that after FPI made the loan, it acquired a property settling the loan and at the same time entered into a new lease. While this transaction is missing the post-sale loan, it is very similar to the Nieber and Hough transactions.**

Furthermore, we estimate Loan #8 allowed FPI to record approximately [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837018004644/fpi-

RF005664

20180331x10q.htm" ], which by itself was enough to turn the quarter from a revenue miss into a beat and represented over 6% of 1Q2018 operating income.

### Adding It All Up

In 2017, FPI reported $46 Million in revenue, $43 Million of it was rent and $555,000 was interest (the remainder was tenant reimbursements and crop sales). We believe that up to 11% total revenue could be the result of the loans made during 2017.

To get to this figure, we assume the $61,800 loan to Ryan Niebur, all of Loan #5 (which we could not find but which FPI disclosed it just extended maturity two years) and all Loan #6,7,8 have been used to record bogus revenues and interest. The chart below shows the math.

| Potential Revenue Impact | |
|---|---|
| Niebur Lease Payment | 67,500 |
| Loan # 5 | 1,647,000 |
| Loan #6 | 100,000 |
| Loan #7 | 669,000 |
| Loan #8 | 2,700,000 |
| **Total Potential Lease Payments** | **5,183,500** |
| Total 2017 Revenues | 46,219,000 |
| **Loans % Total Revenues** | **11.2%** |

*Source: Chart By Author*

It is also possible that FPI is using only part of the loans to improve revenues. Regardless of the total figure, our opinion that FPI is playing accounting games is bolstered by the fact that we believe there is a motive.

### "Pittman Hough" Get A Loan Against FPI Shares

According to a February 13th, 2017 Colorado UCC filing, [ HYPERLINK "https://www.sos.state.co.us/biz/BusinessEntityCriteriaExt.do" ] put up its equity interest in Farmland Partners for a loan. But notice, at the bottom of the document is a line that states **"Optional filer reference: (Bank of the West)/Pittman Hough."** Being that Pittman-Hough Farms disclosed in a [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000092542116000078/xslF345X03/edgar .xml" ] that it distributed its shares to its members, we think the UCC filings is referring to Pittman and Hough personally.

[ PAGE ]

RF005665

*Source:* [ HYPERLINK "https://www.sos.state.co.us/ucc/pages/search/advanceSearch.xhtml" ]

The timing of this loan is interesting because just days later, on [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465917010374/a17-4583_28k.htm" ], FPI entered into a termination agreement with Prudential as part of its acquisition of AFCO. And on the [ HYPERLINK "https://seekingalpha.com/article/4071346-farmland-partners-fpi-ceo-paul-pittman-q1-2017-results-earnings-call-transcript?part=single" ], Pittman stated:

> *"We frankly expected substantial stock price appreciation based on the AFCO acquisition and the termination of Prudential and all of that, and frankly none of which we got."*

Instead of going up, FPI's stock price declined 30% over the following months. And shortly after the stock reached an [ HYPERLINK "https://finance.yahoo.com/quote/FPI/history?period1=1396328400&period2=1501563600&interval=1d&filter=history&frequency=1d" ], FPI made its first loan to Hough.

Our opinion that Pittman pledged his shares is further bolstered by the fact that on [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1389549/000092542117000298/xslF345X03/edgar.xml" ] he converted 531,827 OP units to common shares. July 9th (a Sunday) came after [ HYPERLINK "https://finance.yahoo.com/quote/FPI/history?period1=1396328400&period2=1501563600&interval=1d&filter=history&frequency=1d" ] that Friday. Seeing that Pittman has not sold any shares, we question why he would be willing to convert OP Units, whose primary purpose is to [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465914029209/a14-10865_2ex10d7.htm" ]. We think the bank may have required the conversion of OP units because it wanted liquid collateral.

*Insolvency Risk*

[ PAGE ]

While shareholders have expressed concern about [ HYPERLINK "https://seekingalpha.com/article/4147265-farmland-partners-wait-dividend-cut" ], we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend, but faces a significant risk of insolvency.

And we do not appear to be the only concerned party.

### Insider Departures & Auditor Dismissal

Since the first loan to Jesse Hough in July 2017, four board members and FPI's president have announced resignations. Below we detail each of the departures.

| Date | Name | Position | Reason |
|---|---|---|---|
| [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465917055211/a17-21223_18k.htm" ] | John Conrad | Director; Forsythe Farms nominee | Personal reasons |
| [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465917072549/a17-28227_18k.htm" ] | Dixon Boardman | Director, former Chairman of AFCO | Pursue other business interests |
| [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465918003591/a18-3583_18k.htm" ] | Darell Sarff | Director, father of FPI VP | Pursue other business interests |
| [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465918018869/a18-7956_38k.htm" ] | Thomas Gimbel | Director, former CEO of AFCO | Pursue other business interests |
| [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465918023964/a18-9904_18k.htm" ] | Robert Cowan | President, former President AFCO | Pursue other business interests |

Three of the directors and the president came from FPI's two largest acquisitions (Forsythe Farms and American Farmland Company). These are individuals with significant experience in farmland investing who sold their holdings to FPI and are now leaving.

[ PAGE ]

RF005667

In the case of Forsythe, the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000104746918001924/a2234892zdef14a .htm" ] the Forsyth Sellers own 23.59% of the diluted shares and have to right to a nominate a board seat as long as they own 10%. In August, their representative resigned and Forsyth has yet to nominate another, which may indicate the intention to liquidate their stake below 10%.

In the case of AFCO, its former Chairman and [ HYPERLINK "https://www.fnlondon.com/articles/wall-street-hedge-fund-veteran-hits-highs-with-copycat- tactics-20171109" ], Dixon Boardman, had already [ HYPERLINK "https://www.gurufocus.com/insider/FPI" ] by the time he resigned in December 2017.

Then on [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000110465918016840/a18- 7956_28k.htm" ], FPI dismissed PWC as its independent auditor. The same day, the company engaged EKS&H, who investors may recognize from MusclePharm and Heska. [ HYPERLINK "https://www.denverpost.com/2016/03/16/musclepharm-founder-brad-pyatt-resigns-as-ceo- after-federal-investigation/" ] in 2016 after the SEC charged the company with accounting and disclosure violations. [ HYPERLINK "https://seekingalpha.com/instablog/38059736-the-friendly- bear/5116702-suspect-related-party-dealings-infect-animal-house" ] for alleged related-party transactions.

