IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02351-KLM

FARMLAND PARTNERS INC.,

      Plaintiff,

v.

ROTA FORTUNAE, whose true name is unknown, and
JOHN/JANE DOES 2-10, whose true names are unknown,

      Defendants.

_____

# ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on **Defendant Rota Fortunae's Motion to Dismiss Complaint** [#97][1] (the "Motion"). Plaintiff filed a Response [#110] in opposition to the Motion[2] and Rota Fortunae ("Rota")[3] filed a Reply [#111]. The parties have consented to

---

[1] "[#97]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's electronic case filing and management system (CM/ECF). This convention is used throughout this Order, and the Court cites to the page numbers assigned by CM/ECF.

[2] The Response [#110] was filed in opposition to both the instant Motion [#97] and Rota Fortunae's Motion to Dismiss Under the Texas Citizens' Participation Act ("TCPA") [#98] ("TCPA Motion"). The TCPA Motion was denied without prejudice and that ruling [#127], as well as a ruling [#45] on a previously filed Motion to Dismiss Under the TCPA [#22], are currently on appeal [#49, #130]. The Court denied Rota Fortunae's Motion for Stay Pending Appeal [#52]. *See Order* [#91]. Thus, the Court considers only the portion of the Response [#110] applicable to the instant Motion [#97].

[3] "Rota Fortunae" is a fictitious name used by a person who wrote and published an allegedly defamatory article about Plaintiff which is the subject of this litigation. Rota's true name remains unknown, although Rota's identity is the subject of a motion to compel [#115] by Plaintiff. An Order on that motion [#115] is forthcoming. The Court refers to Rota as "he" and "him" for purposes of convenience only.

proceed before the undersigned for all proceedings pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2(d). *See* [#26, #28]. The Court has reviewed the entire case file and the applicable law and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#97] is **granted in part and denied in part**.

## I. Background[4]

This case arises from an alleged "short-and-distort attack" accomplished via a published posting or article ("Article") written by Defendant Rota, which purportedly resulted in Defendants profiting from short positions in Farmland Partners, Inc.'s ("FPI") stock. *See FPI's Opp'n to Rota's Mot. to Dismiss* [#110] (hereinafter "Response"), at 8; *Compl.* [#3], ¶ 33. The Complaint [#3] asserts claims of defamation/defamation by libel per se, disparagement, intentional interference with prospective business relations, unjust enrichment, deceptive trade practices in violation of the Colorado Consumer Protection Act, and civil conspiracy.

FPI is a publicly-traded farmland REIT ("Real Estate Investment Trust") that acquires and leases farmland throughout the United States and also originates mortgage loans to farmers, including its own tenants. *Compl.* [#3], ¶ 6. FPI's stock is traded on the New York Stock Exchange. *Id.* at ¶ 7.

FPI alleges that on July 9, 2018, it received a letter by email from Texas attorney Matthew Mitzner stating that he represented a "group of investors" who "have prepared and anticipate publishing an article about the FPI Loan Program." *Compl.* [#3], ¶¶ 8-9 and Ex.

---

[4] On a motion to dismiss, the Court accepts the well-pled, non-conclusory allegations of the Complaint as true. *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

A.  Mr. Mitzner's letter stated that, "[p]rior to publishing the prepared article, by this email, we are providing your company the opportunity to respond to the main issues the article addresses, represented by our below-listed questions."  *Id.* ¶ 10.  The letter provided FPI with only 24 hours to respond prior to publication of the "prepared article."  *Id.* ¶ 13 and Ex. A.  The letter did not include a copy of the "prepared article."  FPI did not provide a response with the 24 hour time frame.  *Id.* at ¶ 16.

On July 11, 2019, Rota published the Article about FPI on the website Seeking Alpha, which identified the posting as an "Editors' Pick."  *Compl.* [#3], ¶ 18; *see also Article* [#97-1].  Seeking Alpha is a financial and investor media outlet in New York.  *Compl.* [#3], ¶ 6.  The Article allegedly contained numerous false and misleading statements about FPI, including that FPI "faced a serious risk of insolvency."  *Id.* at ¶¶ 20-21.  The Complaint alleges that many of the false and misleading statements were included in the Article "to drive the price of [FPI's] stock down so that [Defendants] could profit quickly before the falsity of its statements could be revealed."  *Id.* at ¶ 29.  Soon after the internet posting of the Article, FPI's stock dropped by approximately 39%, and Defendants then allegedly profited from any short positions they held.  *Id.* at ¶¶ 34-35.

Also, on July 11, 12 and 16, 2018, the Complaint alleges that Rota published more false and misleading statements about FPI on Twitter, "repeatedly characterizing the false information in the [Article] as 'facts.'"  *Compl.* [#3], ¶¶ 38, 39.  FPI issued a news release denying "the more spurious allegations" in the Article on July 11, 2018, and issued a statement rebutting the false and misleading statements in the Article on July 17, 2018.  *Id.* at ¶¶ 36, 42.  FPI notified Seeking Alpha of the alleged false and misleading statements through its "dispute an article" process, but Seeking Alpha refused to withdraw the Article.

*Id.* at ¶ 44.  This refusal was based in part on Rota's "correction" published on July 19, 2018.  *Id.*  The "correction" conceded that material misstatements had been made in the July 11th Article and attempted to change portions of the Article, but did not correct all the alleged false and misleading statements FPI identified in its press release, and continued to identify the posting as an "Editor's Pick."  *Id.* at ¶¶ 45, 46.

On July 23, 2018, FPI filed this lawsuit against Rota and unknown "John/Jane Does 2-10," the alleged co-conspirators.  The lawsuit was filed thirteen days after the Article was published.

FPI argues that Rota's Motion [#97] is part of the "short-and-distort attack" Rota and his co-conspirators perpetrated on FPI by which they profited from short positions in FPI's stock, as investors digested false and misleading statements published in the Article on July 11, 2018.  *Response* [#110], at 8.  The first phase of the attack, according to FPI, occurred during the run up to July 11, 2018 when Rota "planned the intentional and malicious market manipulation scheme with his co-conspirators, the Does."  *Id.*  The attack also allegedly "involved building short positions of FPI's stock to illegally profit from the decline that followed the attack."  *Id.*  FPI asserts that the next phase involved publishing and broadly disseminating the Article, "a defamatory hit piece claiming, among other falsehoods, that FPI faced insolvency."  *Id.*  According to FPI, "for his misconduct, Rota has sought to retreat with his profits and avoid accountability for his manipulative scheme, including by improper and unsuccessful efforts to evade service in this action, through a frivolous appeal of unappealable orders, by unsupported motions to stay denied by both this Court and the Tenth Circuit, and now through similarly frivolous dismissal arguments refuted by controlling authority. . . ."  *Id.*

Rota argues, on the other hand, that this case is a SLAAP[5] suit filed solely as retaliation for the exercise of his First Amendment rights as an anonymous individual SEC-whistleblower.  *Motion* [#97], at 1.  Rota acknowledges that the Article criticizes FPI's business operations and value, but avers that he "meticulously disclosed all facts upon which he based his analysis and conclusions, (2) disclosed his short position on FPI's (publicly traded) stock, and (3) reiterated that his conclusions were "opinions" and that readers should do their own research and draw their own conclusions." *Id.* at 1-2.  Rota further asserts that FPI fails to identify even one, false defamatory fact in the Article, and that dismissal is appropriate both on this basis and because the Court lacks personal jurisdiction over Rota.  *Id.* at 2.

## II.  Legal Standards

### A.     Federal Rule of Civil Procedure 12(b)(2)

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is to test whether the Court has personal jurisdiction over the named party.  After a motion to dismiss has been filed, the plaintiff bears the burden of establishing personal jurisdiction over the defendant.  *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984).

The Court accepts the well-pled allegations (namely the plausible, nonconclusory, and nonspeculative facts) of the operative pleading as true to determine whether the plaintiff has made a prima facie showing that the defendants are subject to the Court's personal jurisdiction.  *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070

---

[5] While Rota did not define SLAAP, it has been defined as a "strategic lawsuit against public participation."  https://en.wikipedia.org/wiki/Strategic_lawsuit_against_public_participation.

(10th Cir. 2008). The Court "may also consider affidavits and other written materials submitted by the parties." *Impact Prods., Inc. v. Impact Prods., LLC*, 341 F. Supp. 2d 1186, 1189 (D. Colo. 2004). Accordingly, the Court may consider Rota's Declaration and the attached Article and an excerpt of the comments, Exhibit A to the Motion [#97], for purposes of determining personal jurisdiction. The Court may also consider the Declarations and Rota's Tweets related to the Article that are attached to the Response [#110]. Any factual disputes are resolved in the plaintiff's favor. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1074-75 (10th Cir. 2004).

## B.     Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[ ] [has] not nudged [his] claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will

not do.  Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted).  That said, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"; the 12(b)(6) standard does not "require that the complaint include all facts necessary to carry the plaintiff's burden." *Khalik*, 671 F.3d at 1192 .

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  As the Tenth Circuit has explained, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

The Tenth Circuit has stated that "if matters outside the pleading are presented to and not excluded by the court, [a Rule 12(b)(6) motion] shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56." *David v. City & County of Denver,* 101 F.3d 1344, 1352 (10th Cir. 1996).  There are, however, exceptions to this rule.  Thus, a court may review the arguments in a response in opposition to a motion to dismiss. *Martin v. Central States Emblems, Inc.*, 150 F. App'x 852, 857 (10th Cir. 2005).  A court may also "review documents referred to in a complaint if the document is central to the plaintiff's claim and the parties do not dispute the authenticity of the documents." *Id.*  As to the portion of the Motion [#97] that relies on Rule 12(b)(6), the Court will consider the Article and comments thereto ([#97-1], at 3-49) as well as Rota's Tweets

[#110-2] because they are referred to in the Complaint [#3], are central to FPI's claims, and there is no dispute as to their authenticity. *Id.*; *see also GFF Corp. v. Associated Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  The Court will not consider the Declarations attached to the Motion [#97] and the Response [#110].

### III.  Analysis

Rota argues that the case against him should be dismissed on two separate grounds.  First, Rota argues under Rule 12(b)(2) that the Court lacks personal jurisdiction over him.  *Motion* [#97], at 3-6.  Second, Rota argues under Rule 12(b)(6) that the defamation claim fails to state a claim upon which relief can be granted, and that the other claims fail because, among other reasons, they are derivative of the defamation claim.  *Id.* at 6-22.  The Court analyzes each argument in turn.

