IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-02351-KLM

FARMLAND PARTNERS INC.,

    Plaintiff,

v.

ROTA FORTUNAE a/k/a DAVID QUINTON MATHEWS,
QKM, LLC,
FIRST SABREPOINT CAPITAL MANAGEMENT, LP,
DONALD MARCHIONY,
GEORGE BAXTER, and
JOHN/JANE DOES 6-10 (whose true names are unknown),

    Defendants.

**DEFENDANTS DAVID QUINTON MATHEWS AND QKM, LLC'S MOTION FOR SUMMARY JUDGMENT**

Defendants David Quinton Mathews, aka, Rota Fortunae ("Mathews") and QKM, LLC, ("QKM") respectfully submit this motion for summary judgment as follows:

**INTRODUCTION**

In this lawsuit Plaintiff Farmland Partners, Inc. ("FPI") has accused Mathews and his LLC, QKM, of libel (as well as disparagement, intentional interference with prospective business relations (IIPBR), violations of the Colorado Consumer Protection Act (CCPA), unjust enrichment, and conspiracy) for writing and publishing an article on the investor website Seeking Alpha that assessed risks in FPI's business and provided a valuation model for FPI's common stock ("Article"). Prior to publishing the Article, Mathews spent months researching publicly

1

available records, including FPI's own SEC filings, UCC filings, various secretary of state filings, court filings and deed records. He revised and edited his research over a dozen times. Prior to publication, Seeking Alpha subjected the Article to its own editorial process. The Article, which Mathews published anonymously under his pseudonym Rota Fortunae, contained numerous opinions based on publicly available facts and documents that were disclosed and hyperlinked in the Article, so readers could review the same public information that Mathews relied upon.

Based on his research, Mathews believed FPI's stock was overvalued, so he took out a short position in FPI's stock (which he disclosed in the Article). After the Article was published, FPI's stock price dropped. Now, FPI claims that several of Mathews' opinions in the Article are libelous and caused FPI hundreds of millions of dollars in damage.

Defendants have given significant consideration to the Court's Practice Standards regarding summary judgment as well as its February 8, 2021 Minute Order suggesting that summary judgment would be a waste of time due to factual disputes [Doc. No. 200] and appreciates the Court's guidance on this issue. Defendants have chosen to move forward with a narrowly focused motion for summary judgment, for two reasons. One, the issues raised in this motion are questions of law well-suited for summary judgment. Two, due to FPI's aggressive posture throughout this case, including but not limited to claiming $350 million in actual damages plus untold amounts of punitive damages, Mathews (who is a 39-year-old self-employed stock analyst who wrote the Article in his garage office) cannot forego any opportunity to have the Court address these questions of law prior to trial.

The Court should grant summary judgment on FPI's libel claim for two reasons. First, the

evidence in the record is insufficient to support a finding of actual malice by clear and convincing evidence. Second, the four at-issue statements constitute protected opinion under the First Amendment to the U.S. Constitution and under article II, section 10 of the Colorado Constitution. Because the remaining claims are mere "end runs" around the First Amendment, they should also be dismissed if the Court grants summary judgment on FPI's libel claim. The Court should also independently grant summary judgment on FPI's CCPA claim, because FPI cannot meet the public impact element of a private CCPA claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Mathews is the sole employee of QKM, a Texas LLC in which he is the 99% managing member and his wife is a 1% member. *See* **Exhibit A** (Declaration of David Quinton Mathews) at ¶ 1.

2. QKM provides investment research in exchange for compensation to a handful of clients, including Defendant Sabrepoint Capital Management, LP. *Id. ¶* 2.

3. Mathews spent approximately two months researching and evaluating public documents and information about FPI. These public documents and information included FPI's press releases and Security and Exchange Commission (SEC) filings, public deed records including deeds of trust, secretary of state filings, UCC filings and court records. Mathews chose to rely only on public information. *Id.* ¶ 3.