Taken together, we think the facts detailed in this report paint an ominous timeline.



| Date | Event Description |
|---|---|
| 2/12/17 | "Pittman/Hough" pledges stock for loan |
| 2/18/17 | FPI terminates Prudential contract |
| 3/16/17 | FPI "renegotiates" Ryan Niebur loan |
| 5/8/17 | Pittman states he thought stock would go up |
| 7/7/17 | FPI stock closes at new all time low |
| 7/9/17 | Pittman converts 531,827 OP Units |
| 7/25/17 | FPI makes $100 Thousand loan to PHS Holdings |
| 7/25/17 | FPI makes $600 Thousand loan to Hough Farms |
| 8/28/17 | John C. Conrad resigns from board |
| 12/5/17 | D. Dixon resigns from board |
| 1/12/18 | FPI acquires property from PHS Holdings that FPI provided loan |
| 1/18/18 | FPI makes $5.25 Million loan to Sifting Farms signed by Jesse Hough |
| 1/18/18 | Darrell D. Sarff resigns from board |
| 3/30/18 | FPI dismisses PriceWaterHouseCoopers |
| 3/19/18 | Thomas Gimbel resigns from board |
| 3/30/18 | Robert Covington resigns as President of FPI |

= Potential related-party transactions
= Executive, board or auditor events

*Source: Chart By Author, Using SEC Filings & Deed Records*

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside.

[ PAGE ]

RF005668

*Evidence That FPI Has Overpaid For Properties*

Paul Pittman spends time on each conference call trying to convince shareholders that the net asset value (NAV) of FPI is between $11.50 and $12.50 per share. On the [ HYPERLINK "https://seekingalpha.com/article/4172577-farmland-partners-inc-fpi-ceo-paul-pittman-q1-2018-results-earnings-call-transcript?part=single" ], he stated this value is based on what FPI paid for the assets and adjusting for modest increases and decreases in value across different regions of the portfolio.

The problem with Pittman's calculation is that he ignores the old adage that "you make your money when your buy" and so what matters most is not what prices do after you buy but what price you paid.

Pittman's dismissal of this fundamental truth is evident from his comments during the [ HYPERLINK "https://seekingalpha.com/article/3974865-farmland-partners-fpi-ceo-paul-pittman-q1-2016-results-earnings-call-transcript?part=single" ]:

> *"I don't put a lot of stock in annual appraisals... not because appraisers are bad, but you have to understand, they are forced to perform a certain process and their charge is to do a process based on that set of rules and regulations.  It is not really answering the question what farms are worth, it's actually answering a question of what farms are worth under this very mechanical valuation approach, which has a whole set of errors embedded in it."*

He then states:

> *"Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgement of value."*

**We think these comments are absurd.  First, apparently Pittman thinks the appraisal process is a poor judgement of value, despite its widely excepted use across the real estate industry.  Second, he thinks what he pays, even if he overpays, is the safest judgement of value.**

This is akin to saying that if someone paid $1 Million for a house in a neighborhood filled with $500,000 houses, that all of the properties would see a commensurate $500,000 increase in value just because one person was willing to overpay.  And in fact, we have evidence that suggests FPI has overpaid for properties.

*Telfair County, GA*

FPI acquired two Telfair County, GA farms in 2015 and one in 2017.  Based on what FPI paid for the properties vs. what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the [ HYPERLINK "https://www.usda.gov/nass/PUBS/TODAYRPT/land0817.pdf" ]), we believe FPI acquired these properties for 80% above market value.

RF005669

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Selph Farm | Talfiar, Georgia | 5/4/12 | Ernest Selph | 116 | $1,724 | | | |
| | | 12/17/15 | FPI Properties | | $4,537 | 163% | -6.5% | 181.4% |
| Mobley Farm | Talfiar, Georgia | Throughout 2012 | Brad Mobley | 1,069 | $2,154 | | | |
| | | 10/9/15 | FPI Properties | | $3,460 | 61% | -6.5% | 71.8% |
| Dorminey Farm | Talfiar, Georgia | Throughout 2012 | Carlton Dorminey | 47 | $2,150 | | | |
| | | 4/25/17 | FPI Properties | | $3,809 | 77% | 1.4% | 74.7% |
| | | | Total Adjusted Overpayment % | | | | | 80% |

*Source: SEC Filings & Telfair County, GA Deed Records (Search: FPI Properties)*

While we cannot be sure what improvements, if any, were made to these properties during the sellers' ownership, we note the following:

- [                      HYPERLINK        "https://www.google.com/maps/place/GA-132,+Milan,+GA+31060,+USA/@31.9637474,-83.0320058,995m/data=!3m2!1e3!4b1!4m13!1m7!3m6!1s0x88f1b53ec4c8da69:0xd96229a276822208!2sTelfair+County,+GA,+USA!3b1!8m2!3d31.8907647!4d-82.9931607!3m4!1s0x88f1b1c97134b99b:0xeb66f5ec9bc04a3c!8m2!3d31.9637429!4d-83.0298118" ] shows that as far back as 2008 [ HYPERLINK "http://www.farmlandpartners.com/properties/selph/" ] was irrigated farm land.

- The deed record map shows that between 2010 and 2013, part of the [ HYPERLINK "http://www.farmlandpartners.com/properties/mobley-2/" ] was converted from timberland to farmland, which may explain part of the property value increase.

- The deed record map shows [ HYPERLINK "http://www.farmlandpartners.com/properties/dorminey/" ] had already been cleared of timber before the seller acquired it.

### Yell County, AR

FPI acquired two Yell County, AR farms in 2014. Based on what FPI paid or the properties vs. what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the [ HYPERLINK "https://www.usda.gov/nass/PUBS/TODAYRPT/land0817.pdf" ]), we believe FPI acquired these properties for 17% above market value.

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Ruder Farm | Yell, Arkansas | Throughout 2013 | Ruder Properties | 819 | $2,329 | | | |
| | | 9/24/14 | FPI Coloardo | | $3,301 | 42% | 5.5% | 34.3% |
| Ballymore Farm | Yell, Arkansas | 4/3/13 | Ballymore Properites | 1,281 | $3,120 | | | |
| | | 10/24/14 | FPI Arkansas | | $3,588 | 15% | 5.5% | 9.0% |
| | | | Total Adjusted Overpayment % | | | | | 17% |

*Source: SEC Filings & Yell County, AR Deed Records (Search: FPI Colorado, FPI Arkansas)*

We are unsure if any improvements were made to [ HYPERLINK "http://www.farmlandpartners.com/properties/ruder/" ] or [ HYPERLINK "http://www.farmlandpartners.com/properties/ballymore/" ] during the sellers' ownership.