### A.      Personal Jurisdiction

The Court found in its Order [#108] of August 30, 2019, that it has personal jurisdiction over Rota in this case.  *Id.* at 3.  The Court explained that a written order setting forth the reasons for its conclusion would issue after the parties briefed the other arguments raised in the Motion to Dismiss [#97].  *Id.*  This Order explains the basis for the Court's finding.

A Court may only exercise personal jurisdiction over a non-resident defendant if: (1) the long-arm statute of Colorado permits personal jurisdiction in the case; and (2) the exercise of personal jurisdiction in Colorado comports with the Due Process Clause of the United States Constitution.  *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1276 (10th Cir. 2005); *see also Dudnikov*, 514 F.3d at 1070.  The Supreme Court of Colorado interprets Colorado's long-arm statute "to confer the maximum jurisdiction permitted by the

due process clauses of the United States and Colorado constitutions." *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005). Accordingly, because a due process analysis of jurisdiction will also satisfy Colorado's long-arm statute, the Court need only consider whether the exercise of personal jurisdiction over Rota is permitted by the Due Process Clause. *Dudnikov*, 514 F.3d at 1070 ("[T]he first, statutory, inquiry effectively collapses into the second, constitutional, analysis."); *SCC Commc'ns v. Anderson*, 195 F. Supp. 2d 1257, 1260 (D. Colo. 2002) ("[The] analysis turns on a single inquiry, whether the exercise of personal jurisdiction over [the defendant] comports with due process.").

"Due process requires both that the defendant 'purposefully established minimum contacts within the forum State' and that the 'assertion of personal jurisdiction would comport with fair play and substantial justice.'" *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotation marks omitted)). "Depending on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction. *Id.* There is no contention in this case that the Court has general jurisdiction over Rota; rather, FPI only alleges that jurisdiction is proper based on specific jurisdiction. *See FPI's Opp'n to Rota Fortunae's Mots. to Dismiss* [#34] ("initial Response"), at 25-31 (incorporated into Response [#110], at 21-22). Accordingly, the Court addresses only specific jurisdiction for purposes of Rota's Motion [#97].

"Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with the forum state." *Old Republic*, 877 F.3d at 904. Specific jurisdiction calls for a two-step inquiry: (1)

"whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so," (2) "whether the defendant has presented a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King*, 471 U.S. at 476-77; *Shrader v. Biddinger*, 633 F.3d 1235, 1239-40 (10th Cir. 2011)).

### 1.    Minimum Contacts

"The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have 'purposefully directed its activities at residents of the forum state,' and (ii) that 'the plaintiff's injuries must arise out of [the] defendant's forum-related activities.'" *Old Republic*, 877 F.3d at 904 (quoting *Shrader*, 633 F.3d at 1239).  The Court analyzes each requirement below.

### a.    Purposeful Direction

Step one of the minimum contacts test, the purposeful direction requirement, "'ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person." *Old Republic*, 877 F.3d at 904-05 (quoting *Burger King*, 471 U.S. at 475).  "Mere foreseeability of causing injury in another state is insufficient to establish purposeful direction." *Id.*  In a tort case such as this, "a defendant has 'purposefully directed' his activities at Colorado or its residents when he has (1) taken intentional action, (2) the action was 'expressly aimed' at Colorado, and (3) the action was taken with the knowledge that 'the brunt of th[e] injury' would be felt in Colorado." *Advanced Career Techs., Inc. v. Does*, No. 13-cv-0304-WJM-KLM, 2015 WL 328639, at *2 (D. Colo. Jan. 23, 2015) (hereinafter

"*ACT*") (quoting *Dudnikov*, 514 F.3d at 1072).[6]

This test originates from the United States Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), and is also referred to as the "harmful effects test" or the "*Calder* effects test." *See Old Republic*, 877 F.3d at 907-908. The Supreme Court recently emphasized in *Walden v. Fiore*, 571 U.S. 277 (2014) that, under the *Calder* effects test, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 285. In *Walden*, the Court noted that the defendants' "ample" forum contacts in *Calder* included the following: "The defendants relied on phone calls to [forum state sources] for the information in their article; they wrote the story about the plaintiff's activities in [the forum state]; they caused reputational injury in [the forum state] by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that State." 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 789); *see Old Republic*, 877 F.3d at 907.

In *Shrader*, the Tenth Circuit cited with approval the "*Calder*-derived analysis for specific jurisdiction in the internet context." 633 F.3d at 1241; *see also Old Republic*, 877 F.3d at 908; *Silver v. Brown*, 382 F. App'x 723, 728-30 (10th Cir. 2010) (applying the *Calder* effects test to defamation and related tort claims arising out of a derogatory post on an online forum). The Tenth Circuit stated that "it is necessary to adapt the analysis of personal jurisdiction [to internet activity] by placing emphasis on the internet user or site

---

[6]   The parties agree that this is the framework the Court should utilize for determining whether Rota's actions satisfy the purposeful direction requirement. *See Motion* [#97], at 4; *Initial Response* [#34], at 24-25.

*intentionally directing* his/her/its activity or operation at the forum state rather than just having the activity or operation accessible there." *Shrader*, 633 F.3d at 1240 (emphasis in original).

Thus, as this Court has recognized, "[s]imply posting defamatory statements on a website will not, standing alone, form a basis for personal jurisdiction against the poster in any state where the post may be read." *ACT*, 2015 WL 328639, at *2 (citing *Shrader*, 633 F.3d at 1241). Rather, in determining whether personal jurisdiction exists over a particular defendant in the internet context, "courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Shrader*, 633 F.3d at 1241. In short, "*the forum state itself must be the focal point of the tort.*" *Id.* at 1244 (emphasis in original) (quoting *Dudnikov*, 514 F.3d at 1074 n.9) (internal quotation marks omitted).

### i.     Intentional Act and Brunt of The Injury

Applying the purposeful direction test to this case, Rota does not seriously contend that FPI's allegations fail to satisfy the first and third elements of the test. *See generally Motion* [#97], at 4-6. There is no dispute that Rota's alleged actions were intentional, *i.e.*, that Rota intentionally authored the Article and Tweets regarding FPI and amassed a short position in FPI's stock as FPI alleges. *See Silver*, 382 F. App'x at 729.

Moreover, FPI has plausibly alleged that Rota knew that the brunt of FPI's injury would be felt in Colorado. To the extent that Rota argues that the third element is not satisfied because FPI's alleged harm (drop in the price of its shares) occurred in New York (*Motion* [#97], at 5), the Court finds this cursory argument unavailing. FPI alleges that Rota knew that FPI was located in Colorado and conducted its business there, as evidenced by

the July 9, 2018 letter Rota sent to FPI's headquarters in Colorado regarding the anticipated Article. *Compl.* [#3], ¶¶ 8-10; *Initial Resp.* [#34], at 29; *see also Dudnikov*, 514 F.3d at 1077 (finding plaintiffs satisfied their burden by establishing "that defendants knew plaintiffs' business and auction were based in Colorado, and therefore knew the effects of [their actions] would be felt there"). As the Tenth Circuit noted, "the 'intending harm' language in *Shrader* . . . ask[s] whether the defendant intended its online content to create effects specifically in the forum state." *Old Republic*, 877 F.3d at 917. Accordingly, the Court finds that the first and third elements under the purposeful direction test are satisfied.

### ii.   Expressly Aimed

The second element of the purposeful direction test, whether Rota's alleged actions were "expressly aimed" at Colorado, is a closer call. This element requires the Court to focus on the Defendant's intentions and where the "'focal point' of [their] purposive efforts" was. *Dudnikov*, 514 F.3d at 1075. In cases involving online defamation, the audience and content of the statement can be considered to determine the statement's focal point. *Shrader*, 633 F.3d at 1245. However, as stated above, posting defamatory statements on an internet site does not, without more, subject the poster to personal jurisdiction anywhere the statement is accessible. *Id.* at 1241. "In considering what 'more' could create personal jurisdiction for such activities, courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.*

In the Motion [#97], Rota argues that the Complaint [#3] fails to demonstrate that Colorado was "the focal point" of Rota's Article "either in terms of its audience or its content." *Id.* at 4 (quoting *Shrader*, 633 F.3d at 1244). In support, Rota notes that

"Seeking Alpha is a New York media outlet that 'targets a trading community . . . with no particular ties to' Colorado [and that] [Rota's] Article is about FPI's business and stock price, the former of which occurs nationwide and the latter of which is traded in New York." *Id.* at 4-5 (quoting *Shrader*, 633 F.3d at 1245) (other citations omitted) (alterations in original).   Therefore, according to Rota, "the alleged defamatory action (publishing the Article) and the alleged harm (drop in FPI's stock price) both occurred in New York."   *Id.* at 5.   The Court rejects Rota's argument, finding that FPI has made a prima facie case demonstrating that Colorado was the focal point of Rota's conduct.

First, aside from the allegation that Rota authored the Article and Tweets which directly address FPI's and its employees' activities in Colorado, FPI also alleges that the Article: (1) disparages FPI's use of its loan program, which the Court can reasonably infer is managed at FPI's principal place of business in Colorado (Complaint [#3], ¶¶ 1, 24); (2) includes accusations concerning Colorado properties managed by FPI and its transactions with Jesse Hough and Ryan Niebur in Colorado involving Colorado property (see Article [#97-1], at 5-6, 12-13, 25-26, 30); and (3) includes personal and professional attacks against Paul Pittman, FPI's CEO and a Colorado resident (*id.* at 2, 7-9, 26, 33, 36-38). Additionally, like the defendants in *Calder* who relied on phone calls to forum state sources for the information in their article, FPI plausibly alleges that Rota relied on sources from Colorado when drafting the Article.   As FPI notes, the Article references "Colorado UCC filing(s); Washington County, Colorado deed and appraisal records; documents pulled from a Colorado Springs bankruptcy case; Kit Carson County, Colorado deed records; and a 2017 Colorado Farm Land Values & Rents Survey."   *See, e.g., Article* [#97-1], at 12-13, 14-16, 24-27, 31-32.   Finally, there is the fact that Rota allegedly sent the July 9, 2018 Letter

to Plaintiff's principal place of business in Colorado and asked FPI to address many of the allegations at the center of this dispute. *Compl.* [#3], ¶¶ 8, 14, 47.