4. Mathews compiled his research on FPI into a research report which he continually modified and edited as his research progressed. Mathews ultimately drafted approximately fourteen different drafts of his research report on FPI. *Id. ¶* 4.

5. Mathews decided to publish his research on FPI and submitted a draft to Seeking

3

Alpha. Seeking Alpha published the Article under his pseudonym Rota Fortunae on July 11, 2018 (the "Article"). *Id.* at ¶ 6. The Article as published is attached here as **Exhibit B**. When he published the Article and now, Mathews believed the Article was complete, ready for publication, and accurate. Ex. A at ¶ 6.

6. Seeking Alpha is a financial and investor media outlet in New York. Its tagline at the time the Article was published was "Read. Decide. Invest." *Id.* ¶ 7.

7. Prior to publishing the Article, the editors at Seeking Alpha engaged in an editing process to ensure the Article met Seeking Alpha's editorial standards. The process included an effort to ensure there was support for material factual assertions in the Article and that the research opinions based on the factual assertions were appropriately labeled as such. *Id.* ¶ 9.

8. Prior to publishing the Article, Mathews submitted the Article to the SEC's Whistleblower Office. As part of that process, he declared under penalty of perjury that his Article was true and correct to the best of his knowledge and belief. *Id.* ¶ 8.

9. On July 9, 2018, in accordance with Seeking Alpha's policy, Mathews, via his lawyer, sent FPI a list of questions regarding issues raised in the Article and asked for a response within 24 hours. FPI did not respond. *Id.* ¶ 10.

10. Based on his research, Mathews believed FPI's stock was overvalued and he took a short position in FPI's stock, which he disclosed in the Article. *Id.* ¶ 5, Article at 44.

11. In the Article, Mathews disclosed (and provided links to) the documents he relied on in reaching his opinions about FPI's stock price, disclosures, loan program, and accounting practices, all of which were publicly available documents. *See* Article; Ex. A at ¶ 11.

12. The Article repeatedly uses phrases like "we believe," "our opinion," and "we

4

think" before stating his opinions. The Article uses these and like phrases more than 70 times. *See generally* Article. The Article also includes numerous disclaimers, including one in bold on the first page which states "this report represents the opinion of the author. Investors should do their own due diligence and come to their own conclusions" *See id.* at 1.

13. Mathews filed a F.R.C.P. 12(b) motion to dismiss the complaint, arguing that FPI had failed to state claims upon which relief can be granted. [Doc. No 172]. On May 18, 2020, Judge Mix issued an order granting the motion as two of the six at-issue statements in the Article: that FPI "faced a significant risk of insolvency" and its shares "are uninvestable" and the insinuation that four directors had left FPI and FPI's auditor had been dismissed due to disputes with FPI over the issues raised in the Article. [Doc No. 136 at 28-31 and 35-37].

14. There are four remaining statements in the Article that FPI alleges are defamatory:

   a. That FPI "ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred "B" shares, which at 6% of par value is higher than the companies blended cap rate of 4.25%." Am. Compl. [Doc. No 155] ¶ 85;

   b. That FPI "is artificially increasing revenues by making loans to related party tenants." *Id.* ¶ 86;

   c. That "the Article falsely and misleadingly asserted that Farmland Partners failed to properly disclose the financial impact of its loan program." *Id.* ¶ 88; and

   d. That "Paul Pittman, Farmland Partners' Chairman and CEO, pledged some of his shares." *Id.* ¶ 90.

15. Three days after publishing the Article, Mathews was alerted that the Article referred to "AFFO" when it should have referred to "FFO," or funds from operations, on page 5 of the Article. Mathews acknowledged the mistake in the Article's comments section and later,

5

at Seeking Alpha's behest, corrected the mistake in the Article itself. Ex. A ¶ 12.

16. When asking Mathews to make the correction, Seeking Alpha editors told him that "we maintain our opinion that you did an excellent job qualifying your opinion statements, supporting your statements of fact, and differentiating between the two." The Article was and remains up on Seeking Alpha as an "Editors Pick." *Id.* ¶ 13-14.