[ PAGE ]

RF005670

## McDonough County, IL

On July 15th, 2015, FPI acquired the [ HYPERLINK "http://www.farmlandpartners.com/properties/tomasek/" ] from [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1591670/000155837016004168/fpi-20151231x10k.htm" ]. According to SEC filings and [ HYPERLINK "http://mcdonoughil.devnetwedge.com/" ] FPI acquired the property for 2.5% above what Paul Pittman paid for it in 2014. However, in December 2015 FPI acquired the [ HYPERLINK "http://www.farmlandpartners.com/properties/howe/" ], also in McDonough County, for a 15% premium to the Tomasek Farm.

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Comp | Avg. Land Appreciation (USDA) | Avg. Land Appreciation (USDA) |
|---|---|---|---|---|---|---|---|---|
| Tomasek Farm | McDonough, Illinois | 2/20/14 | Paul Pittman | 58 | $11,700 | | | |
| | | 12/17/15 | PH Holdings | | $11,991 | 2% | -0.02% | 2.5% |
| Howe Farm | McDonough, Illinois | 12/1/15 | PH Holdings | 78 | $10,449 | 15% | -0.02% | |

*Source: SEC Filings & McDonough County, IL Deed Records (Search: PH Holdings)*

## American Farmland Company

Perhaps the biggest overpayment (in dollar terms) was FPI's acquisition of American Farmland Company (AFCO). The [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1474777/000104746916017299/a2230543zdefm14a.htm" \l "bu12701_background_of_the_mergers" ] provides a background of the sale process.

The chart below shows that of the seven preliminary bids, FPI's offer was 12% above the average. The only bid (Company E) that was higher dropped out during diligence because of pricing. A comparable bid (Company F) also dropped out during due diligence.

The only other party to put in a second bid (Company G) lowered its price after getting *independent appraisals*. In the end, FPI paid 15% above the only other bidder.

| AFCO Proposals | Preliminary Bids | Secondary Bids | Deal Notes |
|---|---|---|---|
| Company A | $6.61 | - | AFCO declined due to price |
| Company C & D | $6.75 | - | AFCO declined due to price |
| Company E | $8.82 | - | Dropped out because of "pricing a corporate level transaction" |
| Company F | $8.20 | - | Dropped out during due diligence |
| Company G | $7.72 | $7.13 | Lowered offer to $7.13 after getting independent appraisals |
| Company H | $8.00 | - | AFCO declined because would not alleviate challenges |
| Company J | $6.00 | - | AFCO declined |
| Average | $7.44 | $7.13 | |
| Farmland Partners | $8.35 | $8.23 | |
| Premium To Avg. | 12% | 15% | |

*Source: AFCO/FPI Merger Proxy*

[ PAGE ]

**To be clear, we do not believe that FPI overpaid for every property it purchased. However, we think it is highly likely that, in aggregate, FPI has paid an average of 5-15% above market price for its farms. Additionally, we think FPI has seen another 5% decrease across its portfolio, a reasonable assumption given Illinois land values (25% of FPI acres) have fallen approximately 15% (pg. 9) since 2014 and** [ HYPERLINK "http://kticradio.com/agricultural/final-results-released-from-2018-nebraska-farm-real-estate-survey/" ] **over the same time.**

*Valuing FPI*

Finally, Pittman's NAV calculation assumes a buyer would take out the entire company. Given that only one other player was willing to acquire AFCO, which was less than half FPI's size, we think this is highly unlikely.

More likely is an liquidation scenario, which would include transaction costs, operating expenses and capital expenditures during the liquidation. Evidence that these costs are very real and material is the fact that AFCO merger proxy (pg. 67) stated its investment bankers calculated the value of the company under a liquidation scenario. Their value was between $7.12 to $7.33 or 20% less than the $8.98 book value per share reported in the [ HYPERLINK "https://www.sec.gov/Archives/edgar/data/1474777/000156459016029085/afco-10q_20160930.htm" ]

We think the best way value FPI is to take book value per share, which represents what FPI actually paid for the properties (land has no depreciation) and make the following adjustments based on a liquidation scenario:

1. Add appreciation for the legacy properties. On the 1Q2017 call, Pittman stated the difference between book value and his NAV estimate is largely "30-ish" million dollars for the legacy properties, many of which Pittman acquired in the mid-2000s.
2. Subtract overpayment on the remainder of the portfolio (under four scenarios)
3. Subtract 5% reduction in property values
4. Subtract transaction costs of 5% on the disposition of the portfolio
5. Subtract $30 Million in operating expenses incurred during liquidation period (approximate 2 years)
6. Discounting NAV back 1 year at 7.75%

Below we present our NAV calculation under four scenarios: a 15%, 10%, 5% and 0% overpayment for the post-IPO acquisitions. Using an average of the four scenarios, we think FPI is worth $4.85 per share (*Note, diluted share count is based on* [ HYPERLINK "http://ir.farmlandpartners.com/Cache/1500110443.PDF?Y=&O=PDF&D=&FID=1500110443&T=&IID=4426904" ]*2).*

**But even if we assume FPI did not overpay for properties, FPI is still only worth $6.39.**

RF005672

| NAV Calculation | Scenario #1 (15% Overpay) | Scenario #1 (10% Overpay) | Scenario #2 (5% Overpay) | Scenario #3 (No Overpay) |
|---|---|---|---|---|
| Land Value at Cost | 975,107 | 975,107 | 975,107 | 975,107 |
| - Legacy Propert Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| Post IPO Acquisitions at Cost | 936,692 | 936,692 | 936,692 | 936,692 |
| - Overpayment | -140,504 | -93,669 | -46,835 | 0 |
| Market Value of Post IPO Acquisitions (when purchased) | 796,188 | 843,022 | 889,857 | 936,692 |
| - 5% Reduction in Value | 39,809 | 42,151 | 44,493 | 46,835 |
| Today's Market Value of Post IPO Acquisitions | 756,378 | 800,871 | 845,364 | 889,857 |
| + Legacy Properties at Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| + Legacy Property Appreciation | 30,000 | 30,000 | 30,000 | 30,000 |
| Market Value of FPI Land Portfolio | 824,794 | 869,287 | 913,780 | 958,272 |
| - 5% Transaction Costs | -41,240 | -43,464 | -45,689 | -47,914 |
| - Operating Expenses Over 2 Years | -30,000 | -30,000 | -30,000 | -30,000 |
| Net Value of FPI Land Portfolio After Dispotiion | 753,554 | 795,822 | 838,091 | 880,359 |
| Book Value As of 1Q2018 | 357,350 | 357,350 | 357,350 | 357,350 |
| - Net Value After Dispotion vs. Land Value at Cost | -221,553 | -179,285 | -137,016 | -94,748 |
| Post Dispotion NAV | 135,797 | 178,065 | 220,334 | 262,602 |
| Post Dispotion NAV (Discounted 1.5 yrs @ 7.5%) | 122,107 | 160,141 | 198,174 | 236,208 |
| Post Dispotion NAV / Share | $3.21 | $4.34 | $5.37 | $6.39 |
| Diluted Share Count | 38,200 | 38,200 | 38,200 | 38,200 |