"In proper circumstances, even a single letter or telephone call to the forum state may meet due process standards." *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1418-19 (10th Cir. 1988) (citations and quotation marks omitted). This turns on the "*nature* of those contacts" and "whether they represent an effort by the defendant to 'purposefully avail[ ] itself of the privilege of conducting activities within the forum State.'" *Id.* at 1419 (citation omitted); *see also Cascade Fund, LLLP v. Absolute Capital Mgmt. Holdings Ltd.*, 707 F. Supp. 2d 1130, 1140 (D. Colo. 2010) ("The exercise of jurisdiction depends on the quality and nature of the contacts."). Standing alone, each of Rota's contacts may not amount to an effort by Rota to purposefully avail itself of conducting activities in Colorado. However, taken together, it cannot be said that Rota's alleged contacts were so "random, fortuitous, or attenuated" to render this Court's exercise of personal jurisdiction over him violative of due process. *Burger King*, 471 U.S. at 475 (internal quotation marks omitted); *see also Walden*, 571 U.S. at 287 (noting that the jurisdictional inquiry focuses on 'the relationship among the defendant, the forum, and the litigation and not simply the defendant's activities focused on the plaintiff) (citations omitted); *Dudnikov*, 514 F.3d at 1075 (10th Cir. 2008) (noting "the 'express aiming' test focuses more on a defendant's intentions—where was the 'focal point' of its purposive efforts—[rather than] on the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff").

Rota argues, however, that the facts of this case most closely align with those in *Shrader* and the Court should follow its holding to find that personal jurisdiction is lacking.

The Court disagrees.   In *Shrader*, the plaintiff lived and worked in Oklahoma where he produced books and courses for market traders, which he sold online.   633 F.3d at 1237-38.   One of the defendants posted an allegedly defamatory email about the plaintiff and his work on an online investor's forum.   *Id.* at 1238.   On these facts, the plaintiff filed suit in the Eastern District of Oklahoma against the defendant, and others, who did not reside in Oklahoma.   *Id.* at 1237.   As relevant here, the Tenth Circuit held that the posting of the email was insufficient to establish specific personal jurisdiction in Oklahoma over this defendant, because the forum was directed at a world-wide audience of investors with no inherent interest or tie to Oklahoma and because the posted email was geographically neutral.   *Id.* at 1248.

In reaching this conclusion, the *Shrader* Court first noted that the posting was "in response to an inquiry from another forum member about [the plaintiff's] work [and] [t]here was no indication that this other member had any connection with Oklahoma."   *Shrader*, 633 F.3d at 1244.   Second, the Court found that the online investor forum on which the posting occurred "had no particular connection with Oklahoma" given that there was no indication that the forum targeted an Oklahoma audience, the work of Oklahoma writers, or the plaintiff personally.   *Id.* at 1241-42, 1244.   Third, the Court found that there was "nothing about the content of [the plaintiff's] work, or his internet customer base, that [was] shown to have any tie to Oklahoma."   *Id.*   The Court stated in conclusion:

> Oklahoma was not the focal point of the email posted by [the defendant], either in terms of its audience or its content.   We have already seen that the forum where he posted the email targeted a trading community with no particular tie to Oklahoma.   As for content, the email was about [the plaintiff's] work.   That work was marketed and sold worldwide through the internet (there is no suggestion that [the plaintiff] had any local sales outlet) and there is nothing about the nature of the work inherently linking it to Oklahoma—as

-16-

there might be had [the plaintiff] been located in a trading center like New York or Chicago and relied on that tie in producing or marketing his materials. He produced his materials in Oklahoma because he happened to live there; his professional reputation in the trading community was not tied to Oklahoma, as Ms. Jones's was to the California entertainment industry in *Calder*. To be sure, he suffered harm in Oklahoma in the sense that he incurred harm and resided in Oklahoma when he did so. But, as noted above, plaintiff's residence in the forum state, and hence suffering harm there, does not alone establish personal jurisdiction over a defendant who has not purposefully directed his activities at the state.

*Id.* at 1245.

Applying *Shrader* to the present case, the Court agrees with Rota that, like the investor forum in *Shrader*, Seeking Alpha appears to be directed at a world-wide audience of investors with no particular connection to Colorado. *See Compl.* [#3], ¶¶ 18-19. While this indicates that Rota's Article went beyond the confines of a Colorado audience, the content of the Article must also be considered. Rota's Article asserts specific accusations that challenge the propriety and solvency of FPI's lending and investing practices which, unlike the nature of the plaintiff's work in *Shrader*, is inherently linked to the executive-level business operations that occur at FPI's headquarters in Colorado. Thus, despite the fact that Rota's Article was widely available online, it was not "geographically neutral" given that it uniquely implicated Colorado, where FPI and its executive team are located.[7] Accordingly, the Court finds the second element, and thus step one, of the purposeful direction test is satisfied.

---

[7] For these same reasons, the Court rejects Rota's argument that the Court should follow the holding in *ACT*, where the court highlighted the "geographically-neutral content ... [and] geographically-neutral nature of the [online] forum" to find the expressly-aimed element of the purposeful direction test lacking. 2015 WL 328639, at *4.

### b.    "Arise Out Of"

Step two of the minimum contacts test requires the Court to consider whether the plaintiff's alleged injuries "arise out of" the defendant's forum-related activities. *Old Republic*, 877 F.3d at 908. "In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, ___ U.S. ___, 137 S.Ct. 1773, 1781 (2017) (alterations omitted) (citation omitted). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* In *Silver*, the Tenth Circuit noted that courts are split on the causal standard to apply for this requirement. 382 F. App'x at 731 (citing *Dudnikov*, 514 F.3d at 1078). The two standards considered by the Tenth Circuit include (1) "but-for" causation and (2) proximate cause. *Dudnikov*, 514 F.3d at 1078.

Here, however, the Court need not decide which standard to apply given that Rota makes no argument in the Motion [#97] regarding the "arise out of" requirement and the Court is satisfied that both standards are met. *See Silver*, 382 F. App'x at 731 (citing *Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010)). As discussed above, the Complaint [#3] includes allegations from which the Court may reasonably infer that Rota expressly aimed the Article and Tweets against FPI for the purpose of causing it injury in Colorado. Further, FPI alleges that, since the Article and Tweets were published, FPI has experienced a 39% drop in its stock price, harm to its reputation, loss of business, and interference with prospective business relations. *Compl.* [#3], ¶¶ 34, 57, 67, 76, 79, 81, 88-92, 100. Accordingly, the Court finds that Rota's contacts may plausibly be argued to

be the cause in fact and the legal cause of the alleged injury, therefore satisfying the "arise out of" requirement of the minimum contacts test.  *See Silver*, 382 F. App'x at 731.

Because the Complaint [#3] contains sufficient allegations to satisfy both the "purposefully directed" and "arise out of" requirements of the minimum contacts analysis, the Court concludes that FPI has satisfied its burden of establishing a prima facie case of the minimum contacts necessary for the Court to exercise specific jurisdiction over Rota in Colorado.

### 2.    Traditional Notions of Fair Play

The final jurisdictional consideration for the Court is whether Rota has presented a compelling case that the presence of some other considerations would render the exercise of jurisdiction over him unreasonable.  *Old Republic*, 877 F.3d at 904 (citations omitted). Rota makes no argument in this regard in the Motion [#97].  *See Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) (holding that "the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction [and ....] an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]"); *accord Burger King*, 471 U.S. at 477.  Rota has not shown that prosecution of the case in Colorado presents an especially heavy burden on him; nor has he called into doubt the forum state's interest in resolving the dispute, FPI's interest in receiving convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, or the shared interest of the several states in furthering fundamental substantive social policies.  *See OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d

1086, 1092 (10th Cir.1998). Therefore, the Court finds that exercising personal jurisdiction over Rota is appropriate in this case.

Accordingly, the Motion [#97] is **denied** to the extent that Rota seeks to dismiss this case on the basis of personal jurisdiction.

**B.    Whether the Claims Fail to State a Claim for Relief**

**1.    Defamation Claim**

FPI asserts defamation/defamation per se by libel.[8]   Rota argues that FPI's defamation claim fails under Fed. R. Civ. P. 12(b)(6) for three reasons.  First, Rota asserts that the at-issue statements constitute protected opinion under the First Amendment to the United States Constitution and under article II, section 10 of the Colorado Constitution. Second, Rota argues that FPI fails to plausibly plead "actual malice."  Third, Rota argues that FPI fails to plausibly plead material falsity.

In order to adequately plead a defamation claim under the First Amendment and Colorado law as to statements of public concern, a plaintiff must allege that the statements were: (1) defamatory, (2) materially false, (3) concerning the plaintiff, (4) published to a third party, (5) published with actual malice, and (6) caused actual or special damages. *Brokers' Choice of Am. v. NBC Universal, Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017).[9]  FPI cites this standard, acknowledging that it is the correct standard for this case.   *See Response* [#110], at 27.  The Court agrees that the statements at issue involve a matter

---

[8]  Defamation consists "'of the twin torts of libel and slander.'" *Albert v. Lokson*, 239 F.3d 256, 265 (2d Cir. 2001).  Libel, as alleged here, is written defamation, and slander is oral defamation.  *Id.*

[9]  Because this is a diversity case, the substantive law of the forum state, Colorado, applies to the claim.  *Id.* at 1099.

of public concern, as the Article concerns a publicly-traded company and may "affect the financial markets." *Treppel v. Biovail Corp.,* 233 F.R.D. 363, 375 (S.D.N.Y. 2006); *see also Aurelius v. BofI Fed. Bank,* No. MC 16-71, 2016 WL 8925145, at *3 (C.D. Cal. Sept. 20, 2016) (anonymous short-seller's posts on Seeking Alpha involved matters of public concern).[10]   FPI has not disputed this for purposes of the Motion [#97].

Moreover, when a public figure is involved, as here, a heightened standard applies, requiring proof of the publication's falsity and actual malice by clear and convincing proof. *Broker's Choice of Am.*, 861 F.3d at 1109; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991); *Barnett v. Denver Pub. Co, Inc.*, 36 P.3d 145, 147 (Colo. App. 2001).   The Court finds that FPI is a public entity because its stock is publicly traded on the stock exchange.   *See, e.g., MiMedx Grp. v. Sparrow Fund Mgmt. LP*, No. 17CV07568, 2018 WL 847014, *6 (S.D.N.Y. Jan. 12, 2018); *Reliance Ins. Co. v. Barron's,* 442 F. Supp. 1341, 1346 (S.D.N.Y. 1977).   Again, FPI has not disputed this for purposes of the Motion [#97].   The Colorado Supreme Court has recognized that "this rule places a significant burden on the plaintiff's ability to recovery damages," but found that "such a rule was deemed necessary to balance the competing interests of protecting a person's reputation while at the same time providing ample breathing space to assure unrestricted debate of public issue." *DiLeo v. Koltnow*, 613 P.2d 318, 321 (1980).