17. FPI released a rebuttal to the Article on July 17, 2018. Am. Compl. ¶ 111.

## ARGUMENT

The purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if the pleadings and other documents submitted before the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hennigh v. City of Shawnee,* 155 F.3d 1249, 1253 (10th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)). "Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) (internal citation omitted).

### A. FPI's libel claim must be dismissed for lack of actual malice and because the at-issue statements are opinions as a matter of law.

In order to adequately plead a libel claim under the First Amendment and Colorado law[1] as to statements of public concern, a plaintiff must allege that the statements were: (1) defamatory, (2) materially false, (3) concerning the plaintiff, (4) published to a third party, (5)

---

[1] In a diversity case such as this, the substantive law of the forum state, Colorado, applies to the claim. *Brokers' Choice of Am. v. NBC Univ., Inc.*, 861 F.3d 1081, 1099 (10th Cir. 2017).

6

published with actual malice, and (6) caused actual or special damages. *Brokers' Choice of Am. v. NBC Univ., Inc.*, 861 F.3d 1081, 1109 (10th Cir. 2017); Colo. Jury Instr., Civil 22:1 (libel). For cases involving public figures or statements of public concern, a plaintiff must prove by clear and convincing evidence that the defendant acted with "actual malice," defined as knowledge of or reckless disregard for the truth or falsity of the challenged statement. *See id.* at 22:3; *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Inv'r Servs.,* 175 F.3d 848, 853 (10th Cir. 1999).

The Article involves a matter of public concern because it concerns a publicly-traded company and may "affect the financial markets." *Treppel v. Biovail Corp.,* 233 F.R.D. 363, 375 (S.D.N.Y. 2006); *see also Aurelius v. BofI Fed. Bank,* No. MC 16-71, 2016 WL 8925145, at *3 (C.D. Cal. Sept. 20, 2016) (anonymous short-seller's posts on Seeking Alpha involved matters of public concern). Likewise, because FPI is a public company regulated by the SEC and traded on the New York Stock Exchange, it is a public figure as to statements pertaining to its business, value and stock price. *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17CV07568, 2018 WL 847014 *6 (S.D.N.Y. Jan. 12, 2018) ("When the plaintiff is a public figure, such as a public company, the plaintiff must demonstrate that the defendant acted with actual malice…."). Indeed, FPI has not disputed (and its own expert assumes), that this heightened actual malice standard applies here.

> **1. The evidence in the record is insufficient to support a finding of actual malice by the requisite clear and convincing burden of proof.**

"Whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Spacecon Spec. Cont., LLC v. Bensinger*, 713 F.3d 1028, 1041-42 (10th Cir. 2013) (internal citation omitted). To meet its burden at the summary judgment stage, FPI must show by clear and convincing evidence that Mathews published the at-

issue statements in the Article "with knowledge of [their] falsity or in reckless disregard of the truth." *See id.* at 1034-35 & 1041-42 (*citing New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, (1964)) (affirming trial court's grant of summary judgment because plaintiff did meet burden of showing actual malice by clear and convincing evidence); *Wilson v. Meyer*, 126 P.3d 276, 283 (Colo. App. 2005) (same). A showing of reckless disregard requires FPI to demonstrate that Mathews "in fact entertained serious doubts as to the truth of" the statements in the Article, or "acted with a high degree of awareness of [their] probable falsity." *See id.*

Actual malice is a subjective standard that requires proof of a "mental element." *Talley v. Time, Inc.*, 923 F.3d 878, 895–96 (10th Cir. 2019) (evaluating *NYT v. Sullivan* actual malice standard in context of Oklahoma false light claim). "The actual malice inquiry thus rests entirely on an evaluation of [defendant's] state of mind when he wrote his initial report[.]" *Id.* "That a reasonably prudent person would not have published the defamatory statement or would have investigated before publishing does not suffice." *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1123 (Colo. App. 1992).