*Source: Chart By Author, Using Author Estimates*

## Conclusion

We think FPI is in deep trouble, and even though we provide a valuation, we would be uncomfortable buying shares at any price. The evidence that FPI has misstated its financials is indisputable, and, as we will discuss in Part II, we think we have just scratched the surface on FPI's lending scheme. Stay tuned…

## Disclaimer

IMPORTANT - Please read this Disclaimer in its entirety before continuing to read our research opinion. Investors are encouraged to conduct their own due diligence into these factors. This article represents the opinion of the author as of the date of this article. This article expresses the author's investment opinion, which are based upon interpretation of certain facts and observations, all of which are based upon publicly available information. The information set forth in this article does not constitute a recommendation to buy or sell any security. This article contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "think," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This article is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this article and undertakes no duty to update its contents. You should assume that as of the publication date the author (possibly along with or through our members, partners, affiliates, employees, and/or consultants) and clients have a short position in all stocks (and are long/short combinations of puts and call options of the stock) covered herein, including without limitation Farmland Partners, Inc. and therefore stand to realize significant gains in the event that the price of its stock declines. The author may also cover his/her short position at any point in time without providing notice. The author encourages all readers to do their own due diligence.

RF005673

*Addendum A-1*

Loan #2 ($980 Thousand)

**DEED OF TRUST AND SECURITY AGREEMENT**

THIS DEED OF TRUST is made effective this 30th day of October 2013.

The parties to this Deed of Trust are: **RYAN NIEBUR**, also known as Ryan B. Niebur, an individual, whose address is 411 West 4th, Wray, Colorado 80758, (the "GRANTOR"), and the Public Trustee of the County of Washington, State of Colorado, (the "PUBLIC TRUSTEE").

**AMOUNT AND TERMS**
The GRANTOR has made a promissory note payable to the order of **FARMLAND PARTNERS OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, which has an address of 4600 S. Syracuse Street, Suite 1450, Denver, CO 80237, as beneficiary of this Deed of Trust (together with its successors and assigns) (the "BENEFICIARY"). The promissory note is dated October 30, 2013. The Deed of Trust secures the payment of $980,000.00 of the original principal sum and is payable with interest as shown in the promissory note and if not sooner paid, shall be due and payable in full on October 30, 2017, subject to extensions thereof. The promissory note states the interest rate on the principal sum, and also provides for future changes in the interest rate. The Deed of Trust secures the repayment of the principal sum with interest, and any additional indebtedness arising under the terms and conditions of this Deed of Trust.

**PROPERTY CONVEYED**
The GRANTOR, to secure the promissory note, does by this Deed of Trust grant and convey to the PUBLIC TRUSTEE the following property situated in the County of Washington, State of Colorado, described as follows:

*The Northwest Quarter (NW1/4) of Section 2, Township 3 South, Range 51 West of the 6th P.M. Washington County, Colorado, and*

*All of Section 23, Township 2 South, Range 51 West of the 6th P.M. (the "LAND").*

Containing 794 acres, more or less, and including, whether or not owned by GRANTOR on the date of this Deed of Trust, or acquired by GRANTOR after the date of this Deed of Trust, or whether now or later located on or appurtenant to the real estate described above:

All improvements; and all easements, appurtenances, and fixtures; all of which shall be considered a part of the security under the Deed of Trust.

This conveyance is subject to any existing easements, rights of way, and mineral interests or mineral leases owned by third parties which were validly reserved or conveyed and are now of record.

Loan #2 Used For Partial Repayment Of A Mortgage

**SUBORDINATION AGREEMENT**

THIS SUBORDINATION AGREEMENT is effective the 2nd day of November, 2015, by and among **RYAN NIEBUR**, also known as Ryan B. Niebur ("Borrower"); **FARMLAND PARTNERS OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, which has an address of 4600 S. Syracuse Street, Suite 1450, Denver, CO 80237 (together with its successors and assigns, the "Lender"); GREAT WESTERN BANK, whose address is 211 W C St., McCook, NE 69001 ("Existing Mortgage Holder").

WHEREAS, Borrower is this day conveying to Lender a security interest in 794 acres located in Washington County, Colorado, described as follows:

*The Northwest Quarter (NW1/4) of Section 2, Township 3 South, Range 51 West of the 6th P.M.; and*

*All of Section 23, Township 2 South, Range 51 West of the 6th P.M.;*

*all in Washington County, State of Colorado; and*

WHEREAS, Lender is financing Borrower, such financing to be evidenced by a promissory note for $980,000.00 from Borrower to Lender (the "Lender's Note") and secured by a first-lien deed of trust for the benefit of Lender encumbering the Property (the "Lender Deed of Trust"); and

WHEREAS, Borrower is using the financing from Lender for repayment of Existing Mortgage Holder, such Existing Mortgage Holder having financed Borrower in the amount of $4,725,741.00 and being secured by a first-lien deed of trust recorded with the Washington County Clerk and Recorder on June 14, 2013 at Reception No. 857184 for the benefit of Existing Mortgage Holder encumbering the Property ("Existing Mortgage Holder Deed of Trust"); and

*Addendum A-2*

[ PAGE ]

RF005674

<u>Loan #2 Is In Default</u>

**DEED OF TRUST AND SECURITY AGREEMENT**

THIS DEED OF TRUST is made effective this 30th day of October 2015.

The parties to this Deed of Trust are: RYAN B. NIEBUR, also known as Ryan B. Niebur, an individual, whose address is 411 West 4th, Wray, Colorado 80758, (the "GRANTOR"), and the Public Trustee of the County of Washington, State of Colorado, (the "PUBLIC TRUSTEE").