### a.   Whether the Statements Were Defamatory

The Court thus turns to the first element.   A statement may be defamatory "if it tends to so harm the reputation of another as to lower him in the estimation of the community or

---

[10]  The speech relates to a matter of public concern even though there may be elements of commercial speech in the Article.  *Aurelius*, 2016 WL 8925145, at *3.

to deter third persons from associating or dealing with him." *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351, 1357 (Colo. 1983). According to the Colorado Supreme Court, "[a] finding that the language used was defamatory must be predicated on the context of the entire story and the common meaning of the words utilized." *Id.*

FPI's Response [#110] cites "[a] non-exhaustive list of defamatory facts in Rota's Article and Tweets" that includes:

- FPI faced a "significant risk of insolvency" as stated in the title of the Article, ""Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible" (*See Compl.* [#3], ¶ 21; Tweets 1, 9);

- FPI was "artificially increasing revenues by making loans to related-party tenants" (*Compl.* [#3], ¶ 23; Article [#97-1], at 1; Tweet 2);

- FPI failed to properly disclose the financial impact of its loan program (*Compl.* [#3], ¶ 24; Article [#97-1], at 10; Tweets 1, 3, 6);

- The departures of FPI's auditor, directors, and president were related to concerns about the loan program (*Compl.* [#3], ¶ 25; Article [#97-1], at 32-34; Tweet 8); and

- Paul Pittman, the CEO of FPI, pledged his shares (*Compl.* [#3], ¶ 26; Article [#97-1], at 1, 29-31; Tweets 7-8);

*Id.* at 24-25.

According to FPI, Rota does not deny that all of those assertions were false and designed to drive FPI's stock price down to profit on Defendants' short positions. *Response* [#110] at 28. FPI further avers that Rota "amplified his defamatory speech through his Twitter account," and his tweets "repeatedly referenced the Posting and asserted that the statements therein were factual." *Response* [#110], at 25 (citing, *e.g.*, Tweet 18 - ". . . $FPI has had 2.5 days to address the facts. This is all shareholders get??"). According to FPI, "because the goal was to induce panic selling, [Rota] made clear

he wanted readers to understand statements in the Posting were facts." *Id.* at 28 (citing *e.g.*, Tweet 13 - "Tell him to specifically deny the facts in an SEC disclosure where it matters.").

Rota denies that the statements are defamatory, asserting that the Article relates to matters of public concern as to a public company, and is protected opinion under the First Amendment. *See Motion* [#97], at 2, 7, 10-18. Rota also argues that FPI has not pointed to any undisclosed or false facts in the Article that could give rise to a defamation claim. *Id.* Thus, the Court turns to those issues.

### i. Protected Opinion Versus Statements That Are Not Protected

The Supreme Court addressed the parameters of statements related to public concern and what constitutes protected opinion under the First Amendment in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990). The Court found that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Id.* at 19.[11] Thus, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 20. "Rhetorical hyperbole" is protected; to be actionable, the allegedly defamatory statement must "reasonably be interpreted as stating actual facts." *Id.*; *see also TMJ Implants, Inc.*, 498 F.3d at 1184.

---

[11] While the Supreme Court stated that this finding applies "at least in situations where a media defendant is involved[,]" 497 U.S. at 19-20, Colorado courts have not confined it to such defendants. *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1186 (10th Cir. 2007) (discussing cases).

Opinions which imply that they are based on undisclosed defamatory facts are actionable. *Milkovich*, 419 U.S. at 20. "The opinion must appear reasonably to the listener to be based on defamatory facts which the reporter has not disclosed to the audience but which the audience can reasonably expect to exist." *Burns*, 659 P.2d at 1358. Moreover, "although an opinion based on disclosed defamatory facts is not itself subject to liability, the disclosure [or publication] of the defamatory facts . . . is actionable." *TMJ Implants*, 498 F.3d at 1185. As the *Milkovich* Court stated, "[e]ven if the speaker states the facts upon which he bases his opinions, if those facts are either incorrect or incomplete, or if his assessment of them is incorrect, the statement may still imply a false assertion of fact." 497 U.S. at 18-19; *see also Burns*, 659 P.2d at 1358 ("opinions may lose their constitutional protection when 'the average reader or listener or viewer perceives the comment as essentially an assertion of fact, in light of the relative specificity of the language used and the relative insufficiency of the connection of such language to supporting fact'"). There is thus not a "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 19.

As further explained by the Supreme Court:

> If a speaker says, "In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." Even if the speaker states the facts upon which he bases his opinion, if those facts are either inaccurate or incomplete, or if his assessment is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion John Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"

*Id.* at 18-19 (quoting *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 61 (2d Cir. 1980)).[12] On the other hand, the statement, "'[i]n my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin' would not be actionable" because it is "a statement of opinion related to matters of public concern which does not contain a provably false connotation[.]"  *Id.* at 20.

The Tenth Circuit has stated that "*Milkovich* distinguishes between what one scholar has labeled evaluative and deductive opinions." *Jefferson Cty Sch. Dist. v. Moody's Investor's Servs., Inc.,* 175 F.3d 848, 853 (10th Cir. 1999) (citation omitted).  "[E]valuative opinions are those that are not provably false[,]" and cannot be defamatory. *Id.*; *see also Burns*, 659 P.2d at 1358 ("'Once a court needs to speculate concerning the meaning the statement purports to convey, as must be done here, we enter the area of opinion as opposed to factual assertion.'") (citation omitted).  "In contrast, deductive opinions are those that state or imply assertions that may be proven false; the First Amendment does not immunize them from defamation claims." *Id.*

In the case at hand, Rota asserts that the statements are protected opinion because he (1) "meticulously disclosed all facts upon which he based his analysis and conclusions, (2) disclosed his short position on FPI's (publicly traded) stock, and (3) reiterated that his conclusions were "opinions" and that readers should do their own research and draw their own conclusions." *Motion* [#97], at 1-2. Rota further asserts that FPI only complains about conclusions drawn from the disclosed facts and records, not the facts themselves.  *Id.* at

---

[12]  The Court found that the connotation that one committed perjury is sufficiently factual to be susceptible of being proved true or false. *Id.* at 21.  "Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id.*

11.  According to Rota, the Article is "the very definition of 'evaluative opinion[,]'" as it reviews and evaluates public records and information and then presents opinions and conclusions based on perceptions of that evidence.  *Id.* at 11.  "Each reader is left to decide for themselves if they agree with those conclusions, which [Rota] explicitly invited the readers to do in this case."  *Id.*

Rota further points to the express disclaimers that the Article represents opinions, and states it "is replete with conditional phrasing and speculative language" that make clear that it represents "the author's 'intrinsic perceptions' of the presented information."  *Motion* [#97], at 12-13.  According to Rota, he "followed a consistent pattern setting forth items of public information or a public record, and then drawing his conclusions based on that evidence."  *Id.* at 11.[13]  Rota concludes that there is nothing wrong in taking a short position on the stock of a publicly traded company and then publishing opinions about that company.  *Reply* [#111], at 2.

The Court finds that to the extent Rota argues that the Court should find that the Article as a whole is protected opinion which is not actionable, this argument must be rejected.  While the Article contains disclaimers that it represents the author's opinions and other consistent language, such as "I think" and "I believe," such language does not lend to automatic protection under the First Amendment, as made clear in *Milkovich*.  497 U.S. at 20 (no "wholesale defamation exemption" for anything labeled as opinion); *see also Burns*, 659 P.2d at 1358-59 ( not all forms of opinion are immunized; "an opinion may have

_____

[13]  For example, Rota notes that "the Article's opening bullets express an opinion ("We believe" and "could be made up"), and then lists three, true facts that undergird that opinion."  *Id.* Rota avers that he repeats this pattern throughout the Article.  *Id.*

as pernicious and harmful effects as other forms of defamation . . . .'"").   Indeed, the

Colorado Supreme Court in *Burns* made clear that "[a] speaker is not accorded free speech

protection for attacks on an individual's reputation interests by framing the attack as an

'opinion.'" *Id.*  Instead, to determine whether the statements at issue are protected opinion,

the Court must determine whether the Article contains "a provably false factual

connotation." *Milkovich*, 497 U.S. at 20.

   In determining this issue and deciding whether a statement is defamatory, the Tenth

Circuit, quoting the Colorado Supreme Court, has found that "*Milkovich* and *Burns* . . .

provide the necessary framework to determine if a statement if protected[,]" stating as

follows:

> This framework involves two inquiries. The first inquiry is whether the
> statement is "sufficiently factual to be susceptible of being proved true or
> false." *Milkovich*, 49 U.S. at 21. The second inquiry is whether reasonable
> people would conclude that the assertion is one of fact.  *Id.*  The factors
> relevant to the second inquiry are: (1) how the assertion is phrased; (2) the
> context of the entire statement; and (3) the circumstances surrounding the
> assertion, including the medium through which the information is
> disseminated and the audience to whom the statement is directed.  *Burns,*
> 659 P.2d at 1360.

*TMJ Implants*, 498 F.3d at 1187 (quoting *Keohane v. Stewart*, 882 P.2d 1293, 1299 (Colo.

1994)); *see also Jefferson Cty. Sch. Dist.,* 175 F.3d at 853.   The second inquiry is

necessary only if the first inquiry is answered in the affirmative.  *Id.*   Whether allegedly

defamatory language is constitutionally protected is a question of law for the Court.