To meet this high burden, a plaintiff can come forward with direct evidence of actual malice, *see Kuhn v. Tribune-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) (finding showing of actual malice when reporter "admitted that he had no bases for most of his erroneous statements"), or rely on an aggregate of circumstantial evidence. The Supreme Court in *St. Amant v. Thompson* identified only three types of circumstantial evidence that would likely support a finding of actual malice. 390 U.S. 727 (1968). "They are evidence establishing that the story was (1) 'fabricated,' (2) 'so inherently improbable that only a reckless man would have put [it] in circulation,' or (3) 'based wholly on' a source that the defendant had 'obvious reasons to

8

doubt,' such as 'an unverified anonymous telephone call.'" *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510–11 (D.C. Cir. 1996) (citing *Amant,* 390 U.S. at 732).

Colorado courts have found circumstantial evidence sufficient to support a finding of actual malice in only a few instances. In *Kuhn*, the reporter (1) failed to verify or corroborate any of the allegations in the article; (2) "admitted he had no knowledgeable sources for much of his story"; and (3) spent only two hours investigating the story and only 30 minutes writing the story even though there was no need to publish the at issue portion of the article the day he began his investigation. 637 P.2d at 37-18. Similarly, in *Burns v. McGraw-Hill Broad. Co.*, the Court held a jury could find with convincing clarity that the reporter's use of the word "deserted" in the context of a martial relationship that dissolved after the husband's serious injury was made with actual malice because the reporter (1) relied only on the admittedly "frustrated and bitter" husband's "self-serving" description, (2) knew the wife had "compelling reasons" for divorcing the husband, and (3) admittedly "had no basis for the use of the defamatory language" but nevertheless consciously chose to use them in the story as an accurate portrayal of events. 659 P.2d 1351, 1361-62 (Colo. 1983).

In contrast, courts have declined to find a showing of actual malice "with convincing clarity" even when the defendant (1) did not check "all possible sources of corroboration or verification," *see Lewis,* 832 P.2d at 1123; (2) "may have" had a motive to harm plaintiff, *see Spacecon*, 713 F.3d at 1044; (3) did not seek comment from plaintiff until days before publication, *see id.,* and (4) did not accept plaintiff's denials as conclusive, or prefer them over other accusations. *See id.* Courts have even declined to find a showing of actual malice when reporters "rely on statements made by a single source even though they reflect only one side of

9

the story" so long as the reporter lacks a "high degree of awareness of their probable falsity." *Fink v. Combined Commc'ns Corp.*, 679 P.2d 1108, 1111 (Colo. App. 1984), a*ccord McFarlane*, 91 F.3d at 1511–13 (no actual malice where defendant knew that source had credibility problems and there were incongruities between source's representations and facts in record).

Here, there is no direct or circumstantial evidence in the record that at the time Mathews published the Article, he knew the statements were false, "entertained serious doubts as to the truth of" the statements, or "acted with a high degree of awareness of their probable falsity." *See Spacecon*, 713 F.3d at 1041–42. To the contrary, Mathews spent months researching FPI by reviewing the publicly available information, and writing and re-writing his research report until, by the time of publication, he felt the Article was complete, ready for publication, and accurate. (*See* Statement of Undisputed Facts (SUF) at ¶ 5); *Spacecon*, 713 F.3d at 1041-42 (defendant's decision to go forward with publication even though it was not complete and there was no time pressure to publish was not evidence of actual malice because defendant "testified he considered the film ready for viewing"). Similarly, when Mathews learned he accidently used "AFFO" instead of "FFO," even though it was a minor point to an unchallenged larger conclusion, he immediately acknowledged this in the comments to the Article and corrected that portion of the Article. (SUF ¶¶ 15 -16); *see Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("Refusal to retract an exposed error tends to support a finding of actual malice. Conversely, a readiness to retract tends to negate actual malice.").