**AMOUNT AND TERMS**

The GRANTOR has made a promissory note payable to the order of FARMLAND PARTNERS OPERATING PARTNERSHIP, LP, a Delaware limited partnership, which has an address of 4600 S. Syracuse Street, Suite 1450, Denver, CO 80237, as beneficiary of this Deed of Trust (together with its successors and assigns) (the "BENEFICIARY"). The promissory note is dated October 30, 2015.  This Deed of Trust secures the payment of $980,000.00 of the original principal sum and is payable with interest as shown in the promissory note and if not sooner paid, shall be due and payable in full on October 30, 2017, subject to extensions thereof.  The promissory note states the interest rate on the principal sum, and also provides for future changes in the interest rate. The Deed of Trust secures the repayment of the principal sum with interest, and any additional indebtedness arising under the terms and conditions of this Deed of Trust.

**PROPERTY CONVEYED**

The GRANTOR, to secure the promissory note, does by this Deed of Trust grant and convey to the PUBLIC TRUSTEE the following property situated in the County of Washington, State of Colorado, described as follows:

*The Northwest Quarter (NW1/4) of Section 2, Township 3 South, Range 52 West of the 6th P.M., Washington County, Colorado; and*

*All of Section 23, Township 2 South, Range 51 West of the 6th P.M. (the "LAND").*

Containing 794 acres, more or less, and including, whether or not owned by GRANTOR on the date of this Deed of Trust, or acquired by GRANTOR after the date of this Deed of Trust, or whether now or later located on or appurtenant to the real estate described above.

All improvements, and all easements, appurtenances, and fixtures, all of which shall be considered a part of the security under the Deed of Trust.

This conveyance is subject to any existing easements, rights of way, and mineral interests or mineral leases owned by third parties which were validly reserved or conveyed and are now of record.

---

<u>FPI Acquires Property Collateralizing Loan #2 For $801,800</u>

**DEED**
(Washington County)

KNOW ALL MEN BY THESE PRESENTS:

This Deed is made and entered into as of the 16th day of March, 2017 between Ryan B. Niebur ("Grantor") whose legal address is 411 W. 4th Street, Wray, CO 80758, and FPI Brundidge Farms LLC, a Delaware limited liability company ("Grantee") whose legal address is 4600 S. Syracuse St., Suite 1450, Denver, CO 80237.

WHEREAS, Grantor has reviewed the Grantee's lien secured by the Property set forth below, and Grantor desires to deed the Property to Grantee

**WITNESSETH**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantor acknowledges that Grantee's lien secured by the Property is in default, that Grantor is aware of its rights regarding cure and redemption under Colorado and federal law, including any rights of redemption, fraeback, first refusal, continued possession, homestead under C.P.S. §§ 13-54-102 and 38-41-201 et seq. or 11 U.S.C. § 522 or any other homestead right, reversion or abandonment under 11 U.S.C. § 554 or otherwise to all or any part of the Property, and Grantor does hereby bargain, sell, transfer, assign, convey to Grantee its successors and assigns forever all of Grantor's right, title and interest in and to the Property, together with all crops, mineral rights and improvements, if any, situate, lying and being in the County of Washington State of Colorado described as follows:

**THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE COUNTY OF WASHINGTON, STATE OF COLORADO:**

Township 2 South, Range 51 West of the 6th P.M., Washington County, Colorado;
Section 23: All

| Sale Date | Sale Price | Deed Book | Doc Page | Number Improvement | Qualification | Vacant/Improved | Grantor | Grantee |
|---|---|---|---|---|---|---|---|---|
| 03/16/2017 | $801,800 | 0 | 0 | 887003 | 01 | Unqualified (U) | Vacant | NIEBUR RYAN B | FPI BRUNDIDGE FARMS LLC |
| 03/21/2023 | $0 | 1044 | 490 | | 03 | Unqualified (U) | | NIEBUR RYAN B | MEDLIN LAND CO |

---

*Addendum A-3*

<u>Loan #4 ($2.194 Million) Is Actually An Acquisition Of Three Properties</u>

<u>$1.392M For Two Properties in Kit Carson County</u>

**WARRANTY DEED**
(Kit Carson County)

THIS DEED, made this 16th day of March, 2017, between Ryan B. Niebur of the County of Yuma and State of Colorado, grantor(s), and FPI Burlington Farms LLC, a Delaware limited liability company whose legal address is 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 of the City and County of Denver and State of Colorado, grantee(s).

WITNESSETH, That the grantor(s), for and in consideration of the sum of One Million Three Hundred Ninety-Two Thousand Dollars ($1,392,000), the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell, convey and confirm, unto the grantee(s), its heirs and assigns forever, all the real property, together with improvements, if any, situate, lying and being in the County of Kit Carson and State of Colorado, described as follows:

THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE COUNTY OF KIT CARSON, STATE OF COLORADO:

The Southwest Quarter (SW1/4) of Section Four (4), Township Eight (8) South, Range Forty-three (43) West of the Sixth Principal Meridian, Kit Carson County, Colorado;

and

The Northeast Quarter (NE1/4) of Section Five (5), Township Eight (8) South, Range Forty-three (43) West of the Sixth Principal Meridian, Kit Carson County, Colorado; and

A tract of land situate in the Southeast Quarter of Section 5, Township 8 South, Range 43 West of the 6th Principal Meridian, Kit Carson County, Colorado and being more particularly described as follows: Commencing at the East 1/4 Corner of said Section 5; Thence S 01°38'03" W along the easterly line of the Southeast Quarter of said Section 5 a distance of 1172.46 feet, Thence S 88°21'57" W a distance of 375.00 feet; Thence N 01°38'03" W a distance of 1172.94 feet to a point on the northerly line of said Southeast Quarter of Section 5; Thence N 88°12'09" E along said northerly line a distance of 523.00 feet to the point of beginning, described parcel containing 14.12 acres more or less, as shown in that Survey Plat recorded November 27, 2013 at Document No. 564509 and in Plat Book 91 at Page 81 of the Kit Carson County, Colorado records; and

A tract of land situate in the Southeast Quarter of Section 5, Township 8 South, Range 43 West of the 6th Principal Meridian, Kit Carson County, Colorado and

---

<u>$801,800 For One Property in Washington County</u>

**DEED**
(Washington County)

KNOW ALL MEN BY THESE PRESENTS:

This Deed is made and entered into as of the 16th day of March, 2017 between Ryan B Niebur ("Grantor") whose legal address is 411 W 4th Street, Wray, CO 80758 and FPI Burlington Farms LLC, a Delaware limited liability company ("Grantee") whose legal address is 4600 S Syracuse St., Suite 1450, Denver, CO 80237

**RECITALS**

WHEREAS, Grantor has reviewed the Grantee's lien secured by the Property set forth below, and Grantor desires to deed the Property to Grantee