*Milkovich,* 497 U.S. at 17; *Keohane*, 882 P.2d at 1299 n. 8.  With that framework in mind,

the Court turns to the contested statements.[14]

_____

   [14] The Court notes that FPI's failure to separately address each of the allegedly defamatory
statements is not only inexplicable, but remarkably unhelpful.  "Judges are not like pigs, hunting for

### ii.   Whether the Statements at Issue Are Defamatory

### A.   FPI Faced a "Significant Risk of Insolvency" and its Shares "Are Uninvestible"

FPI first asserts that the statements in the headline of the Article that FPI faced a "significant risk of insolvency" and that its shares "are uninvestible" are defamatory. The full headline reads, "Farmland Partners: Loans to Related-Party Tenants Introduce Significant Risk of Insolvency - Shares Uninvestible." *Article* [#97-1], at 1; *see also* Tweets 1, 9 [#110-2]. FPI asserts that the statement that it faced a "significant risk of insolvency" is obviously false as the loan program constituted only 1% of its business and thus could not cause a risk of insolvency. *Response* [#110], at 28. FPI further asserts that it "is still solvent fourteen months after the Posting's publication, demonstrating that [Rota's] statements that FPI faced a 'Significant Risk Of Insolvency' and that its shares were '[u]ninvestible' were false." *Id.*

The Court agrees with Rota that the statement that FPI faced a significant risk of insolvency due to the loan program, or that the loan program "introduced" a significant risk of insolvency, is not sufficiently factual to be susceptible of being proved true or false. Even if the Court were to find the term "insolvency" itself to be sufficiently clear to a reader, which is questionable,[15] whether there is a "significant risk" of insolvency is inherently subjective. As Rota notes, both words in the "significant risk" term are subject to a myriad

---

truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

[15] Even the meaning of "insolvent" in a well-accepted dictionary has multiple definitions. *See https://www.merriam-webster.com/dictionary/insolvent* (defining insolvency by reference to the term "insolvent", which means: "1.a: unable to pay debts as they fall due in the usual course of business, b: having liabilities in excess of a reasonable market value of assets held; [or] 2: insufficient to pay all debts).

of definitions and subjective perceptions.  *Motion* [#97] at 14.  The Court agrees with Rota that what may be a significant risk to one person based on his subjective assessment of certain factors may not be significant, or a risk at all, to another person based on his or her subjective assessment of different factors.  *See id.*

This same rationale applies to the statement that FPI shares are "uninvestible."  The shares were not and are not literally uninvestible, as FPI's shares were and are sold on the public market.  Given this, the term "uninvestible" as used in the Article then becomes a subjective measure; again, what is uninvestible to one person may not be to another. There is no objective evidence that could prove this statement is false.  *See Jefferson Cty. School Dist.*, 175 F.3d at 854 (citing *NBC Subsidiary (KCNC-TV) v. Living Will Center*, 879 P.2d 6, 13-14 (Colo. 1994) (concluding that the statement that a product was not worth the price was not verifiable because "[t]he worth of a given service or product is an inherently subjective measure which turns on myriad considerations and necessarily subjective economic, aesthetic, and personal judgments"); *James v. San Jose Mercury News, Inc.,* 20 Cal. Rptr. 2d 890, 898 (1993) (concluding that the statement "when the legal community turns on kids, it doubles their trauma" was protected under *Milkovich* because it was not verifiable and asking, rhetorically, "When does 'the legal community 'turn on' 'kids'?  What is 'trauma' in this context, and how can its increments be measured?")).

Moreover, taken in the context in which these statements were written and the medium used, the Court finds that reasonable people would not conclude that the assertion that the loan program introduced a "significant risk of insolvency" or that FPI's shares are "uninvestible" are facts.  These statements were part of an attention grabbing headline of an Article seeking to cause concern about investments in FPI and the value of its shares.

The statements, which were inherently subjective, were followed by disclaimers in the Article stating that the "report represents the opinion of the author" and that "[i]nvestors should do their own due diligence and come to their own conclusions." [#97-1], at 1. Moreover, the text of the Article expresses a conditional opinion as to the issue of the "significant risk" of insolvency, stating:

> If investors lose faith, FPI may quickly find its endless stream of capital has run dry. With only $19 million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency.

*Id.* at 4. Finally, the Article itself was posted on an internet media outlet, Seeking Alpha, that publishes reports and analyses for investors with a tagline that states "Read, Decide, Invest." *Motion* [#97], at 13; *see Keohane*, 882 P.2d at 1302 (noting the context and medium were important, and stating "[t]he letter's placement in the editorial section of the paper . . . serves to put readers on notice that the assertions should be carefully scrutinized before being accepted as actual facts").

Finally, the Court finds that whether the loan program introduced a significant risk of insolvency to FPI calls for speculation as to a future event that is not actionable. Whether the loan program would actually cause insolvency is merely a prediction. FPI's own reliance on its current solvency to rebut this past prediction only underscores this point. "'A prediction, or statement about the future' . . . is essentially an expression of opinion that is not actionable.'" *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 485, 505 (4th Cir. 2015) (citing *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 P.2d 674, 680 (5th Cir. 1986)).

Based on the foregoing, Rota has shown that the statements that FPI faced a "significant risk of insolvency" and that its shares "are uninvestible" are protected opinion

and are not actionable as defamatory.  Accordingly, the Motion to Dismiss [#97] is **granted** as to these statements.

### B.    Artificial Increase of Revenues

FPI next asserts that the statement that it was "artificially increasing revenues by making loans to related-party tenants" is defamatory.  *See Compl.* [#3], ¶23; *Article* [#97-1], at 1.  The full statement in the Article, which immediately follows the headline/title, is that "[w]e believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up." *Article* [#97-1], at 1; *see also* 4 (stating "**[o]ur research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest revenue"**) (emphasis in original).

Rota asserts that it is unclear whether FPI claims the word "artificially" or the phrase "related-party" is false.  *Motion* [#97], at 14.  In either case, Rota avers that the statement is protected opinion, and that FPI takes the statement out of context.  According to Rota, the statement is accompanied by conditional language and "words replete with opinion and speculation", such as 'we believe,' 'our research has lead us to believe,' 'we think,' and 'If the acquisition paid off the loan, we think that would qualify as a loan that lacks economic substance.'"  *Id.*  Rota also avers that he fully disclosed the public information on which he based his conclusion, and invited the reader to draw independent conclusions based on that evidence.  Thus, he asserts that no undisclosed, defamatory fact is implied.  *Id.*

The Court finds that the statement at issue is not protected opinion.  While Rota argues that the word "artificially" is inherently subjective and not capable of being proved true or false, the Court disagrees in the context of the Article.  Whether FPI was making loans to related-party tenants in the manner discussed in the Article is capable of being proved as true or false, at least as to the related-party tenants identified in the Article.  For example, the Article states "[w]hile FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team)." *Article* [#97-1], at 5; *see also* 3.

Thus, while the term "artificially" and phrase "related-party tenants" may be subjective when viewed in isolation, the Article provides the context for the statement such that it is objectively verifiable.  It states, for example, that "the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant." *Article* [#97-1], at 5.  The Article then provides specific facts as to how this loan pattern applied to Ryan Niebur.  *Id.*  All of these facts are capable of being independently verified.  The "factual" nature of these statements is further reinforced by the Tweets, which sought to give legitimacy to the Article by referring to it as a "report" with "facts."  *See, e.g. Tweet 20* [#110-2]; *Lawson v. Stow*, 327 P.3d 340, 348-49 (Colo. App. 2014) (although statement was phrased in terms of what the speaker felt, in context, it was part of an effort to convince a third party of the underlying fact and could therefore be actionable).  Accordingly, the Court finds that a reasonable person could find that the assertion that FPI artificially increased its revenues by making loans to related-party tenants in the Article is a fact.

The verifiable facts as to this statement distinguish it from the statements in the headline as to the "significant risk" of insolvency and the shares being uninvestible discussed in the previous section.  These factual assertions render the statement immune from First Amendment protection despite the medium in which the statement is presented and the conditional language in the Article.  *See Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1179-80 (D. Colo. 1999) (finding specific statements within a publication that the defendants' claims were opinion were "properly . . . characterized as actionable defamatory allegations" when they "could be evaluated in terms of their veracity or falsity" and could be considered as an assertion of fact).

Having found that the statement at issue is not protected opinion, the Court must next determine whether the statement could be construed to be defamatory for purposes of the first element of a defamation claim.  The Court must accept as true at this stage of the litigation FPI's allegation that the statement is false.  *Compl.* [#3], ¶ 23.  Moreover, the Court finds that this statement could be construed to be defamatory.  In fact, while Rota has disputed the falsity of statements at issue, he has not disputed that they are "defamatory" for purposes of the first element of the defamation claim.  A statement suggesting that FPI's revenues were inaccurate, as FPI was artificially inflating them in the manner suggested related to loans to related-parties, certainly tends to harm the reputation of FPI, a public company, and could "lower [FPI] in the estimation of the community or . . . deter third persons from associating or dealing with [it]."  *Burns*, 659 P.2d at 1357.  Indeed, FPI alleges that the value of its shares went down almost 40% shortly after this Article was published, lending support for this finding.  Accordingly, the first element that the statement is "defamatory" has been established as to this statement for purposes of the Motion [#97].

### C. Statement that FPI "Failed to Properly Disclose the Financial Impact of its Loan Program"

FPI next claims the Article falsely asserted that FPI "failed to properly disclose the financial impact of its Loan Program." *See Compl.* [#3], ¶ 24; *Article* [#97-1], at 10.  Rota asserts that it is difficult to respond to this allegation because the Article did not make such a statement.  Rota acknowledges, however, that the Article did assert that "FPI failed to disclose numerous matters that would be of interest to investors, including the names of the borrowers, the uses of the loan funds, that 70% of the loan volume went to two related-party tenants, that FPI was acquiring properties that secured mortgages it had made to tenants, and that Rota believes FPI misstated its financials when it reported certain transactions as loans instead of acquisitions." *Motion* [#97], at 15.  Rota asserts that these assertions are well supported by the fact that FPI had to provide "additional information" in its public rebuttal to explain why it did so.  *Id.*  Also according to Rota, what constitutes "proper" disclosure in this circumstance and what constitutes a "financial impact" on the loan program are inherently subjective.  *Id.*  Given the numerous factors and interpretations that underlie these words, Rota argues that they cannot be considered a verifiable statement of fact.  *Id.*

While the Court agrees with Rota that what constitutes "proper" disclosure may be a subjective issue that would vary depending on the matter at issue, the Article includes a specific factual statement on this issue that provides context for what Rota means by the term.  The Article states, "[s]o, if the loans are to be settled by property acquisitions, they need to be disclosed as such.  Furthermore, we think a reasonable investor would want to know if FPI was acquiring properties it also lent against, as it may signal an

underperforming property or tenant." *Article* [#97-1], at 30.   The issue of disclosure as stated by Rota is thus whether FPI disclosed that its loans are settled by property acquisitions, and whether FPI was acquiring properties it lent against.   Moreover, Tweet 3 states, with no conditional language, that "$FPI has neglected to disclose that over 70% of its mortgages have been made to members of the management team, including Jesse Hough, the CEO's long time business partner." [#110-2].   The foregoing reflect objective facts that can be verified as true or false.   Further, the Court finds that a reasonable person would view these as facts given the details provided.   Accordingly, the Court finds that the statement and related Tweet are not protected opinion.

As to whether the statement and related Tweet could be construed to be defamatory, again the Court must accept as true at this stage of the litigation FPI's allegation that the statement is false. *Compl.* [#3], ¶ 24.   Moreover, the Court finds that the statement at issue could be construed to be defamatory.   As with the statement that FPI was artificially increasing its revenue, a statement suggesting that FPI failed to properly disclose the financial impact of its loan program in the manner discussed in the Article and Tweet could certainly tend to harm or lower the reputation of FPI.   Accordingly, this statement is also deemed to be defamatory for purposes of the Motion [#97].