There is also no evidence in the record that Mathews "fabricated" the Article, or that his statements were "so inherently improbable that only a reckless man would have put it in circulation." Indeed, FPI does not even dispute the numerous underlying facts on which

10

Mathews relies in his research opinions – it is the opinions themselves FPI disputes. Likewise, a theory that a public company may be playing accounting games is not "improbable," much less "*inherently* improbable." Examples abound of such financial shenanigans abound, *i.e.*, Enron and WorldCom. Even the Article's headline and top bullet-pointed takeaways have no bearing on whether Mathews believed it was false. *Accord McFarlane*, 74 F.3d at 1307 ("The fact that a commentary is one sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false.").

There is also no evidence in the record that the statements were "based wholly on a source that the defendant had obvious reasons to doubt, such as an unverified anonymous telephone call," as required to make a circumstantial showing of actual malice. *See Amant*, 290 U.S. at 732. To the contrary, the record shows that Mathews based all his opinions, including the ones FPI disagrees with, on publicly available information, all of which he disclosed and provided links to in the Article. (SUF ¶¶ 3, 11). By making the decision to only rely on publicly available documents and information, it was impossible for Mathews to have relied on *any* untrustworthy source (unless FPI is taking the position that deed records, SOS filings, and its own public SEC filings are untrustworthy and require further corroboration).

That Mathews did not exhaust every possible research source, *i.e.*, by calling into FPI's quarterly earnings calls and asking questions, does not demonstrate actual malice. *See Lewis,* 832 P.2d at 1123 (when defendant's only source is "proper and reliable," defendant has no obligation to go further to verify fact). Likewise, the possibility that Mathews would profit from his (disclosed) short position if FPI's stock went down cannot establish actual malice. *See Harte-Hanks*, 491 U.S. at 667 ("If a profit motive could somehow strip communications of the

11

otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."); *see also MiMedx*, 2018 WL 847014 *8 ("Because actual malice is a measure of the defendant's attitude towards the truth, not his attitude towards the plaintiff, allegations of a defendant's bias or hostility fail to plausibly establish actual malice.").

Additionally, Mathews' attempt to reach out to FPI prior to the publication of the Article by having his lawyer send a letter with questions and asking FPI if they would like to respond within 24 hours does not demonstrate actual malice. *See id.* ("That Bensinger waited until days before the [] screening to seek comment from Spacecon regarding the messages conveyed by the film is not evidence of actual malice because Bensinger had no obligation to seek comment from Spacecon."). Because Mathews was basing his statements on publicly available documents, including FPI's own documents, he had no reason to believe that his sources were untrustworthy, or in need of further corroboration (or most likely, denial) from FPI. *See Fink,* 679 P.2d at 1111; *Harte–Hanks,* 491 U.S. at 691 n.37 ("[T]he press need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.").

Finally, Mathews anticipates that FPI will cherry-pick statements from early drafts of his research or from emails to the Sabrepoint defendants to try to argue that Mathews was aware that some of the at-issue statements were false. To the contrary, these early drafts show the thoroughness of Mathews' research. He engaged in a months-long iterative research and drafting process and as he gleaned new facts from publicly available information, such as details about the transactions between FPI and its borrowers, the tone, language and opinions in his draft

4833-4290-5309, v. 1

research also changed. Notably, many of his earlier drafts contained more aggressive opinions, none of which made it to print due to Mathews' care to provide only those opinions that he felt were supported by the evidence, all of which was disclosed. *Accord McFarlane*, 74 F.3d at 1307.

Measuring the evidence in the record against the applicable legal standards, FPI cannot show by clear and convincing evidence that Mathews knew the alleged defamatory statements were false or acted with reckless disregard as to their falsity. Summary judgment is appropriate.

### 2. The remaining at-issue statements are protected opinion[2]

The First Amendment of the United States "protects freedom of expression and 'was fashioned to assure unfettered interchange of ideas for the bringing about political and social changes desired by the people.'" *Jefferson Cty. Sch. Dist.*, 175 F.3d at 852 (citing *NYT v. Sullivan,* 376 U.S. at 269). Thus, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* Whether a statement is defamatory or a protected opinion is a question of law to be determined by the Court. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990).