**WITNESSETH**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantor acknowledges that Grantee's lien secured by the Property is in default, that Grantor is aware of its rights regarding cure and redemption under Colorado and federal law, including any rights of redemption, fraeback, first refusal, continued possession, homestead under C.P.S. §§ 13-54-102 and 38-41-201 et seq. or 11 U.S.C. § 522 or any other homestead right, reversion or abandonment under 11 U.S.C. § 554 or otherwise to all or any part of the Property, and Grantor does hereby bargain, sell, transfer, assign, convey to Grantee its successors and assigns forever all of Grantor's right, title and interest in and to the Property, together with all crops, mineral rights and improvements, if any, situate, lying and being in the County of Washington State of Colorado described as follows:

**THE FOLLOWING DESCRIBED PROPERTY LOCATED IN THE COUNTY OF WASHINGTON, STATE OF COLORADO:**

Township 2 South, Range 51 West of the 6th P.M., Washington County, Colorado;
Section 23: All

| Sale Date | Sale Price | Deed Book | Doc Page | Number Improvement | Qualification | Vacant/Improved | Grantor | Grantee |
|---|---|---|---|---|---|---|---|---|
| 03/16/2017 | $801,800 | 0 | 0 | 447 | 01 | Unqualified (U) | Vacant | NIEBUR RYAN B | FPI BURLINGTON FARMS LLC |

RF005675

*Addendum A-4*

FPI Signs Lease With Ryan Niebur For $61,750 Due On Day FPI Loans Him $61,800

**FARM LEASE – NIEBUR KIT CARSON COUNTY FARM**

THIS LEASE AGREEMENT (the "**Agreement**") is made and entered into as of the date of the last signature (the "**Effective Date**"), by and between FPI Burlington Farms LLC, a Delaware limited liability company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 (the "**Landlord**"), and Ryan B. Niebur and Stacie K. Niebur whose address is 411 W. 4th Street, Wray, CO 80758 (the "**Tenant**").

The parties agree to the following:

1. **Description of the Property.** Landlord leases to Tenant, for the purpose of producing agricultural crops only, the real property described in Exhibit A, together with all improvements thereon ("**Improvements**"), all appurtenances and all hereditaments (collectively, the "**Farm**"). This Agreement is for 334.4 tillable acres. Landlord shall have the right to lease or sell a portion of the Farm for non-farming purposes. In case of such sale or lease of acreage, Landlord will reimburse Tenant for any lost crop revenues for the year in which such reduction occurs and will reduce rents in future years on a pro rata per acre basis.

2. **Term of Agreement.** The lease period begins on March 16, 2017 and ends on November 30, 2021, unless terminated earlier in accordance with Section 11 of Exhibit B or otherwise provided in this Agreement.

3. **Rental Payments.** The annual rent for the Farm shall be $41,750 for farming plus $20,000 for a building totaling $61,750 due and payable in full for each calendar year during the term of the Agreement. The first year's rent will be due on March 16, 2017 and rent shall be due on March 15th of each subsequent year of the Agreement. Although the last year of this lease ends on November 30 which is less than a full calendar year Tenant shall pay $61,750 for the period of March 15 to November 30, 2021. In the event the cash rent is not paid in full by the due date(s), Tenant agrees to pay interest on the amount of unpaid rent at an interest rate equal to the higher of two percent (10%) per annum or two percent (2%) above the prime interest rate then published by the Wall Street Journal but not to exceed the highest rate permitted by law. The first year's rent in the amount of $61,750 shall be paid on March 16, 2017 from proceeds of Tenant's real estate sale on March 16, 2017.

| LANDLORD: | TENANT: |
|---|---|
| FPI BURLINGTON LLC | Ryan B. Niebur and Stacie K. Niebur |
| | |
| By: | By: |
| Name: Greg Ruddel | Name: Ryan Niebur & Stacie Niebur |
| Title: Chief Financial Officer | Date: 3-15-17 |

*Addendum B-1*

FPI Loans $100,000 To Jesse Hough Thru Holdings (Loan #4)

**TRUST DEED**

**WITH POWER OF SALE**

This Trust Deed made July 25, 2017, by and among the following:

DATE:  July 25, 2017

TRUSTOR:  PHS HOLDINGS, LLC,
an Illinois Limited Liability Company
906 E Louisiana Avenue, Suite #209
Denver, Colorado 80220

TRUSTEE:  ANDREW J. HOFFMAN
ATTORNEY AT LAW
PO Box 910
47640 E. HWY 20, Ste 81
Atkinson, Nebraska 68713

BENEFICIARY:  Farmland Partners Inc.,
a Maryland Corporation
1519 York Road
Lutherville, Maryland 21093

CONSIDERATION:  $100,000.00

Trustor, in consideration of the sum of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00), receipt of which is hereby acknowledged, conveys to Trustee, in trust, with power of sale, the following described real estate (as defined in Neb. Rev. Stat. §76-201):

The W1/2 NE1/4 of Section 27, Township 17 North, Range 4 East of the 6th P.M., Butler County, Nebraska, EXCEPT A part of the W1/2 NE1/4 of Section 27, Township 17 North, Range 4 East of the 6th P.M., Butler County, Nebraska, located in the NW1/4 NE1/4 and being more particularly described as follows: Beginning at the Northwest corner of the NE1/4 of said Section 27; thence S89°28'44" E (assumed bearing) on the North line of said NE1/4, a distance of 268.61 feet; thence S00°31'16" W perpendicular to said North line, distance of 33.00 feet; thence S60°00'00" W, a distance of 309.11 feet to a point on the West line of said NE1/4; thence N00°10'49" W on said West line, a distance of 190.00 feet to the point of beginning.

FPI Acquires The Property Collateralizing Loan #4

**WARRANTY DEED**

PHS Holdings, LLC, an Illinois Limited Liability Company, GRANTOR, in consideration of One Dollar ($1.00) and other good and valuable consideration, conveys to GRANTEE, Cottonwood Valley Land, LLC, a Nebraska Limited Liability Company the following described real estate (as defined in Neb. Stat. § 76-201):

Parcel 1:
The E1/2 NE1/4 of Section 27, Township 17 North, Range 4 East of the 6th P.M., Butler County, Nebraska.

Parcel 2:
The W1/2 NE1/4 of Section 27, Township 17 North, Range 4 East of the 6th P.M., Butler County, Nebraska. EXCEPT A part of the W1/2 NE1/4 of Section 27, Township 17 North, Range 4 East of the 6th P.M., Butler County, Nebraska, located in the NW1/4 NE1/4 and being more particularly described as follows: Beginning at the Northwest corner of the NE1/4 of said Section 27; thence S89°28'44" E (assumed bearing) on the North line of said NE1/4, a distance of 268.61 feet; thence S00°31'16" W perpendicular to said North line, distance of 33.00 feet; thence S60°00'00" W, a distance of 309.11 feet to a point on the West line of said NE1/4; thence N00°10'49" W on said West line, a distance of 190.00 feet to the point of beginning.