### D.   The Departures of FPI's Auditor, Directors, and President Were Related to Concerns about the Loan Program

Next, FPI alleges that the Article falsely claimed that four directors had left the company, and the auditor had been dismissed "due to disputes with the company, based on issues raised in the posting." *Compl.* [#3], ¶ 25. The Complaint [#3] refers to the statement in the Article that ""it appears that we are not the only concerned party.   Since

making its first loan to [a non-party] . . . four board members and FPI's president have resigned.  And in March, FPI dismissed PWC [its auditor]. . . ."  *Id.*; *Article* [#97-1], at 6. This statement immediately follows the assertion that "we think FPI . . . faces a significant risk of insolvency" from the loan program.  *Id.*

Rota is correct that the Article never expressly says that the departures of FPI's auditor, directors, and president were related to disputes with FPI about its loan program or other issues raised in the Article, but  Rota acknowledges that this is the implication from the Article.  *See Motion* [#97], at 16.  The departures are further discussed at a later point in the Article, which details the dates of and stated reasons for the departures of the auditor, directors, and president (which reasons are unrelated to FPI or its loan program). *Article* [#97-1], at 34.  It then states, "[t]aken together, we think the resignations overlaid with the facts detailed in this report paint an ominous timeline."  *Id.*  A timeline then immediately follows that is tied to the loan program and the loans to CEO Paul Pittman and his business partner Jesse Hough.  *Id.* at 37.

Rota asserts that all of the facts underlying the implication that the auditor, directors, and president of FPI left due to concerns about the loan program are fully disclosed. *Motion* [#97], at 16.  The Court agrees.  FPI has not alleged an undisclosed defamatory fact that is implied in reference to this alleged statement.  Moreover, the Court agrees with Rota that while FPI may complain about the conclusions and implications drawn by Rota from the disclosed facts, the facts that support the opinion and "concern" noted by Rota related to the departures based on the timing of events are not alleged to be false.  *See id.*  The Court finds that this statement could be construed as an evaluative opinion, whereby Rota discussed the facts and timing of the departures of the directors and other members of the

management team and reached a conclusion that is not provably false.  *See Jefferson Cty.*

*Sch. Dist.*, 175 F.3d at 853.  It would be difficult, if not impossible, to objectively verify what

the "real" reasons were for the departure of the executives, as this is a subjective issue.

Moreover, a person may have multiple reasons or motivation for leaving a position with a

company, and the person may choose not to reveal what those motivations are or to select

a particular reason.  Unless the executives actually admitted they were lying about the

reasons they gave publicly for leaving, the statements at issue do not contain "a provably

false factual connotation."  *Milkovich*, 497 U.S. at 20.

Based on the foregoing, Rota has shown that the statements in the Article inferring

that the departures of FPI's auditor, directors, and president were related to the loan

program are protected opinion and are not actionable as defamatory.  Accordingly, the

Motion to Dismiss [#97] is **granted** as to these statements.

### E.    Statement that CEO Pittman Pledged Some Shares

The next statement that FPI asserts is defamatory is the statement that Paul Pittman

"pledged some of his shares."  *See Compl.* [#3], ¶ 26.  Rota avers that the Article does not

make that statement, but rather provides Rota's opinion that he thinks Pittman pledged

shares.  *Motion* [#97], at 16.  Rota states that this section of the Article is titled "'Pittman

Hough' Get A Loan Against FPI Shares."  *Id.*; Article [#97-1], at 31.  This statement is

based on a 2017 Colorado UCC filing pledging FPI shares as collateral which lists "Pittman

Hough" as an "Optional Filer Reference."  *Id.*  The UCC filing itself is included in the Article.

*Article* [#97-1], at 30.  Rota then avers that he stated his opinion: "Being that Pittman-

Hough Farms disclosed in a 2016 Form 4 that it distributed its shares to its members, we

think the UCC filing[ ] is referring to Pittman and Hough personally. . . . Our opinion that Pittman pledged his shares is further bolstered by the fact that on July 19th, 2017 he converted 531,827 operating partnership shares (OP units) to common shares." *Motion* [#97], at 16-17; *Article* [#97-1], at 31, 33.

According to Rota, the facts relevant to these statement are disclosed and no undisclosed defamatory fact is implied. *Motion* [#97], at 17. The Court finds that it is questionable whether undisclosed defamatory facts are implied in relation to these statements given the subsequent Tweets that "lots more on the loan program and Pittman to come. Stay tuned ..." and "We haven't even touched on Pittman." *See Tweets 17, 19* [#110-2]. In any event, Rota does not address the statement made on the very first page of the Article stating, "a UCC shows 'Pittman Hough' pledged shares of FPI for a loan then FPI's stock fell 30% . . . ." [#97-1], at 1. This statement is distinct from and separated by over 30 pages from the more conditional statements Rota refers to. It is a definitive statement that is not prefaced as an opinion but as a fact, and can be objectively verified as true or false. Moreover, this statement was then verified by more facts in Tweet 7 stating, "[a] UCC filing shows 'Pittman Hough' pledged shares of FPI for a bank loan days before $FPI signed an agreement Pittman later said he thought would drive the stock up. He was wrong. . . ." [#110-2]. Given the definitive way these statements are phrased and the fact they are not tied to other core conditional statements, the Court finds that a reasonable person would believe Rota was stating facts, despite the disclaimers and conditional language in the Article as a whole. Accordingly, the Court finds that the above statements relating to CEO Pittman pledging shares are not protected opinion.

FPI alleges that Rota's assertion that Pittman was pledging shares is false (Compl. ¶ 26), which is accepted as true at this stage of the litigation.  Moreover, statements that FPI's CEO pledged his shares as collateral for a loan could certainly harm the reputation of FPI, a public company, and could "lower [FPI] in the estimation of the community or . . . deter third persons from associating or dealing with [it]."  *Burns*, 659 P.2d at 1357. Accordingly, the Court finds for purposes of the Motion [#97] that the first element that the statement is "defamatory" has been established as to the statements regarding Pittman pledging his shares.

### E.   Statement Regarding Adjusted Funds from Operations ("AFFO")

The Complaint [#3] further alleges that Rota falsely and misleadingly stated that FPI "ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred 'B' shares."  *Id.* ¶ 22; *see also* ¶ 43.  In fact, FPI asserts that Rota "expressly concedes" that this statement concerning AFFO on page five of the Article was false.  *Response* [#110], at 28 (citing *Motion* [#97], at 17-18).  Rota acknowledges that to be technically accurate, the Article should have referenced "funds from operations" (FFO) rather than "adjusted" funds from operations (AFFO).  *Motion* [#97], at 17.  While Rota refers to this as a "minor mistake," *id.*, he does not deny the statement is false as written.  Whether this is a "minor mistake" goes to material falsity, not the first element requiring that the statement be defamatory.  Moreover, the statement is of a definitive fact that can be objectively verified, and a reasonable person would view it as stating a fact for the same reasons discussed as to the other statements that have been found not to be entitled to protection.

The Court further finds that this statement, even if a "minor mistake," could harm the reputation of FPI, a public company.  Accordingly, the Court finds for purposes of the Motion [#97[ that the first element of "defamatory" has been established as to this statement [#97].

### F.    Alleged Deception Regarding Who Was Expressing the Opinions in the Article

Lastly, FPI avers that Rota "stipulates to intentional deception." *Response* [#110], at 29.  FPI states on that issue that "[t]o cause investors to dump FPI's stock, [Rota] represented that the [Article] was a credible source of facts written by a group of people who all reached the same 'conclusion.'" *Id.* at 29-30 (citing Article [#97-1], at 34).  FPI avers that "[n]ow that the goal is to hold onto his ill-gotten gains, [Rota] argues that the representation was false," claiming that the Article just represents *his* opinions. *Id.* at 30; *Motion* [#97], at 1.  While FPI has shown that there may be deception as to whose opinions are being expressed in the Article, *i.e.,* Rota or multiple people representing the collective "we" referred to in the Article, FPI has not shown how such deceptiveness is actually defamatory.  In fact, neither party addressed that issue in the briefing on the Motion [#97].  As the issue was not adequately briefed, the Court does not decide at this time whether this alleged deception is "defamatory" within the meaning of the law.  This alleged deception is, however, discussed further in Section III.B.1.c, *infra*, in reference to actual malice.

### b.    Material Falsity

As the Court found in the previous section that FPI has alleged defamatory statements for purposes of the Motion [#97], the Court thus turns to material falsity, the second element in dispute regarding the defamation claim.  As noted previously, in a

defamation action relating to matters of public concern, the plaintiff must show the statement is not only false, but "materially false." *Broker's Choice,* 861 F.3d at 1107, 1109. While this must be proven under Colorado law by clear and convincing evidence in FPI's case-in-chief, *id.* at 1109-10, the issue at this procedural posture is simply whether FPI has adequately alleged that the Article [#97-1] was materially false. *See id.* at 1110-11.

"[D]etermining whether a publication is materially false requires examination of the published statements in context, not in isolation." *Broker's Choice,* 861 F.3d at 1108. The Court must overlook inaccuracies and "focus[] on substantial truth.'" *Id.* at 1107 (citation omitted). "'A statement is not considered false unless it would have produced a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* (quoting *Masson*, 501 U.S. at 517). Thus, in determining material falsity, "(1) ''minor inaccuracies' do not count . . .; (2) the [article] must be 'likely to cause reasonable [readers] to think significantly less favorably about the plaintiff[s] than they would if they knew [the truth]; and (3) if a 'misstatement' from the [article] caused only 'modest [reputational harm,' it is not actionable." *Id.* at 1111.

Here, while Rota disputes that the statements at issue in the Article [#97] are false, he does not, with one exception addressed below, contest that if they are false, their falsity is material. *See Motion* [#97], at 19. Thus, it is undisputed for purposes of the Motion [#97] that soon after the Article was published, FPI's shares dropped approximately 39%. *Compl.* [#3], ¶ 34. Moreover, a class action was initiated against FPI that "essentially regurgitates" the Article and alleges a violation of federal securities laws. *Id.* at ¶ 37. It can plausibly be inferred from the foregoing that the harm to FPI's reputation from the alleged false statements was significant. It is further reasonable to infer that the harm to FPI can

be attributed to the alleged defamatory statements, *i.e.,* that FPI was "artificially increasing revenues by making loans to related-party tenants," had not properly reported the financial impact of its Loan Program, was ignoring expenses, and that FPI's CEO had pledged his stock as collateral for a loan. The Court finds that these statements, in the context of the Article as a whole asserting that FPI was facing a substantial risk of insolvency and that its shares were "uninvestible," Article [#97], at 1, "would have produced a different effect on the mind of the reader from that which the pleaded truth would have produced." *Broker's Choice,* 861 F.3d at 1107.