In Colorado, a reviewing court will determine if a statement is protected opinion pursuant to a two-part test. The first inquiry is whether the statement is sufficiently factual to be susceptible of being proved true or false. *Keohane v. Stewart,* 882 P.2d 1293, 1299 (Colo. 1994). The second inquiry is whether reasonable people would conclude that the assertion is one of fact, taking into account three factors: (1) how the assertion is phrased; (2) the context of the entire

---

[2] In her May 18, 2020 Order [Doc. No. 136], Judge Mix considered whether the six at-issue statements were opinions in the context of a F.R.C.P. 12(b)(6) motion to dismiss and granted Mathews' motion to dismiss as to two of the six-at issue statements. This motion addresses the remaining four statements still at issue.

13

statement, and (3) the circumstances surrounding the statement, including the medium through which the information is disseminated and the audience to whom it is directed. *Id.* Thus, a statement that is "replete with speculative" language, stated in a context in which it was obvious that the speaker was stating her opinion, is not that which a reasonable reader would presume to be a factual declaration. *Jefferson Cty. Sch. Dist.*, 175 F.3d at 853.

Generally, if the factual premise underlying an opinion is fully disclosed, the statement is protected. *Id., see also Keohane v. Stewart,* 882 P.2d 1293, 1298 (Colo. 1994) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."); *Bucher v. Roberts,* 595 P .2d 239, 241 (Colo.1979) ("A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is") (quoting comment c to the Restatement (Second) of Torts § 566 (1976)). "The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1439–40 (9th Cir. 1995)

Multiple courts have found that articles on Seeking Alpha, whose tagline at the time of the Article was "Read. Decide. Invest.", and websites like Seeking Alpha, are protected opinion so long as the facts underlying the article's conclusions are disclosed. *See MiMedx Grp.*, 2018 WL 847014, at *7. For example, in *Nanoviricides, Inc. v. Seeking Alpha, Inc.*, the court, found

14

4833-4290-5309, v. 1

the entire article was "pure opinion" because "[t]he statements made by the author in the article are either followed by a recitation of 'facts' uncovered from public filings or publicly available material, which are linked to in the article itself, or no implication is given that they are based on undisclosed facts." No. 151908, 2014 WL 2930753 *5-6 (N.Y. Sup. June 26, 2014). The Court found it persuasive that the article was published on Seeking Alpha, stating:

> [T]he fact that the article appears on an internet based message board also supports a finding that the article must be an expression of the author's opinion. As an initial matter, Seeking Alpha's website's tagline is "Read. Decide. Invest." This clearly gives the impression that the website is designed to give people a place to express their opinions and for the reader to then form his or her own assumptions based on the posted articles. Further, the articles published on the website are almost exclusively published by third-parties and not actual reporters. Indeed, the article herein at issue was posted by an anonymous third-party user. Thus, readers are likely to give less credence to the articles found on this website and view the assertions in the articles, like the one herein at issue, with some skepticism and to treat its contents as opinion rather than fact.

*Id. See also Eros Int'l PLC v. Mangrove Prs.*, No. 653096, 2019 WL 1129196 *7 (N.Y. Sup. March 8, 2019) ("A reasonable reader who encountered the Seeking Alpha articles posted by [defendants] would understand that they are sharing opinions about Eros based on news about the company.").

Here, the Article contains numerous disclosures that the Article is the opinion of the author. Like the articles in *Nanoviricides* and *Eros International*, the Article was published on Seeking Alpha and the at-issue statements all follow a recitation of facts gleaned from public information and are opinions based on that evidence. That the statements are opinions based on the disclosed facts is clearly signaled by the use of phrases such as "we believe," "we think," and "our opinion." That is particularly important because FPI would have the Court review the at-issue statements in isolation and without consideration of the larger context, or even the qualifying language at the start of the very phrases to which FPI objects.