Executed:  1 - 12          20__.

PHS Holdings, LLC, an Illinois
Limited Liability Company

By:
Jesse Hough, Manager

[ PAGE ]

RF005676

*Addendum B-2*

RF005677

_June 14th, 2018 Subordination Agreement (Butler County, NE) Shows FPI Enters Lease With PHS Holdings_

SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is dated as of the 6th day of May, 2018, and is by PHS Holding LLC, an Illinois limited liability company with principal offices at 900 E. Louisiana Ave. Suite 209, Denver, CO 80210 (the "Subordinating Party"), and Cottonwood Valley Land, LLC, or assigns, a Nebraska limited liability company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 ("CVL"); Attention: Chief Financial Officer and BRIGHTHOUSE LIFE INSURANCE COMPANY, a Delaware corporation, on behalf of itself, and any of its subsidiaries, affiliates, successors and assigns with an interest in the Loan (defined herein, individually and collectively the "Lender");

WITNESSETH

WHEREAS, CVL intends to obtain a loan from the Lender (the "Loan")

WHEREAS, the Loan will be secured, without limitation, by a first mortgage or deed of trust on the real estate located in Butler County, Nebraska, and described on Exhibit A, attached (the "Land") together with all improvements located on the Land and other real and personal property described therein (collectively, the "Mortgaged Property"; and that mortgage or deed of trust granted by CVL to the Lender, as it is now or may hereafter be amended, modified or restated in its entirety, the "Security Instrument");

WHEREAS, the Subordinating Party has certain repurchase rights as provided in the real estate purchase agreement between the Subordinating Party, as "Seller" and CVL, as "Buyer" signed and effective on December 30, 2017 [that agreement, as amended, the "REPA"], specifically providing as follows [the "Repurchase Rights"]:

7    Additional Provisions.

a    Repurchase Option and Deadline. On the third, fourth and fifth anniversary of this Agreement [as defined in the REPA] (the "Repurchase Option Deadline") Seller shall have the option to repurchase the Property [as defined in the REPA](the "Repurchase Option") for a total consideration (the "Repurchase Price") equal to the sum of, (a) the Purchase Price [defined in the REPA] multiplied by 1.053 if exercised on or prior to the third anniversary [of the REPA]; or 1.176 if exercised on or prior to the fourth anniversary [of the REPA] or 1.179 if exercised on or prior to the fifth anniversary [of the REPA] and, (b) the Total Investment made from the Effective Date [as defined in the REPA] through the Repurchase Option [insolence by buyer for any improvements multiplied by 1.06. The "Total" the "Total Investment" at any time will equal the actual out-of-pocket costs Landlord [Buyer] and its affiliates incurred in arms-length transactions with third parties in connection with Landlord's [Buyer's] development of the Farm [defined in the REPA]. The Total Investment will be determined in good faith by Landlord [Buyer], provided however that Landlord [Buyer] will provide Tenant [Seller] with such evidence of the Landlord's [Buyer's] determination of the Total Investment as Tenant [Seller] may reasonably require. Failure of the Seller to comply with any term of that Agreement [defined in the REPA] at the Cottonwood Farm Lease Agreement [as defined in the REPA] will immediately terminate the Seller's Repurchase Option. Upon such termination, Seller agrees, upon the request of the Buyer, to the execute an knowledge and deliver such other acts covenant, instruments, documents and other assurances as may be commonly necessary to terminate the rights set forth in Section 7(a) [of Exhibit A to the REPA]. The decision to exercise the Repurchase Option shall be communicated to Buyer no later than six months prior to the applicable Repurchase Option Deadline ("Repurchase Notification Deadline"). Buyer shall then have 30 days to provide Seller with an estimate of the Repurchase Price. Within ten (10) days of receipt of the estimate Repurchase Price, Seller shall make a non-refundable down payment equal to 15% of the estimated Repurchase Price.

PHS HOLDINGS LLC

By: _____

Name: _Jesse Hough_

Title: _Manager_

Date: _5-3-18_

_FPI Lends Jesse Hough $5.25 Million Thru Siffring Farms Six Days After Entering Lease With PHS Holdings_

TRUST DEED WITH POWER OF SALE

THIS DEED OF TRUST ALSO CONSTITUTES A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER THE UCC

This Trust Deed made January 18, 2018, by and among the following:

DATE:        January 18, 2018

TRUSTOR:     SIFFRING FARMS, INC., A Nebraska Corporation
             3620 B ROAD
             RISING CITY, NE 68658

TRUSTEE:     ANDREW J. HOFFMAN
             ATTORNEY AT LAW
             PO Box 900
             47640 E. HWY 20, Ste #1
             Atkinson, Nebraska 68713

BENEFICIARY: FARMLAND PARTNERS OPERATING
             PARTNERSHIP, LP
             a Delaware Limited Partnership
             4600 S. Syracuse St., #1450
             Denver, CO 80237

CONSIDERATION:  $5,250,200.00

SIFFRING FARMS, INC., A Nebraska Corporation,
TRUSTOR

By: _____
    JESSE HOUGH, President

STATE OF NEBRASKA  )
                   ) ss.
COUNTY OF _Butler_ )

The foregoing instrument was acknowledged before me this 18 day of January, 2018, by JESSE J. HOUGH, as President of SIFFRING FARMS, INC., a Nebraska Corporation, TRUSTOR.