The only statement that Rota specifically asserts does not rise to the level of material falsity is the statement that FPI "ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred 'B' shares." *Motion* [#97], at 17-18 (citing *Article* [#97], at 5). Rota acknowledges that this is a mistake, and that the statement should have referenced "funds from operations" (FFO) rather than "adjusted" funds from operations (AFFO). *See id.* at 17. Rota states that the chart immediately below the disputed statement correctly represents AFFO and therefore proves that the reference does not indicate a reckless disregard for the truth. *Id.* Furthermore, Rota argues that this "minor mistake in no way affected the substance of the opinion being expressed - that FPI is overly-reliant on raising additional capital and that 'AFFO has drifted miles away from free cash flow[.]" *Id.* (citing *Article* [#97-1], at 5). Finally, Rota states that it addressed the error in the comment section on July 14, 2018, well before FPI pointed it out in its public rebuttal and Complaint. *See* [#97-1], at 48.

While the statement regarding ignoring expenses when FPI promotes adjusted funds from operations (AFFO), rather than FFO, may not have been materially false in and of

itself, the Court finds that the statement is materially false when viewed in context with the entirety of the Article. Thus, the Tenth Circuit has held that "'minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified.'" *Broker's Choice,* 861 F.3d at 1107 (citation omitted). Here, the "gist" or the "sting" of the Article has been called into question by FPI. This statement, when read in the context of the other alleged false statements and the Article as a whole, would "'likely cause reasonable people to think significantly less favorably about [FPI] than they would if they knew [the truth]. . . .'" *Id.* at 1110 (citation omitted). This is particularly true as the statement is in the very introduction to the Article, as Rota acknowledges. *See Motion* [#97], at 18. Finally, while Rota asserts that he corrected the information in the comments to the Article, he did so only after a reader of the Article pointed out the error. [#97-1], at 48. Moreover, at that point, the damage from the Article to FPI's reputation had already been done, and the Article was not withdrawn.

Based on the foregoing, the Court finds that FPI has established material falsity for purposes of the Motion [#97].

### c.    Actual Malice

The Court now turns to actual malice, the final element in dispute as to the defamation claim. Actual malice requires proof that the statement by the defendant was made "with knowledge that it was false or with reckless disregard of whether it was false." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). "A showing of reckless disregard requires sufficient evidence to demonstrate that the defendant in fact entertained serious doubts as to the truth of the published statement." *Lockett v. Garrett*, 1 P.3d 206, 210 (Coo. App. 1999). "Mere negligence is not enough." *Masson*, 501 U.S. at 510. This

culpability requirements "ensure[s] that debate on public issues remains 'uninhibited, robust, and wide-open.'" *Milkovich*, 497 U.S. at 20 (citation omitted).

"'The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.'" *Milkovich*, 497 U.S. at 17 (citation omitted).  At the motion to dismiss stage, "'a public-figure plaintiff must plead plausible grounds to infer actual malice by alleging enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice.'" *MiMedx Grp. v. Sparrow Fund Mgmt. LP*, No. 17CV07568, 2018 WL 847014, at *8 (S.D.N.Y. Jan. 12, 2018) (quoting *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (further quotations and internal quotations omitted)); *see also Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 58 (1st Cir. 2012) (a complaint must "lay out enough facts from which malice might reasonably be inferred"); *Adelson v. Harris*, 973 F. Supp. 2d 467, 503 (S.D.N.Y. 2013) ("[T]he pleading standards . . . require courts to dismiss defamation actions where the allegations in the complaint do not plausibly suggest actual malice.").

The Court finds that FPI has plausibly pled the actual malice element for purposes of the Motion [#97].  Thus, the Complaint [#3] alleges that Defendants "maliciously published false and defamatory written statements about [FPI] that held [FPI] up to contempt or ridicule. . . . On information and belief, [Defendants] knew that [the] written statements about [FPI] were false, or made those statements with reckless disregard as to their veracity, by, for example, personal attacks on Paul Pittman, . . . among other things." *Id.* ¶¶ 50-51.  The Complaint [#3] then explained these alleged personal attacks by stating that the Article:

took aim at Paul Pittman, Farmland Partners' Chairman and CEO, personally, by repeatedly attacking his public statements regarding Farmland Partners' valuations and financial health and his business dealings with Farmland Partners.  Among other things, in the context of the posting's false and misleading assertions, [Defendants] displayed malice by attacking Mr. Pittman's defense of Farmland Partners with respect to short sellers, evincing an intent to punish Mr. Pittman for stating that "the roughly 10% short in our stock are going to get killed, and I'll be cheering the day it happens."

*Id.* ¶ 27.  The Complaint further avers that the Article "displayed further malice by stating that Rota . . . 'think[s] the shares [of Farmland Partners' stock] are uninvestible.'"  *Id.* ¶ 28. Finally, it is alleged "[o]n information and belief" that the "statement that the company's stock is 'uninvestible,' like the posting's unsupportable statement that Farmland Partners 'faces a significant risk of insolvency" (and many other statements described herein), was included in the posting specifically to drive the price of Farmland Partners' stock down so that [Defendants] could profit quickly before the falsity of its statements could be revealed." *Id.* ¶ 29.

From the foregoing, FPI alleged the standard for actual malice, *i.e.*, that Defendants knew that the statements about FPI were false, or made those statements with reckless disregard as to their falsity, and supported that allegation with explanations as to what the actual malice was.  At this juncture of the case, before discovery, FPI's assertions made "on information and belief" must be accepted as true.

FPI's allegations further show the strong motive that Rota had to publish defamatory statements, as Rota stood to profit from a public sell-off of FPI's stock due to his short position.  *Compl.* [#3], ¶¶ 29, 31.  This is supported by the extreme statements in the Article [#3] that FPI maintains are false, including, for example, the headline that FPI faces a **"Significant Risk Of Insolvency - Shares Uninvestible**."  Article [#97-1], at 1 (emphasis

added).  This unequivocal language likely caused or contributed to the mass selling of FPI's stock - the alleged goal of the short-and-distort attack.  *See Compl.* [#3], ¶ 29.  Rota's motives, while not conclusive on the issue of actual malice, provide some support for a finding that he may not have acted in good faith and acted in reckless disregard for the truth or falsity of the statements.  *See Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1042-43 (10th Cir. 2013) ("The motivation behind a publication is a factor to consider in determining whether the evidence shows a publisher acted with actual malice. . . . A publisher's motive in publishing a story cannot by itself, however, provide a sufficient basis for finding actual malice."); *see also Keohane*, 882 P.2d at 1300 n. 11 (the fact that an alleged defamer did not use her real name "may be some evidence that she wished to damage [the plaintiff] while attempting to avoid culpability").

A reasonable jury could also find actual malice in the way Rota handled verification of the facts in the Article.  *See Compl.* ¶¶ 8-18.  Specifically, the July 9, 2018 letter from Rota's counsel [#3-1], asked FPI to respond in writing to more than thirty inquiries relevant to the Article within 24 hours (Complaint ¶ 13), a completely unrealistic time frame given the depth of information requested in the inquiries.  Moreover, the letter did not provide a copy of the Article, even though the letter claimed it was already drafted, giving FPI even less of an opportunity to provide information relevant to the issues raised in the Article. *See Compl.* [#3], ¶ 15 and Ex. A.  Rota then used FPI's lack of a response within the 24 hour time frame to justify the content and veracity of the Article by implying that FPI had no comment. Thus, Rota stated, "[w]e reached out to FPI's management with a list of questions (located at the end of this report). The company did not respond." *Article* [#97-1], at 4; *see also Tweet 18* ("Starting from when we sent management our detailed questions

-46-

asking for response, $FPI has had 2.5 days to address the facts."); *Tweet 20* ("$FPI, you can bet we will look into these transactions but for now how about addressing the facts detailed in our report"); *Tweet 14* ("We also note that $FPI neglected to respond to our list of questions, but gives major news agency a generic response").  If Rota had actually talked to or received a response from FPI before making his comments, this would in fact "show[] precisely the opposite of malice—that he considered its position before stating his views. . . ." *MiMedx Grp., Inc.*, 2018 WL 847014, at *8

While Rota asserts that there was no duty on his part to notify FPI or verify the facts with FPI before publishing the Article, Rota chose to do so and his actions indicate a lack of good faith and "a high disregard of awareness of its probable falsity."  *Quigley*, 43 F. Supp. 2d at 1182.  As the *Quigley* Court stated, "[f]ailure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice."  *Id.* at 1180 (citing *Burns*, 659 P.2d at 1362).  While FPI did respond and refute those allegations shortly after publication of the Article, the damage had already been done to FPI's reputation.

FPI further asserts that the actual malice element is satisfied because there are obvious reasons to doubt Rota's veracity.  *Response* [#110], at 30 (citing *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).  The Supreme Court held in *St. Amant* that recklessness for purposes of malice may be found "where there are obvious reasons to doubt the veracity of the [defendant] or the accuracy of his reports."  *Id.*; *see also Burns*, 659 P.2d at 1361 ("A key issue to be resolved in determining reckless disregard is the credibility of the reporter or publisher in the context of the surrounding facts and

circumstances.").[16]  Here, FPI has put the veracity of Rota at issue as to who was involved in authoring or providing the opinions and facts.  The Article is written as representing the viewpoint of multiple people, *i.e.*, "we believe," "[w]e found evidence," "we think the shares are uninvestible."  *See, e.g., Article* [#97-1], at 1.   As FPI asserts, the Article could be construed to be "a set of facts written by a group of people who all reached the same 'conclusion.'"  *Response* [#110] at 28-29.[17]  Rota has claimed in this case, however, that *he* wrote the Article [#97-1], *Motion* [#97] at 1, and stated in a prior filing that he "kept its singular nature ambiguous."  *Rota's Response in Opp'n to Motion to Remand* [#29], at 3.[18] Frankly, the Court fails to perceive the "ambiguity," as the use of a single anonymous name for the purported author/s and multiple plural references to those whose conclusions were expressed logically implies that a group of persons was purporting to be "Rota Fortunae." This also lends support to a finding that Rota's conduct was at least reckless.

---

[16] Rota argues that the Supreme Court's decision in *St. Amant* actually "demonstrates the insufficiency of Plaintiff's actual-malice allegations."  *Reply* [#111], at 5. Rota notes that the Court found no actual malice even though the defendant (1) failed to verify the allegedly defamatory information in any way; (2) did not consider whether the statements were defamatory and went ahead heedless of the consequences, and (3) relied on another's affidavit without any indication of that person's veracity.  *Id.* at 5-6 (citing *St. Amant*, 390 U.S. 730).  That finding is not dispositive here, on a motion to dismiss, because the *St. Amant* case was decided after a trial.  The Court based its holding on the fact that "there was no evidence in the record" of the speaker's reputation for veracity[,]" and the record lacked evidence that the defendant had "an awareness . . .of the probable falsity of the defamatory statement."  *Id.* at 732-33.