For example, while FPI claims the Article falsely asserted that "Paul Pittman pledged his shares," the Article is not so succinct. A top bullet in the Article states "a UCC shows 'Pittman Hough' pledged shares of FPI . . ." and the full section of the Article reads:

> According to a February 13th, 2017, Colorado UCC filing, Hough Holdings put up its equity interest in Farmland Partners for a bank loan. But notice, at the bottom of the document is a line that states 'Optional filer reference: (Bank of the West)/Pittman Hough.' Being that Pittman-Hough Farms disclosed in a 2016 Form 4 that it distributed its shares to its members, we think the UCC filings is referring to Pittman and Hough personally. We note that the UCC filing also uses FPI's corporate address . . . . Our opinion that Pittman pledged his shares is further bolstered by the fact that on July 29, 2017, he converted 531,827 operating partnership shares (OP units) to common shares." Article at 1, 29; 31.

Thus, the statement is not merely an unsupported assertion that "Pittman pledged his shares," but an opinion (signaled by the phrases "we think and "our opinion") that is based on numerous publicly available documents and information, all of which is discussed, cited, and linked in the Article so the readers can see for themselves. This is an archetypal example of a situation where the "factual premise underlying [the] opinion is fully disclosed," and the statement should be protected. *Jefferson Cty. Sch. Dist.*, 175 F.3d at 853.

The same is true for the remaining at-issue statements in the Article. While FPI alleges that the Article falsely asserted that FPI is "artificially increasing revenues by making loans to related-party tenants," this statement is always accompanied by conditional language and words signaling opinion and speculation, such as "we believe," "our research has led us to believe," "we think," and "If the acquisition paid off the loan, we think that would qualify as a loan that lacks economic substance." (Art. at 1, 3, 9, 10). The full statement, as it appears most robustly in the Article (it is reiterated in several places), states:

> Our research leads us to believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest

16

> revenue. We believe these loans lack economic substance because whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price. And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires a property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/tenant.

(Article at 3; *see also id.* at, 1, 9, 10). The Article discusses and discloses the public information on which Mathews bases this opinion (documents showing some borrowers were part of FPI's management team, and deed-record documents showing that FPI would make a loan against a property, acquire the property around the time the loan matures, enter into a lease with the borrower, and, days later, lend more money to the borrower/new tenant). FPI does not challenge the underlying facts regarding the details of the transactions (the timing and amount of the loans, the identity of the borrowers), merely Mathews' opinions as to whether some of the borrowers were related parties and whether these loans artificially increased FPI's revenues. *See Yagman*, 55 F.3d at 1439–40 ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning.").

As to FPI's allegation that the Article falsely alleged that "FPI failed to properly disclose the financial impact of its Loan Program," this is not a statement that appears in the Article. Instead, the Article variously states that FPI did not disclose the names of the borrowers, the uses of funds, that 70% of the loans went to Messrs. Hough and Niebur, that Niebur later filed for bankruptcy, that FPI was acquiring properties secured by loans it made to borrowers, and that FPI disclosed certain transactions as loans, not acquisitions. (Art. 3, 9-22, 27-28). FPI does not dispute any of these underlying facts. Instead, in its rebuttal to the Article, it offered "additional disclosures" regarding its loan program and specific loans to Messrs. Hough and Niebur. Because FPI does not dispute the accuracy of the underlying statements regarding what it did not

17

disclose, and later made additional disclosures regarding the loan program and the Niebur and Hough loans, its objection to a statement that is not even included in the Article cannot be actionable. *See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998) ("Thus, the article clearly disclosed the factual bases for the [challenged statement and plaintiff] . . . . When the bases for the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.").

Finally, FPI alleges the Article falsely asserted that it "ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend of FPI's preferred "B" shares." (SUF ¶ 14). To be technically accurate, the Article should have referenced "funds from operations" (FFO) rather than "adjusted" funds from operations, and Mathews fixed the issue after being alerted to the mistake. Regardless, this sentence comes as a lead up to Mathews' larger opinion that "AFFO has drifted miles away from free cash flow," (Art. at 5), which FPI does not dispute. And, all the facts underlying this larger opinion are disclosed in the chart immediately below this language. The chart correctly represents Adjusted Funds From Operations and FPI never claims that the chart presented in this section is incorrect.

The statements are protected opinion and summary judgment is appropriate.

### B. The remaining claims should also be dismissed

In general, a plaintiff such as FPI cannot evade First Amendment protections for speech by dressing up a libel claim as other torts. *See Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("A plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."); *See Jefferson Cty Sch. Dist.*, 175 F.3d at 857 (dismissing IIPBR claim and

trade libel claim as derivative of defamation claim); *Wedbush Morgan Sec., Inc. v. Kirkpatrick Pettis Capital Mgmt*, 2007 WL 1097872 at *8 (D. Colo. April 9, 2007) (disparagement, IIPBR, and CCPA claims are all derivative of defamation claim); *Ruffin-Steinbeck v. dePasse*, 267 F.3d 457, 463 (6th Cir. 2001) (dismissing unjust enrichment claim under First Amendment grounds because the claim was based on protected statements).

Here, all of FPI's remaining claims are predicated on Mathews' allegedly defamatory speech (Am. Compl. ¶¶ 130-136; 143; 149-151; 154 – 161; 171) and should be dismissed if the Court determines the Article is protected speech.

### C. FPI's CCPA claims fails on independent grounds

FPI, as a non-consumer of Mathews' and QKM's research services, lacks standing to assert a CCPA claim. While the CCPA permits non-consumers to bring claims, they must prove:

> (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) the practice significantly impacts the public as actual or potential consumers of the defendant's services; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury.

*Bldg. On Our Best LLC v. Sentinel Ins. Co. Ltd.*, No. 15-CV-00669-RBJ, 2015 WL 7014445, at *3 (D. Colo. Nov. 12, 2015) (internal citations omitted).

FPI cannot meet the public impact requirement, which requires a showing that the challenged practice may prove "injurious, offensive, or dangerous" to "actual or potential customers" of *Defendants*. *See Hall v. Walker*, 969 P.2d 224, 234 (Colo. 1998), *compare* Am. Compl. ¶ 161 (alleging Article impacted public by "harming consumers of FPI's services").

Mathews' and QKM's actual customers are the half-dozen or so investors who pay for research. Mathews' and QKM's potential customers are the same: investors who may pay QKM

19
4833-4290-5309, v. 1

for Mathews' research. As FPI has repeatedly argued, these customers were not harmed by the Article, but benefited, particularly if they also had short positions. *See Bldg. On Our Best,* 2015 WL 7014445, at *4. (potential customers of defendant's business are insurance companies, and defendant's alleged unsavory practices do not harm insurance companies but help them).

Respectfully submitted this 19th Day of February, 2021.

> By: */s/ John A. Chanin*
> John A. Chanin
> Katherine Roush
> FOSTER GRAHAM MILSTEIN & CALISHER, LLP
> 360 South Garfield Street, 6th Floor
> Denver, Colorado 80209
> jchanin@fostergraham.com
> kroush@fostergraham.com
> Phone: 303-333-9810
> *Attorneys for Defendants David Quinton Mathews aka Rota Fortunae and QKM, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2021, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

| | |
|---|---|
| sllewellyn@mofo.com | tgalloway@winstead.com |
| mbirnbaum@mofo.com | jlacy@winstead.com |
| sbarr@mofo.com | Chad.Williams@dgslaw.com |
| rbachelder@mofo.com | Tess.Hand-Bender@dgslaw.com |
| bcline@mofo.com | Claire.Mueller@dgslaw.com |
| | |
| Counsel for Plaintiff Farmland Partners, Inc. | Counsel for Defendants First Sabrepoint Capital Management, LP, George Baxter, and Donald Marchiony |

> By: */s/ Lucas Wiggins*
> Lucas Wiggins, Paralegal

20