_Addendum B-3_

[ PAGE ]

RF005678

**FPI Lends Jesse Hough $669,000 Thru Hough Farms**

### TRUST DEED
### WITH POWER OF SALE

This Trust Deed made August 25, 2017, by and among the following:

DATE:  August 25, 2017

TRUSTOR:  HOUGH FARMS,
a Nebraska General Partnership
810 Montgomery Street
Bellwood, Nebraska 68624

TRUSTEE:  ANDREW J. HOFFMAN
ATTORNEY AT LAW
PO Box 938
47640 E. HWY 20, Ste #1
Atkinson, Nebraska 68713

BENEFICIARY:  FARMLAND PARTNERS OPERATING
PARTNERSHIP, LP
a Delaware Limited Partnership
4600 S. Syracuse St., #1450
Denver, CO 80237

CONSIDERATION:  $669,000.00

Hough Farms,
a Nebraska General Partnership

JESSE J HOUGH, General Partner

*Addendum C-1*

RF005679

FPI Acquires Property From Justice Farms of NC On Same Day Settled Loan #8

| | Date | Grantor | Grantee | Kind | Bk | Pg | Description | Doc # |
|---|------|---------|---------|------|----|----|-------------|-------|
| 16 | 01/12/2018 | JUSTICE FARMS OF NORTH CAROLINA, LLC | FPI CAROLINAS LLC | DEED | 1301 | 241 | APP 3915.00 ACS PAR 1; APP 96 ACS PAR 4 GRAIN | 443959 |
| 17 | 01/12/2018 | TANGLEWOOD-EC, LLC | FPI CAROLINAS LLC | DEED | 1301 | 249 | 485.44 ACS NORFOLK SOUTHERN RAILROAD MAP | 443960 |
| 18 | 01/12/2018 | JUSTICE FARMS OF NORTH CAROLINA, LLC | FPI CAROLINAS LLC | DEED | 1301 | 254 | 123.7 ACS W/EX SCHEDULE A TCT 1 BK 478 | 443961 |

Subordination Agreement Shows FPI Enters Lease With Justice Farms

SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is dated as of the 6th day of June, 2018, and is by JUSTICE FARMS OF NORTH CAROLINA, LLC, a Virginia limited liability company ("JFNC"), JAMES C. JUSTICE COMPANIES INC., a Delaware corporation ("Justice") and TANGLEWOOD-EC, LLC, a Virginia limited liability company, with principal offices at 302 S. Jefferson St., Roanoke, VA 24011 (collectively the "Subordinating Parties"), FPI CAROLINAS LLC, a Delaware limited liability company, FARMLAND PARTNERS OPERATING PARTNERSHIP, LP, a Delaware limited partnership, and FARMLAND PARTNERS INC., a Maryland corporation, (collectively the "Farmland Entities")with a an address for purposes of this Agreement at 4600 S. Syracuse Street, Suite 1450, Denver, Colorado 80237, Attention: Chief Financial Officer; and BRIGHTHOUSE LIFE INSURANCE COMPANY, a Delaware corporation, on behalf of itself, and any of its subsidiaries, affiliates, successors and assigns with an interest in the Loan (defined herein, individually and collectively the "Lender").

WITNESSETH

WHEREAS, the Farmland Entities intend to obtain a loan from the Lender (the "Loan").

WHEREAS, the Loan will be secured, without limitation, by a first mortgage or deed of trust on the real estate located in Pasquotank County, North Carolina, and described on Exhibit A, attached (the "Land") together with all improvements located on the Land and other real and

WHEREAS, the Subordinating Parties have certain repurchase rights as provided in the real estate purchase agreement between one or more of the Subordinating Parties, as "Seller" and one or more of the Farmland Entities, as "Buyer" signed and effective on December 20, 2017(that agreement, as amended, the "REPA"), specifically providing as follows (the "Repurchase Rights"):

7.    Additional Provisions

a.    Repurchase Option and Deadline. On the third and fourth anniversary of this Agreement [as defined in the REPA] (the "Repurchase Option Deadline") Seller shall have the option to repurchase the Property [as defined in the REPA](the "Repurchase Option") for a total consideration (the "Repurchase Price") equal to the sum of: (a) the Purchase Price [defined in the REPA] multiplied by 1.174 if exercised on or prior to the third anniversary [of the REPA], or 1.239 if exercised on or prior to the fourth anniversary [of the REPA], (b) the number of tillable acres added from the date of Closing as a result of any development of the Property by Buyer multiplied by $4,500.00, and (c) the Total Investments made from the Effective Date [defined in the REPA] through the Repurchase Option Deadline by Buyer for any improvements multiplied by 1.06. The "Total Investment" at any time will equal the actual out-of-pocket costs Buyer and its affiliates incurred in arms-length transactions with third parties in connection with Buyer's development of the Property. The Total Investment will be determined in good faith by Buyer, provided however that Buyer will provide Seller with such evidence of Buyer's determination of the Total Investment as Seller may reasonably require. Failure of the Seller to comply with any term of this Agreement [defined in the REP] or the Farm Lease [as defined in the REPA] will immediately terminate the Seller's Repurchase Option. Upon such termination, Seller agrees, upon the request of the Buyer, to do, execute, acknowledge and deliver such other acts, consents, instruments, documents and other assurances as may be reasonably necessary to terminate the rights set forth in Section 7(a) [of Exhibit B to the REPA]. The decision to exercise the Repurchase Option shall be communicated to Buyer no later than six months prior to the applicable Repurchase Option Deadline ("Repurchase Notification Deadline"). Buyer shall then have 30 days to provide Seller with an estimate of the Repurchase Price. Within ten (10) days of receipt of the Repurchase Price, Seller shall make a non-refundable down payment equal to 15% of the estimated Repurchase Price and the closing of the repurchase shall occur no later than the Repurchase Option Deadline.

[ PAGE ]

RF005680

Message

**From:**  Person A   Person A
**Sent:**  7/2/2018 4:02:16 PM
**To:**  RF   RF   RF
**Subject:**  Re: New RF Research

Thank you. Will review

Person A

# Person A

On Jul 2, 2018, at 4:52 PM, RF   RF   RF wrote:

Person A

Please find the attached new research from RF As always, call me with questions.

# RF

************************************************************************************************************************************************

NOTICE: This e-mail does not represent an offer to purchase or a solicitation of securities by RF Such an offer can only be made by obtaining appropriate offering documents. Any past performance provided is for illustrative purposes only and is not indicative of future investment results.

THIS COMMUNICATION DOES NOT CONSTITUTE AN INTENTION BY THE SENDER TO CONDUCT A TRANSACTION OR MAKE ANY AGREEMENT OR CONTRACT BY ELECTRONIC MEANS. NOTHING CONTAINED HEREIN OR IN ANY ATTACHED ELECTRONIC FILE SHALL SATISFY THE REQUIREMENTS FOR A WRITING, NOR CONSTITUTE A CONTRACT OR AN ELECTRONIC SIGNATURE, AS THOSE TERMS ARE DEFINED IN OR CONTEMPLATED BY THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE, 15 U. S. C. SECTION 7000 ET SEQ. OR ANY VERSION OF THE UNIFORM ELECTRONIC TRANSACTION ACT ADOPTED BY ANY STATE OR ANY OTHER STATUTE GOVERNING ELECTRONIC TRANSACTIONS.

<FPI v14.docx>