[17] This is substantiated by the July 9, 2018 letter to FPI from Mr. Mitzner stating that he "represent[s] a group of investors who have been analyzing publicly available information about your company and, noting a series of concerns, they have prepared and anticipate publishing an article about the Farmland Partners Inc. ("FPI") Loan Program."  *Compl.* [#3], Ex. A.

[18] A court may take judicial notice of its own files and records.  *Tal v. Hogan*, 453 F.3d 1244, 1265 n. 24 (10th Cir. 2006).  Documents subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. *Id.*

Ultimately, as the Supreme Court has noted, a defendant in a defamation action brought under the actual malice standard cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.  The finder of fact must determine whether the publication was indeed made in good faith."  *St. Amant*, 390 U.S. at 732.  Thus, "[p]rofessions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant[,]" or "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."  *Id.*  These are issues that must be determined at a later stage.  At this stage of the litigation, however, the Court finds that FPI has adequately alleged actual malice.

### d.   Conclusion as to the Defamation Claim

The Court finds from the foregoing that FPI has plausibly plead a defamation claim as to some statements at issue, but not as to others.  Accordingly, the Motion [#97] is **granted in part and denied in part** as to the defamation claim.

### 2.   Remaining Claims

### a.   Derivative Nature of the Claims

Rota argues that dismissal is appropriate as to FPI's remaining claims because they are based on Rota's protected speech and are derivative of the defamation claim.  *See Motion* [#97], at 201.  The Motion [#97] is **denied** as to this argument.  The Court found in Section III.B.1, *supra*, that FPI adequately plead its defamation claim as to some of the statements in the Article.  As the Motion [#97] was denied in part as to the defamation claims, the remaining claims are not subject to dismissal as derivative of that claim.

### b.    Disparagement Claim

Rota next argues that the disparagement claim must be dismissed because, like the defamation claim, FPI has not shown that there is a defamatory or derogatory false statement of fact. *Motion* [#97], at 21.  The Court rejects this argument.

A claim for disparagement requires demonstration of 1) a false statement; 2) published to a third party; 3) derogatory to the plaintiff's title to his property or its quality, to his business in general or to some element of his personal affairs; 4) through which defendant intended to cause harm to the plaintiff's pecuniary interest or either recognized or should have recognized that it was likely to do so; 5) malice; and 6) special damages." *TMJ Implants, Inc. v. Aetna, Inc.*, 405 F. Supp. 2d 1242, 1249 (D. Colo. 2005).  Here, FPI has pled that statements in the Article were derogatory to the company and to Mr. Pittman's business and personal reputations respectively.  Further, FPI has pled that Rota intended to cause harm to the company, acted with malice, and that the disparagement caused FPI damages. *See Compl.* [#3], ¶¶ 8-18, 25, 31, 34, 63-67.  Accordingly, as FPI has pled a plausible disparagement claim, the Motion [#97] is **denied** as to this claim.

### c.    Colorado Consumer Protection Act Claim

Rota's only argument in its Motion [#97] for dismissal of the Colorado Consumer Protection Act ("CCPA") claim is that FPI has not shown that Rota made a "false or misleading statement of fact"as required by Colo. Rev. Stat. § 6-1-105(h). *See id.* at 22. A "false or misleading statement that induces the recipient to act or refrain from acting" is actionable when it is made "either with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the

plaintiff." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003).

Rota's argument is rejected. The Court previously found in connection with the defamation claim that FPI plausibly alleged false statements, and it is undisputed that those statements disparaged FPI's business. See Colo. Rev. Stat. § 6-1-105(h). Accordingly, the Motion [#97] is **denied** as to the CCPA claim.[19]

### d.    Intentional Interference with Prospective Business Advantage

Rota next asserts that the intentional interference with prospective business advantage claim must be dismissed because Rota's alleged "'false, misleading, defamatory and/or disparaging statements about Farmland Partners'—cannot sustain" the claim because it is protected opinion speech. *Motion* [#97], at 21. This argument is rejected based on the Court's findings as to the defamation claim.

Rota also argues that the claim should be dismissed because FPI did not allege "a reasonable likelihood or probability that a contract would have resulted" but for Defendants' interference. *Motion* [#97], at 21. The Colorado Court of Appeals has held that "[a] claim for intentional interference with prospective business relations requires a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party" where there is a "reasonable likelihood or

---

[19]    Rota also argued that dismissal is warranted based on a statement FPI made in its Response [#110] that Rota's actions "significantly impact[ed] the public as actual or potential consumers" of FPI's stock. *See id.* at 33; Reply [#111], at 11. Rota asserts that a CCPA claim requires that the alleged deceptive trade practice "significantly impacts the public as actual or potential consumers of the *defendant's* goods, services or property," not the plaintiff's. *Reply* [#111], at 11 (emphasis added); *see Rhino Linings USA, Inc.*, 62 P.3d at 147. This is a new argument that the Court will not consider as FPI did not have the opportunity to respond. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164-65 (10th Cir. 1998).

reasonable probability that a contract would have resulted." *MDM Grp. Assocs., Inc. v. CX Reinsurance Co. Ltd.*, 165 P.3d 882, 886 (Colo. App. 2007).  "[T]here must be something beyond a mere hope" as to a contract.  *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1059 (D. Colo. 2017).

Here, FPI alleged that "on information and belief," Rota "prevented the formation of contracts" between FPI and others.  *Compl.* [#3], ¶ 75.  The Complaint [#3] does not allege, however, what prospective contracts were interfered with or shown that there was a likelihood or reasonable probability that a contract or contracts with third parties would have resulted.  The Court agrees with Rota that the allegations are conclusory on this issue.

However, FPI asserts in this claim that Rota intentionally induced FPI shareholders and other potential business partners to decide not to purchase its shares and FPI shareholders to sell their shares "through its "false, misleading, defamatory, and/or disparaging statements about" FPI.  *Compl.* [#3], ¶¶ 73, 74.  While the parties did not brief this issue, the Colorado courts have also "recognized that the tort of interference with a prospective economic or business advantage may be established by a showing of intentional and improper interference which induces or otherwise causes a third person not to continue the prospective relationship, or of preventing the other from continuing the relation."  *Cronk v. Intermountain Rural Elec. Ass'n*, No. 90CA0666, 1992 WL 161811, at *7 (Colo. App. April 2, 1992).  This makes sense as Colorado recognizes both the torts of intentional interference with a contractual relationship and intentional interference with a prospective business advantage.  *Ervin v. Amoco Oil Co.*, 885 P.2d 246, 253 (Colo. App. 1994), *aff'd in part, rev'd on other grounds*, 908 P.2d 493 (1995). In *Zueger v. Goss,* 343 P.2d 1028, 1036 (Colo. App. 2014), the court found that there was sufficient evidence to

support damages on an intentional interference with prospective business advantage claim when there was evidence that sales declined as a result of disparaging statements online. This lends support to FPI's claim. Accordingly, at this stage of the case, the Court will **deny** the Motion [#97] as to the claim of intentional inference with prospective business advantage.

### e.    Unjust Enrichment Claim

Rota asserts that this claim must be dismissed because FPI made no factual assertion that it conferred any benefit on Rota. *Motion* [#97], at 22. To state a claim for unjust enrichment, the plaintiff must allege that the defendant received a benefit at the plaintiff's expense, under circumstances that would make it unjust for the defendant to retain the benefit. *Scott v. Scott*, 428 P.3d 626, 636 (Colo. App. 2018). From the foregoing, FPI does not have to show that it conferred a benefit on Rota, only that Rota received a benefit at FPI's expense. *Id.* Here, FPI has made such an allegation through pleading facts showing that Rota's short-and-distort scheme conferred a monetary benefit on Rota (and other Defendants) at FPI's expense. *See Compl.* ¶ 80 (Rota "had a short position in Farmland Partners, and thus realized gains when the price of Farmland Partners' stock declined following [Rota's] publication of [his] false, misleading, defamatory, and/or disparaging information about Farmland Partners."). Accordingly, the Motion is **denied** as to this claim.

### f.    Civil Conspiracy Claim

Finally, Rota argues that the civil conspiracy claim must be dismissed because Rota is an individual and no other person or entity aided him in drafting the Article. *Motion* [#97],

at 22.[20]  This argument must be rejected.  It is true that the elements of a conspiracy require, among other things, "an object to be accomplished" and "an agreement by two or more persons on a course of action to accomplish that object[.]"  *Double Oak Const., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003).  FPI has, however, made allegations that support this requirement.

Thus, FPI alleges, for example, that John/Jane Does 2-10 "worked with or for Rota Fortunae in connection with the false and misleading statements" about FPI that Rota "made publicly in an internet posting and on Twitter."  *Compl.* [#3], ¶ 94.  FPI further asserts that the Does "shared" and had a "meeting of the minds on the object to be accomplished" of improperly profiting from short positions by causing FPI's stock price to decline through the publication of the Article and related Twitter comments.  *Id.* at ¶¶ 97-98.  Moreover, as discussed previously, the Article is written in a way that suggests to the reader that it represents the opinions and work of more than one person.  Further, the July 9, 2018 [#3-1] letter from Mr. Mitzner wrote on behalf of "a group of investors" who "have prepared and anticipate publishing an article".  *See also Compl.* ¶¶ 9, 30; Tweets 2, 9, 14, 16, 18, 19, 20 [#110-2] (using the term "we").  FPI asserts in the Response that the civil conspiracy claim extends to anyone who worked with Rota in researching, drafting, publishing, and Tweeting about the Posting, as well as anyone who worked with Rota amassing and selling short positions in FPI's stock and profiting unjustly. [#110], at 42.  Based on the foregoing, the

---

[20] Rota cites his Declaration in support of this.  The Court previously stated in Section II.B., *supra*, that it will not consider the Declarations in connection with the arguments under Rule 12(b)(6).  Nonetheless, the facts asserted by Rota as to this argument have been asserted in the filings which are part of the public record and can be considered by the Court, as discussed in footnote 17.

Court finds at this stage of the case that FPI has plausibly pled that there are more than one co-conspirator, and the Motion [#97] is **denied** as to this claim.

## IV.   Conclusion

In conclusion,

IT IS HEREBY **ORDERED** that Defendant Rota's Motion [#97] is **DENIED** as to the personal jurisdiction argument, **GRANTED IN PART AND DENIED IN PART** as to the defamation claim, and **DENIED** as to the remaining claims.

Dated:  May 15, 2020

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge