# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02351-KLM

FARMLAND PARTNERS INC.,

      Plaintiff,

v.

ROTA FORTUNAE (WHOSE TRUE
NAME IS UNKNOWN), JOHN/JANE
DOES 2–10 (WHOSE TRUE NAMES ARE
UNKNOWN),

      Defendants.

---

**PLAINTIFF FARMLAND PARTNERS INC.'S OBJECTIONS AND RESPONSES
TO ROTA FORTUNAE'S REVISED FIRST SET OF INTERROGATORIES**

---

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff

Farmland Partners Inc. ("FPI") hereby serves its Objections and Responses to Rota

Fortunae's ("RF") Revised First Set of Interrogatories ("Interrogatories").

      These responses and objections are based upon information presently available to

Plaintiff.  Plaintiff reserves the right to modify, supplement, or amend its responses and

objections.  Plaintiff has not completed its investigation of the facts relating to this action, has

not completed discovery in this action, and has not completed preparation for trial in this action.

These responses and objections are provided without prejudice to Plaintiff's right to supplement

its responses if information is discovered after the date of these responses and objections.

ny-1766644

**GENERAL OBJECTIONS**

Plaintiff objects to each Request to the extent that it calls for information protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or doctrine.  Plaintiff further states that by providing a response to a Request, Plaintiff is not waiving, intentionally or otherwise, the attorney-client privilege, work product doctrine, or any other privilege or doctrine protecting communications, transactions, or records from disclosure.

Plaintiff objects to inclusion in the Interrogatories of multiple subparts addressing discrete, separate subjects, to the extent that such subparts cause the Interrogatories to exceed the 25-request limit imposed by the parties and the Court.  Plaintiff's response to each of the requests below does not constitute agreement to answer to more than 25 Interrogatories.

Plaintiff further objects to responding to RF's discovery requests at a time when RF has refused to comply with its obligations under the Federal Rules of Civil Procedure and this Court's Orders with respect to disclosing the identifies of relevant parties.

Subject to and without waiving Plaintiff's general objections set forth above, and to the specific objections stated with respect to particular Requests below, Plaintiff responds to the Requests as follows:

**SPECIFIC OBJECTIONS TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Describe with specificity all damages and harm you claim to have suffered because of the Article and/or because of conduct alleged in the Complaint.

ny-1766644

**RESPONSE TO INTERROGATORY NO 1:**

Plaintiff objects to this Interrogatory on the ground to the extent that it is premature and calls for information that is appropriately the subject of expert discovery. Subject to and without waiving the foregoing General and Specific Objections, Plaintiff has suffered the following types of damages and harm from the Article and/or the conduct alleged in the Complaint:

- Loss of value in FPI's stock, and the related impact of that loss of value on FPI's business and opportunities;

- Loss of employees and money spent on retention agreements to keep FPI's employees at the Company following publication of the Article;

- Loss of prospective business, including a joint venture deal with pension funds and similar investors, the names of which will be disclosed once the parties enter into a protective order;

- Harm to FPI's reputation;

- Harm to FPI's ability to raise capital, including the related impact of that harm on FPI's business and opportunities;

- Harm to the parties FPI serves, including farmers and its shareholders, including its OP unit holders; and

- The unjust enrichment of RF and others, including his co-conspirators, based on the money they made from their short-and-

ny-1766644

distort scheme.

**INTERROGATORY NO. 2:**

Identify each and every statement in the Article you claim is false and describe with particularity why you claim each such statement is false.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to this Interrogatory on the ground that it is compound and constitutes multiple interrogatories.  Further, Plaintiff objects to the portion of the interrogatory that asks Plaintiff to "describe with particularity why you claim each statement is false," as this is an improper attempt to pose 58 additional Interrogatories.  Plaintiff further objects on the ground that dividing Defendants' nearly 40-page posting into discrete false and misleading segments ignores the fact that the Posting as a whole is false and misleading, and individual excerpts contribute to the Posting's false and misleading nature when considered in the context of the Posting (*e.g.* statements 3, 5, 26), or considered in the absence of the relevant context in which those excerpts arose (*e.g.* statements 12, 15, 24).  With respect to determining falsity, the accuracy of the Posting should be considered as a whole and in context.  *See, e.g.*, ECF No. 110 at 20-21.  Subject to and without waiving the foregoing General and Specific Objections, the many false and misleading statements contained in the Posting include those attached hereto as Exhibit A.

**INTERROGATORY NO. 3:**

Describe with particularity the discontinuation of the business partnership between Paul Pittman and Jesse Hough, including but not limited to, the date in which Paul Pittman and Jesse Hough ceased their business partnership, the steps they took to unwind their business partnership

4

(including without limitation changes made to any and all joint or common ownership, membership, or control in limited liability companies, joint ventures, partnerships, limited liability partnerships, or common ownership in real property) and the names of every interest holder in the entities in which both Paul Pittman and Jesse Hough held or hold an interest together, the percentage interest held by each interest holder both before and after the discontinuation of the business partnership, and any consideration exchanged in the restructuring of Pittman and Hough's business interests.

**RESPONSE TO INTERROGATORY NO. 3:**

Subject to and without waiving the foregoing General Objections, Plaintiff will produce relevant, non-privileged documents and communications concerning the business partnership between Paul Pittman and Jesse Hough, to the extent such documents are identified after a reasonable and proportionate search of locations where such documents are likely to be found.

**INTERROGATORY NO. 4:**

Describe with particularity how the Loans to and asset purchases from Ryan Niebur came to be, when you learned that Ryan Niebur was not going to be able meet his contractual obligations to FPI and when you learned that it was likely that Ryan Niebur would seek bankruptcy protection.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to this Interrogatory on the ground that it is compound and constitutes three of RF's 25 interrogatories.  Plaintiff further objects to this Interrogatory as vague and ambiguous as terms including "contractual obligations to FPI" and "came to be" are not defined and are susceptible to more than one meaning.  Subject to and without waiving the foregoing

General and Specific Objections and following the necessary clarification from RF, Plaintiff will produce relevant, non-privileged documents and communications related to Ryan Niebur's loans with FPI, to the extent such documents are identified after a reasonable and proportionate search of locations where such documents are likely to be found.

**INTERROGATORY NO. 5:**

Explain why the first rent payment for the "Niebur Kit Carson County Farm" lease dated March 15, 2017 was due on March 16, 2017 while the payments due in subsequent years were due on March 15th.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to this Interrogatory because it is not tailored to the claims or defenses of any party to this action and seeks information that is not relevant to this litigation.  Subject to and without waiving the foregoing General and Specific Objections, Plaintiff will produce documents in its possession, custody, and/or control responsive to Interrogatory No. 5 after the parties have a protective order in place.  Plaintiff notes that the first rent payment for the "Niebur Kit Carson County Farm" lease dated March 15, 2017 was due on March 16, 2017 because the lease start date was March 16, 2017.

**INTERROGATORY NO. 6:**

Describe with particularity why FPI was not required to disclose Justice Farms of North Carolina as a related party in its 2017 and 2018 SEC filings.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this Request as vague and ambiguous as "related-party transactions" is not defined and is susceptible of more than one meaning.  Plaintiff also objects to this

6

Interrogatory to on the ground that it calls for a legal conclusion.  Subject to and without waiving

the foregoing General and Specific Objections, Plaintiff states that at the relevant time, Plaintiff

was not aware of information indicating that Justice Farms had a relationship with FPI, Paul

Pittman, or another FPI employee that would justify deeming Justice Farms a related party under

the Generally Accepted Accounting Principles of the United States and notes that Plaintiff's

financial statements were certified by FPI's independent auditors as having been prepared in

conformity with GAAP.

**INTERROGATORY NO. 7:**

Describe with particularity any all relationships between Paul Pittman and Justice Farms

of North Carolina, its affiliated entities, owners, executives, directors or management.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff objects to this Request as vague and ambiguous as "relationships" is not defined

and is susceptible of more than one meaning.  Subject to and without waiving the foregoing

General and Specific Objections, Plaintiff states that it is not aware of any business relationships

between Paul Pittman in a personal capacity and Justice Farms of North Carolina or any of its

affiliated entities, owners, executives, directors or management that are known to FPI.  Plaintiff

will produce relevant, non-privileged documents and communications concerning Justice Farms,

to the extent such documents are identified after a reasonable and proportionate search of

locations where such documents are likely to be found.

7

Dated: October 21, 2019

Respectfully submitted,


*/s/ Scott F. Llewellyn*
Scott F. Llewellyn
Morrison & Foerster LLP
4200 Republic Plaza
370 Seventeenth Street
Denver, Colorado  80202
Telephone:  303.592.1500
Facsimile:  303.592.1510
sllewellyn@mofo.com

Michael D. Birnbaum
Rhiannon N. Batchelder
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Telephone:  212.336.4079
Facsimile:   212.468.7900
mbirnbaum@mofo.com
rbatchelder@mofo.com

*Attorneys for Plaintiff, Farmland Partners Inc.*

# EXHIBIT A

## Ex. A:  RESPONSE TO INTERROGATORY NO. 2

| No. | Statement |
|---|---|
| 1. | Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible |
| 2. | We believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up. |
| 3. | FPI has neglected to disclose that the majority of its loans have been made to two members of the management team, including Jesse Hough, CEO Paul Pittman's long-time business partner. |
| 4. | A UCC shows "Pittman Hough" pledged shares of FPI for a loan then FPI's stock fell 30%, and two weeks after reaching an all-time low, FPI began lending to Hough. |
| 5. | Four board members and FPI's president have resigned since FPI began lending to Hough, and in March, FPI dismissed its auditor. |
| 6. | We found evidence that strongly supports FPI has significantly overpaid for properties; under normal circumstances, we estimate FPI is worth $4.85/share, but we think the shares are uninvestible. |
| 7. | Chapter five of Financial Shenanigans teaches investors the methods companies use to artificially increase revenues. One technique is to sell a product to a friendly customer who has no real obligation to pay. Such a transaction is said to lack economic substance. And how do you trick the auditor? Draft a normal sales contract but have a secret "side agreement" that modifies the terms. We think this is happening at Farmland Partners. |
| 8. | Farmland Partners (FPI) is a highly levered farm REIT whose cash flow does not cover its dividend and whose non-GAAP earnings have drifted miles away from economic reality. Yet, despite evidence that rents have fallen across key geographies, FPI just posted its largest ever same-property revenue (i.e. same-store sales) increase and notched its longest stretch of positive revenue surprises. To be blunt, we do not believe the numbers. |
| 9. | When we started looking into FPI, we found it was playing classic accounting games like capitalizing part of the expense to lease CEO Paul Pittman's personal jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency. |
| 10. | |

1

|  | Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest revenue. We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.

And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other. |
|---|---|
| 11. | While FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported the purchase as a loan and then lent him an additional $61,800 the day after he signed a lease with FPI for $61,750. |
| 12. | Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's properties, which FPI then acquired two weeks before the loan matured and leased back to him just days before FPI lent him another $5.25 Million, this time as the president of an inactive entity that corporate records show he has no affiliation with, and that is secured by land that deed records show he does not own. |
| 13. | Our opinion that FPI appears to be playing accounting games is further bolstered by a Colorado UCC filing that shows "Pittman Hough" pledged shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. He was wrong. Instead the stock tanked, and two weeks after hitting an all-time low, FPI made its first loan to Jesse Hough. |
| 14. | While shareholders have expressed concern about FPI's ability to maintain its dividend, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency. |
| 15. | And it appears that we are not the only concerned party. Since making its first loan to Jesse Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed PWC for EKS&H (auditor for MusclePharm and Heska). |
| 16. | But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside. We found evidence that |

| | suggests FPI has significantly overpaid for properties. We estimate that under normal circumstances FPI would be worth $4.85 per share (45% below the current stock price). But there is never just one cockroach, and we have no confidence in FPI's financials. Accordingly, we think FPI is uninvestible. |
|---|---|
| 17. | Note: We reached out to FPI's management with a list of questions (located at the end of this report). The company did not respond. |
| 18. | Note that while the related parties discussed herein may fail to meet the SEC's definition, we believe they meet the more stringent definition set out by audit rules, and more importantly, we think the relationships would be considered material information to most investors. |
| 19. | From its IPO through 2017, FPI generated *negative $3.2 Million* in cumulative free cash flow (operating cash flow - depletion/depreciation - preferred dividends). And this figure excludes an additional $69 Million in capital expenditures that FPI says are all growth related, an incredulous statement given the lack of organic growth. |
| 20. | And FPI ignores very real expenses when it promotes funds from operations (FFO). Excluded expenses include the dividend on FPI's preferred "B" shares, which at 6% of par value is higher than the companies blended cap rate of 4.25% (pg. 13). Preferred dividends are subtracted to calculate Adjusted Funds from Operations (AFFO), but even that figure has drifted miles away from free cash flow as the recession in the ag economy has deepened.<br><br><br>*Source: Chart By Author, Using SEC Financials* |

| 21. | In simple terms, millions in executive pay (including $0.5 Million for leasing Pittman's personal jet) and $27 Million in dividends has been funded, not by profits, but by a hamster wheel of dilutive debt and equity raises. |
| --- | --- |
| | The fact that FPI generates no cash is very important to remember. If our thesis is correct, the related-party loans are being "paid off" by FPI, and capital from new investors is funding the related revenues. |
| | That makes this accounting maneuver particularly hard to detect because, unlike channel stuffing, there is no build up in receivables or decline in operating cash flow to forewarn investors. No, in this case, the red flags came in the form of hard-to-believe numbers that we could not reconcile with reality. |
| 22. | For years, Paul Pittman has been making incredulous statements about the prospects for flat-to-increasing rents even though farm (i.e. tenant) incomes have been declining since 2013. On the 2Q2015 call, he said: […] |
| 23. | Pittman's comments do not jive with well-publicized industry data. The Illinois Society of Professional Farm Managers and Rural Appraisers (pg. 49) shows Illinois cash rents are down approximately 25% from 2013 (pg. 49). And the 2017 Nebraska Farm Survey (pg. 50) shows cash rents on irrigated cropland across Nebraska are down 24% since 2013 and down 18% in eastern Nebraska. |
| | So, we were not surprised when, in the 1Q2017, average annual rent per acre fell off a cliff when FPI's original three-year leases rolled over. But we were surprised when the number began to improve throughout the year and when, in the 4Q2017, FPI stopped disclosing the figure completely and simply reported that rents on row crops were "flat to slightly lower" (pg. 52). |

4



*Source: Chart By Author, Using SEC Filings (Search: "same-property")*

| 24. | On the 2Q2017 conference call, management said the improvement was due to leases moving from straight cash rent to cash plus crop share and farmers locking in prices during the run up over the summer. Perhaps, but this must assume that FPI's tenants had the foresight to sell the vast majority of their crops in the short period of time when prices peaked because shortly after prices fell, and average prices for row crops ended down for the year. |
|-----|---|



*Source: Bigcharts.com*

| 25. | And given that prices were hitting fresh lows in early 2018, we doubt farmers were willing to sign leases that allowed FPI to report +15% same-property revenue growth in the 1Q2018 (FPI's highest ever year-over-year gain).

We think the first quarter surge was, in part, due to how FPI defines "same property" as those that are "owned and operated" for the entirety of both periods. Only including "operated" farms means that FPI can exclude properties that are not leased, which skews the financial picture of the entire portfolio.

And sure enough that is exactly what we found FPI doing. The chart below shows that in the 1Q2018, FPI excluded 6.5% of the properties owned for the entirety of 1Q2017 (note FPI does not provide figures in 10-Ks to make the fourth quarter calculations). |

| Same-Property Acres | 1Q2017 | 2Q2017 | 3Q2017 | 1Q2018 |
|---|---|---|---|---|
| Current Year Acres | 74,420 | 107,206 | 110,828 | 109,270 |
| Comparable Period Acres | 74,267 | 107,052 | 110,675 | 116,424 |
| Implied Non-Operating Acres | 153 | 154 | 153 | -7,154 |
| % Of Total Same-Property Acres | 0.2% | 0.1% | 0.1% | -6.5% |

But it was not until we reviewed hundreds of deed records across the country that came to believe FPI is using its mortgage lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest revenue.

| 26. | In August 2015, Farmland Partners introduced the FPI Loan Program to "address a market need created by short term cash flow pressure on farmers who otherwise *maintain solid balance sheets*" but cannot get traditional funding. The press release promoted FPI's quick underwriting abilities and conservative loan-to-value criteria. Further disclosure given in the 3Q2015 10-Q (pg. 21) states "the company intends to make loans to *third-party* farmers (both tenant and non-tenant)." |
|---|---|

Below we present a chart of the loan program's originations (in boxes), the borrower (where known) and the ongoing balances.



| FPI Loans | Borrower | 3Q2015 | 4Q2015 | 1Q2016 | 2Q2016 | 3Q2016 | 4Q2016 | 1Q2017 | 2Q2017 | 3Q2017 | 4Q2017 | 1Q2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan #1 | Boersen Land Co. | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Loan #2 | Ryan Niebur | | 980,000 | 980,000 | 980,000 | 980,000 | 980,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| Loan #3 | ? | | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan #4 | Ryan Niebur | | | | | | | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 |
| Loan #5 | ? | | | | | | | | 1,647,000 | 1,647,000 | 1,647,000 | 1,647,000 |
| Loan #6 | Jesse Hough | | | | | | | | | 100,000 | 100,000 | 0 |
| Loan #7 | Jesse Hough | | | | | | | | | 669,000 | 669,000 | 0 |
| Loan #8 | Justice Farms (?) | | | | | | | | | | 2,700,000 | 0 |
| Loan #9 | Jesse Hough | | | | | | | | | | | 5,250,000 |
| Revenue Beat / Miss | | BEAT | BEAT | MISS | MISS | BEAT | BEAT | MISS | BEAT | BEAT | BEAT | BEAT |

*Source: Chart By Author, Using SEC Filings, Deed Records and FactSet*

Off the bat, this struck us as an accountant's version of the devil's playpen. How are investors to know whether FPI is making loans to struggling tenants so they can pay rent they otherwise would be unable to pay? And we noticed that FPI has missed revenue estimates only once in a quarter when it also originated a loan.

|   | And then, we found that FPI has neglected to disclose that $9.2 Million (out of a total of $15.4 Million) in loans have been made to Ryan Niebur and Jesse Hough, who are both members of FPI's management team. We believe these loans lack economic substance and have been used to artificially increase revenues. |
|---|---|
| 27. | On October 30th, 2015 (recorded in deed records and SEC filings as November 16th, 2015), FPI lent $980 Thousand (Loan #2) to a tenant farmer (pg. 51). The only other disclosure (pg. F-23) was that the loan was collateralized by a first mortgage on farm real estate and that the first year of interest was due up front (allowing FPI to report immediate interest revenue). <br><br> What was not disclosed was that the loan was made to Ryan Niebur and that it was not used for farming operations but rather to pay off part of an existing mortgage. <br><br>  <br><br> Source: Washington County, CO Deed Records |
| 28. | Niebur's loan remained unchanged until the 1Q2017 10-Q (pg. 16) when FPI disclosed that it "renegotiated" the loan while simultaneously entering into a new $2.194 Million loan (Loan #4) collateralized by two additional properties. |

| ($ in thousands) | | Principal Outstanding as of | | Maturity |
| Loan | Payment Terms | March 31, 2017 | December 31, 2016 | Date |
|---|---|---|---|---|
| Mortgage Note [1] | Principal & interest due at maturity | $     1,800 | $     1,800 | 1/15/2017 |
| Mortgage Note [2] | Principal & interest due at maturity | 240 | 980 | 3/16/2022 |
| Mortgage Note [2] | Principal & interest due at maturity | 2,194 | - | 3/16/2022 |
| Total outstanding principal | | 4,234 | 2,780 | |
| Points paid, net of direct issuance costs | | (3) | (4) | |
| Interest receivable (net prepaid interest) | | 16 | 67 | |
| Total notes and interest receivable | | $     4,247 | $     2,843 | |

(1)  In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity.  The Company is currently in negotiations to extend the terms with the borrower.

(2)  The original note was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

*Source: FPI 1Q2017 10-Q (pg. 16)*

But this is not the real story. FPI did not disclose that on March 16th, 2017, it acquired the Andersons Farm from Niebur which was collateral for Loan #2, and in which the deed specifically states that Niebur was in default on the loan and obligated to pay a remaining balance of $240 Thousand (Loan #2's balance as of 1Q2017).

| 29. | Then, in January 2018, Niebur filed for bankruptcy, a material fact that we could not find in FPI's SEC filings. Court records shows that the remaining $240,000 owed is collateralized by a property worth $192,000, resulting in a loan-to-value ratio of 125%. We hardly call this conservative. |
|---|---|
| 30. | We believe the transactions with Niebur show FPI's willingness to make loans outside of the programs stated parameters and stabilize rental income by making risky loans to struggling tenants. But, more importantly, we believe the loans show that FPI has misstated its SEC filings and used the loan program to artificially increase revenues. |
| 31. | It turns out that the new $2.194 Million loan to Niebur was not actually a loan, but an acquisition of three properties, all on March 16th, 2017. As shown above, FPI acquired one of the properties collateralizing Niebur's original loan for $801,800. The other two are the same properties that purportedly collateralize the new loan. Deed records show FPI acquired these properties for $1.392 Million. |
| | Low and behold, the total acquisition price is $2.194 Million (= 0.802 + 1.392), the same amount as Loan #4. Further proof that there was no new loan, is the fact that Niebur did not list Loan #4 in his bankruptcy, only the remaining $240,000 of Loan #2. |



*Source: Kit Carson County & Washington County, CO Deed Records*

So, in fact, FPI reported a loan on its financial statements when it actually was an acquisition. But that is not all. After Neibur defaulted and on the same day FPI acquired his properties, FPI lent him an additional $61,800 that we believe was used to immediately pay rent on a new FPI lease.

| 32. | We know this was a mountain of numbers, so below is a picture showing the three transactions. |

10



*Source: Chart By Author, Using SEC Filings & Deed Records*

There are two important takeaways:

1. The partial payoff of Loan #2 was funded by FPI's acquisition of a property collateralizing the loan. We believe this means the loan lacked economic substance and is akin to a bank paying full price to acquire a home securing a defaulted mortgage and then calling the loan money good when the borrower uses the sale proceeds to pay off the loan.
2. Second, because Niebur was already in default when FPI lent him the additional $61,800 on the same day he owed $61,750 in rent, we think this transaction artificially increased revenues by allowing a defaulted tenant/borrower to pay his rent.

| 33. | Given the evidence that FPI has used the loan program to prop up a struggling tenant and, we believe, issue a loan to artificially increase revenues, shareholders should be concerned with the similar pattern of transactions with Jesse Hough. |
|---|---|
| 34. | |

|  | Paul Pittman and Jesse Hough have been business partners since at least January 2012 when, according to SEC filings (pg. F-50), Pittman-Hough Farms, LLC was formed as a merger of their personal farmland holdings. They were also partners in a web of businesses that FPI hired for service before and after the IPO. |
|---|---|
|  | Two of the entities are Astoria Farms and Hough Farms, which were FPI's first tenants (pg. 17), are currently controlled by Jesse Hough (pg. 20) and, as of December 2017, still lease 4% of FPI's acres (pg. F-19). Another entity was PHS Holdings, which leased land and equipment to FPI (pg. F-63), but has not been mentioned in FPI's SEC filings in years.

After the IPO, Jesse Hough became an FPI consultant, but according to an August 2016 investor presentation, he is considered part of the management team (we found no newer investor presentations that removed his name). |
| 35. | On July 25th, 2017, FPI made a $100,000 loan to Jesse Hough through PHS Holdings. Like the original loan to Ryan Niebur (Loan #2), we think this loan was likely paid off with the proceeds from FPI acquiring the property. Deed records show FPI acquired the property on January 12th, 2018, two weeks before the January 31st, 2018 maturity date (pg. 17).



*Source: Butler County, NE Deed Records* |

| 36. | While we cannot be sure that the acquisition paid off the loan, an inconsistency in FPI's SEC disclosure bolsters our opinion that details are being misreported. The 1Q2018 10-Q (pg. 16) states the loan was fully settled "on the maturity date of January 1, 2018," (before the acquisition closed) but the disclosure listed right above states the original maturity date of January 31st, 2018. |

As of March 31, 2018 and December 31, 2017, the Company had the following notes receivable:

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
|---|---|---|---|---|
| | | March 31, 2018 | December 31, 2017 | |
| Mortgage Note [1] | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note [2] | Principal & interest due at maturity | 240 | 240 | 3/16/2022 |
| Mortgage Note [2] | Principal due at maturity & interest due monthly | 2,194 | 2,194 | 3/16/2022 |
| Mortgage Note [6] | Principal & interest due at maturity | 1,647 | 1,647 | 4/27/2018 |
| Mortgage Note [3] | Principal & interest due at maturity | - | 100 | 1/31/2018 |
| Mortgage Note [4] | Principal due at maturity & interest paid in advance | - | 669 | 2/15/2018 |
| Mortgage Note [5] | Principal due at maturity & interest paid in advance | - | 2,700 | 1/29/2018 |
| Mortgage Note | Principal & interest due at maturity | 5,250 | - | 8/19/2020 |
| Total outstanding principal | | 11,131 | 9,350 | |
| Points paid, net of direct issuance costs | | (1) | (6) | |
| Interest receivable (net prepaid interest) | | 609 | 461 | |
| Provision for interest receivable | | (91) | (45) | |
| Total notes and interest receivable | | $ 11,648 | $ 9,760 | |

(1) In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. On July 28, 2017, the Company notified the borrower of default under the Promissory Note. The Company currently believes that collectability is reasonably assured as the fair value of the mortgaged farm is greater than the amount owed under the loan.

(2) The original note was renegotiated and a second note was entered into simultaneously with the borrower during the three months ended March 31, 2017. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

(3) The note was fully settled and outstanding amounts paid on the maturity date of January 1, 2018.

(4) The note was fully settled and outstanding amounts paid on the maturity date of February 2, 2018.

(5) The note was fully settled and outstanding amounts paid on the closing of an acquisition in North Carolina, which was completed on January 12, 2018.

(6) On April 17, 2018, the Company amended the loan to extend the term of the loan through March 1, 2020 and increased the interest rate to 7.5% per annum.

Source: 1Q2018 FPI 10-Q

If the acquisition paid off the loan, we think this would qualify as a loan that lacks economic substance.

14

| 37. | But there is another important similarity to the Niebur transactions. Deed records show that PHS Holdings entered into a lease agreement with FPI as part of the acquisition agreement. |
|---|---|



June 14th, 2018 Subordination Agreement (Butler County, NE) Shows FPI Enters Lease With PHS Holdings

Source: Butler County, NE Deed Records

And just six days after the property was acquired (and presumably the lease went into effect), FPI lent $5.25 Million to Hough under circumstances that, in our opinion, are highly irregular.

| 38. | |
|---|---|

On January 18th, 2018 (pg. 16), FPI made a $5.25 Million loan to Siffring Farms. Nebraska corporate records show that Siffring Farms is an inactive LLC whose president is Duane R. Siffring. However, the deed of trust for the loan was signed by Jesse Hough as President of Siffring Farms.



*Source: Butler County, NE Deed Records (Search: Siffring Farms)*

And Butler County appraisal records (search: Siffring Farms) show that Siffring Farms has owned the properties for years.

We ask, why is Jesse Hough signing on a loan for an inactive entity, that corporate records show he has no affiliation with, and that is collateralized by land that deed records show he does not own?

Based on the circumstances in which this loan [Siffring Farms] was made and the fact that it was made just days after FPI entered into a lease with Jesse Hough (through PHS Holdings), we think there is a significant probability that part of the $5.25 Million was used to pay PHS Holdings' annual rent payment.

We also think there is a significant probability that part of the proceeds was used to roll over another loan made to Jesse Hough.

| | |
|---|---|
| 39. | Go back to August 25th, 2017, and FPI made a $669,000 loan to Jesse Hough through Hough Farms. |

*Source: Butler County, NE Deed Records*

According to the 10-Q disclosure above, this loan was paid-off on February 2nd, 2018 (we note that again the original maturity date of February 15th does not match this disclosure). In any event, the loan was paid off just weeks after FPI gave Hough the $5.25M loan through Siffring Farms, which introduces the possibility that this loan was simply rolled into a new loan.

We also note that we could not find any filed reconveyances in the deed records, which is the normal public filing a bank uses when a borrower pays off a loan.

| | |
|---|---|
| 40. | When Ryan Niebur sold his properties to FPI, he entered into two lease agreements. The first agreement, previously discussed, had an annual rent payment of $61,750 for 334.4 tillable acres or $185 per acre. This is 29% above the $143 average cash rent per acre for irrigated farmland cited in this 2017 Colorado Farm Land Values & Rents Survey (in line with what the USDA reported in its annual survey.) |

|  | We note that the lease includes $20,000 for a building, which if you exclude would bring the lease rate to $125 per acre, or less than the average. However, we think this is the incorrect way to look at the lease. First, farms often come with buildings and equipment, that is why survey's report average rent. |
|---|---|
| 41. | Second, FPI's second lease also appears to be above market. The lease has an annual rent payment of $26,160 for 628.3 acres or $42 per acre. |

FPI Signs Lease With Ryan Niebur For $26,160 Due On The Day FPI "Renegotiates" Loan #2

**FARM LEASE – NIEBUR WASHINGTON COUNTY FARM**

THIS LEASE AGREEMENT (the "**Agreement**") is made and entered into as of the date of the last signature (the "**Effective Date**"), by and between FPI Burlington Farms LLC, a Delaware limited liability company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 (the "**Landlord**"), and Ryan B. Niebur and Stacie K. Niebur whose address is ██████████████████ (the "**Tenant**").

The parties agree to the following:

1. **Description of the Property.** Landlord leases to Tenant, for the purpose of producing agricultural crops only, the real property described in Exhibit A together with all improvements thereon ("**Improvements**"), all appurtenances and all hereditaments (collectively, the "**Farm**"). This Agreement is for 628.3 tillable acres. Landlord shall have the right to lease or sell a portion of the Farm for non-farming purposes. In case of such sale or lease of acreage, Landlord will reimburse Tenant for any lost crop revenues for the year in which such reduction occurs and will reduce rents in future years on a pro rata per acre basis.

2. **Term of Agreement.** The lease period begins on March 16, 2017 and ends on November 30, 2021, unless terminated earlier in accordance with Section 11 of Exhibit B or otherwise provided in this Agreement.

3. **Rental Payments.** The annual rent for the Farm shall be $26,160 due and payable in full for each calendar year during the term of the Agreement. The first year's rent will be due on March 16, 2017 and rent shall be due on March 15th of each subsequent year of the Agreement. Although the last year of this lease ends on November 30 which is less than a full calendar year Tenant shall pay $26,160 for the period of March 15 to November 30, 2021. In the event the cash rent is not paid in full by the due date(s), Tenant agrees to pay interest on the amount of unpaid rent at an interest rate equal to the higher of ten percent (10%) per annum or two percent (2%) above the prime interest rate then published by the Wall Street Journal but not to exceed the highest rate permitted by law. The first year's rent in the amount of $26,160 shall be paid on March 16, 2017 from proceeds of Tenant's real estate sale on March 16, 2017.

Source: Pacer - Case #1:2018bk10568 - Document #90-1

18

| | As evidenced in the Washington County Deed Records (Search: FPI Burlington Farms), this land is coded "DF" or "dry-farmland." The abovementioned survey and USDA data both say average cash rents for non-irrigated farmland in Colorado are $30 per acre. This suggests FPI's lease is 40% above average market. |
|---|---|
| 42. | We also believe that, on the 1Q2015 conference call, Paul Pittman admitted to charging above-market rents to related-party tenants (most likely Astoria Farm and Hough Farms): |

*the only real renewals we had last fall were with a related party. So, what we gave was basically a 1% rent increase in an environment, in which rents are flat to slightly down on the group of properties*

And looking at what Astoria Farms and Hough Farms paid per acre (disclosed in 10-K's), there is evidence that they were paying above-market rents. Originally, Astoria and Hough Farms leased Pittman and Hough's legacy properties in Nebraska and Illinois. The table below shows a significant jump in rent per acre in 2016. We believe this jump was not all increases, but largely dropping the leases in Nebraska (which we think get picked up by other Hough entities) and maintaining the leases in Illinois, a state with significantly higher lease rates. Additionally, the 7,026 acres in Illinois are very close to the legacy Illinois acreage.

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Total FPI Acres | 46,460 | 74,267 | 115,489 | 159,983 |
| % Lease To Astoria/Hough | 62.30% | 20.10% | 6.08% | 4.00% |
| Acres Leased To Astoria/Hough | 28,945 | 14,928 | 7,026 | 6,399 |
| Rent Paid | $2,474,839 | $2,720,758 | $2,464,905 | $2,000,000 |
| Implied Rent per Acre | $86 | $182 | $351 | $313 |

*Source: Chart By Author, Using SEC Filings*
If our assumption is correct, the $351 per acre is 8% higher than cash rents on the top-third of "excellent" farmland reported in the 2017 Illinois Farmland Values and Lease Trends Report (pg. 46). We note that the difference may be that FPI is getting cash plus crop share, but we found no evidence that is the case.

| | |
|---|---|
| 43. | What is interesting though is that the implied cost per acre paid by Hough Farms and Astoria Farms actually decreased 11% in 2017. This flies in the face of Pittman's comments that lease rates in Illinois are down in the "5-ish range."

And while this fact may appear to refute our thesis, remember FPI is now leasing properties in Nebraska to Jesse Hough through PHS Holdings, a fact that we could not find in FPI's SEC filings. And we also believe there is another entity Jesse Hough may be using.

On January 9th, 2018, eight days before he received the $5.25 Million Siffring Farm loan, Hough incorporated H-KO Land & Cattle Company in Nebraska. And the address listed on the corporate records is the same address the Butler County appraisal records have for the Siffring Farm properties.



*Source: Nebraska Secretary of State & Butler County, NE Deed Records (Search: Siffring Farms)*

We also note that Paul Pittman recently called out Nebraska and Colorado (the two states where Niebur and Hough loans were made) as "very difficult locations."

But the loans to Niebur and Hough are not the only ones that concern us. |

| 44. | The only legitimate argument we can think to describe away the issues of economic substance with these loans is that, in the end, FPI receives a property in lieu of cash? But we do not think this argument would hold up. First, the intent of any loan is to be repaid in principal and interest. So, if the loans are to be settled through property acquisitions, they need to be disclosed as such. Furthermore, we think a reasonable investor would want to know if FPI was acquiring properties it also lent against, as it may signal an underperforming property or tenant. |
| --- | --- |
|  | But more importantly, these transactions leave an incredible amount of room for games to be played in non-arm's length transactions. For instance: |
|  | 1.  FPI could overpay for the property to fund the principal and interest payments that are due when the loan is repaid |
|  | 2.  FPI could overpay and the parties could split the excess proceeds without anyone knowing about it |
|  | 3.  FPI could overpay to fund lease payments to the seller/tenant |
|  | 4.  FPI could be taking dog properties off the borrowers' hand in return for helping FPI improve its financial picture |
| 45. | We believe FPI lent Ryan Niebur money to pay rent after he had already defaulted on an FPI loan. Whether or not Jesse Hough used the money (directly or indirectly) to pay rent is for each investor to decide, but we think, taken together, all the |

evidence suggests a high probability that he did. If we are right, the question is how much did FPI benefit from the loan program in 2017?

One way to estimate that figure is to adjust full-year 2017 same-property revenues to be in line with the drop seen earlier in the year. Below is a table showing the potential revenue benefit based on same-property revenue dropping 15-35%, an average of the -43% reported in the 1Q and the -8% reported for the full year.

Using this method, we estimate up to 6% of 2017 revenues could be the result of the loans. And assuming the revenue is all incremental, it would represent 75% to 310% of reported 2017 net income and 74% to 303% of 2017 cash flow from operations.

|  | Reported | | Scenario #1 | Scenario #2 | Scenario #3 | Scenario #4 | Scenario #5 |
|---|---|---|---|---|---|---|---|
|  | 2016 | 2017 | 2017E | 2017E | 2017E | 2017E | 2017E |
| Reported Same-Property Revenue | 10.60 | 9.70 | 9.01 | 8.48 | 7.95 | 7.42 | 6.89 |
| Same-Property Revenue Decline |  | -8.5% | -15% | -20% | -25% | -30% | -35% |
| Revenue Improvement vs. Reported |  |  | 0.69 | 1.22 | 1.75 | 2.28 | 2.81 |
| % of 2017 Total Revenue |  |  | 1.5% | 2.6% | 3.8% | 4.9% | 6.1% |
| % of 2018 Net Income |  |  | 76.1% | 134.5% | 192.9% | 251.4% | 309.8% |
| % of 2018 Cash Flow From Operations |  |  | 74.3% | 131.3% | 188.4% | 245.4% | 302.5% |

*Source: Chart By Author, Using SEC Filings*
And this is just 2017. In the 1Q2018, FPI reported it largest ever same-property gain, which coincides with originating its largest ever loan (the $5.25 Million loan to Siffring Farms).

| 46. | Our opinion that FPI appears to be playing accounting games is further bolstered by what we consider to be another major red flag. |
|---|---|

| 47. | According to a February 13th, 2017, Colorado UCC filing, Hough Holdings put up its equity interest in Farmland Partners for a bank loan. But notice, at the bottom of the document is a line that states "Optional filer reference: (Bank of the West)/Pittman Hough." Being that Pittman-Hough Farms disclosed in a 2016 Form 4 that it distributed its shares to its members, we think the UCC filings is referring to Pittman and Hough personally. We note that the UCC filing also uses FPI's corporate address. |
|---|---|



*Source: Colorado UCC Filings*

The timing of this loan is interesting because just days later, on February 18th, 2017, FPI entered into a termination agreement with Prudential as part of its acquisition of AFCO. And on the 1Q2017 conference call, Pittman stated: […]

Instead of going up, FPI's stock price declined 30% over the following months. And shortly after the stock reached a new low, FPI made its first loan to Hough.

| 48. | Our opinion that Pittman pledged his shares is further bolstered by the fact that on July 19th, 2017, he converted 531,827 operating partnership shares (OP units) to common shares. July 19th (a Sunday) came after FPI's stock closed at the new all-time low that Friday. Seeing that Pittman has not sold any shares, we question why he would be willing to convert OP Units, whose primary purpose is to delay having to pay capital gains taxes. We think the bank may have required the conversion of OP units because it wanted liquid collateral.<br><br>And, based on his comments in quarterly conference calls, Paul Pittman seems to have become highly focused on FPI's stock price. On the 1Q2018 conference call, Pittman stated:[]<br><br>And the stock price is one of the reasons that FPI is not lowering its dividend despite the fact that it is not covered by cash flow. |
|---|---|
| 49. | But we do not think FPI's dividend being cut is the largest risk.<br><br>While shareholders have expressed concern about FPI's ability to maintain its dividend, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but faces a significant risk of insolvency. |

ny-1780116

| 50. | And we do not appear to be the only concerned party. |
|-----|------------------------------------------------------|

Since the first loan to Jesse Hough in July 2017, four board members and FPI's president have announced resignations. Below we detail each of the departures.

| Date | Name | Position | Reason |
|------|------|----------|--------|
| 8/28/17 | John Conrad | Director; Forsythe Farms nominee | Personal reasons |
| 12/5/17 | Dixon Boardman | Director, former Chairman of AFCO | Pursue other business interests |
| 1/18/18 | Darell Sarff | Director, father of FPI VP | Pursue other business interests |
| 3/19/18 | Thomas Gimbel | Director, former CEO of AFCO | Pursue other business interests |
| 4/10/18 | Robert Cowan | President, former President AFCO | Pursue other business interests |

Three of the directors and the president came from FPI's two largest acquisitions (Forsythe Farms and American Farmland Company). These are individuals with significant experience in farmland investing, who sold their holdings to FPI, gained board membership, and have now resigned.

In the case of Forsythe, the 2018 proxy states (pg. 14) the Forsythe Sellers own 23.59% of the diluted shares and have to right to a nominate a board seat as long as they own 10%. In August, their representative resigned and Forsythe has yet to nominate another, which may indicate the intention to liquidate their stake below 10%.

In the case of AFCO, its former Chairman and hedge fund manager, Dixon Boardman, had already sold the majority of his position by the time he resigned in December 2017.

Then on March 10th, 2018, FPI dismissed PWC as its independent auditor. The same day, the company engaged EKS&H, who investors may recognize from MusclePharm and Heska. Muscle Pharm's founder resigned in 2016 after the SEC charged the company with accounting and disclosure violations. Heska was written up on SA for alleged related-party transactions.

ny-1780116

Taken together, we think the resignations overlaid with the facts detailed in this report paint an ominous timeline.

| Date | Event Description |
|------|-------------------|
| 2/12/17 | "Pittman/Hough" pledges stock for loan |
| 2/18/17 | FPI terminates Prudential contract |
| 3/16/17 | FPI "renegotiates" Ryan Niebur loan |
| 3/16/17 | FPI lends Ryan Niebur $61,800 and $61,750 is due for new lease |
| 5/8/17 | Pittman states he thought stock would go up |
| 7/7/17 | FPI stock closes at new all time low |
| 7/9/17 | Pittman converts 531,827 OP Units |
| 7/25/17 | FPI makes $100 Thousand loan to PHS Holdings |
| 8/25/17 | FPI makes $669 Thousand loan to Hough Farms |
| 8/28/17 | John C. Conrad resigns from board |
| 12/5/17 | D. Dixon resigns from board |
| 1/12/18 | FPI acquires property from PHS Holdings that secures FPI loan |
| 1/18/18 | FPI makes $5.25 Million loan to Siffring Farms signed by Jesse Hough |
| 1/18/18 | Darrell D. Sarff resigns from board |
| 2/2/18 | Hough Holdings pays off $669,000 loan |
| 3/10/18 | FPI dismisses PriceWaterHouseCoopers |
| 3/19/18 | Thomas Gimbel resigns from board |
| 4/10/18 | Robert Cowan resigns as President of PFI |

███ = Related-party transactions

███ = Executive, board or auditor events

| 51. | But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares are significantly overvalued. |
|---|---|
| 52. | Paul Pittman spends time on each conference call trying to convince shareholders that FPI is worth $11.50 to $12.50 per share based on his calculation of net asset value (NAV). On the most recent call, his calculation was based on what FPI paid for the assets and adjusted for modest increases and decreases in value across different regions of the portfolio. |

The problem with Pittman's calculation is that he ignores the old adage that "you make your money when you buy" and so what matters most is not what prices do after you buy but what price you paid.

And we think shareholders should be concerned with Pittman's preferred method of property valuation. From the 1Q2016 conference call: […]

We think these comments are absurd. First, we have many reasons to question the claim that all acquisitions were arm's length. Second, Pittman apparently thinks the appraisal process is a poor judgement of value, despite its widely accepted use across the real estate industry and its use by a direct competitor. Third, he thinks what he pays, even if he overpays, is the safest judgement of value.

This is akin to saying that if someone paid $1 Million for a house in a neighborhood filled with $500,000 houses, that all of the properties would see a commensurate $500,000 increase in value just because one person was willing to overpay. And in fact, we have evidence that suggests FPI has overpaid for properties.

| 53. | FPI acquired two Telfair County, GA farms in 2015 and one in 2017. Based on what FPI paid for the properties versus what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the 2016 / 2017 USDA Farm Land Surveys), FPI appears to have acquired these properties for 68% above market value (assuming the previous sale was market value). |
|---|---|

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Selph Farm | Talfiar, Georgia | 5/4/12 | Ernest Selph | 116 | $1,724 | | | |
| | | 12/17/15 | FPI Properties | | $4,537 | 163% | 0.3% | 162.3% |
| Mobley Farm | Talfiar, Georgia | Throughout 2012 | Brad Mobley | 1,069 | $2,154 | | | |
| | | 10/9/15 | FPI Properties | | $3,460 | 61% | 0.3% | 60.2% |
| Dorminey Farm | Talfiar, Georgia | Throughout 2012 | Carlton Dorminey | 47 | $2,150 | | | |
| | | 4/25/17 | FPI Properties | | $3,809 | 77% | 8.9% | 62.6% |
| | | | Total Adjusted Overpayment % | | | 68% | | |

Source: SEC Filings & Telfair County, GA Deed Records (Search: FPI Properties)

While we cannot be sure what improvements, if any, were made to these properties during the sellers' ownership, we note the following:

- Google Street View shows that as far back as 2008 Selph Farm was irrigated farm land.

- The deed record map shows that between 2010 and 2013, part of the Mobley Farm was converted from timberland to farmland, which may explain part of the property value increase.

The deed record map shows Dorminey Farm had already been cleared of timber before the seller acquired it.

29

| 54. | FPI acquired two Yell County, AR farms in 2014. Based on what FPI paid for the properties versus what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the 2017 USDA Farm Land Survey), FPI appears to have acquired these properties for 17% above market value (assuming the previous sale was market value). |
|---|---|

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Ruder Farm | Yell, Arkansas | Throughout 2013 | Ruder Properties | 819 | $2,329 | | | |
| | | 9/24/14 | FPI Coloardo | | $3,301 | 42% | 5.5% | 34.3% |
| Ballymore Farm | Yell, Arkansas | 4/3/13 | Ballymore Properites | 1,281 | $3,120 | | | |
| | | 10/24/14 | FPI Arkansas | | $3,588 | 15% | 5.5% | 9.0% |
| | | | Total Adjusted Overpayment % | | | 17% | | |

Source: SEC Filings & Yell County, AR Deed Records (Search: FPI Colorado, FPI Arkansas)
We are unsure if any improvements were made to Ruder Farm or Ballymore Farm during the sellers' ownership.

| 55. | Perhaps the biggest overpayment (in dollar terms) was FPI's acquisition of American Farmland Company (AFCO). The merger proxy (pg. 57) provides a background of the sale process. |
| --- | --- |
|  | The chart below shows that, of the seven preliminary bids, FPI's offer was 12% above the average. The only bid that was higher (Company E) dropped out during diligence because of pricing. A comparable bid (Company F) also dropped out during due diligence. |
|  | The only other party to put in a second bid (Company G) lowered its price after getting independent appraisals. In the end, FPI paid 15% above the only other bidder. |

| AFCO Proposals | Preliminary Bids | Secondary Bids | Deal Notes |
| --- | --- | --- | --- |
| Company A | $6.61 | - | AFCO declined due to price |
| Company C & D | $6.75 | - | AFCO declined due to price |
| Company E | $8.82 | - | Dropped out because of "pricing a corporate level transaction" |
| Company F | $8.20 | - | Dropped out during due diligence |
| Company G | $7.72 | $7.13 | Lowered offer to $7.13 after getting independent appraisals |
| Company H | $8.00 | - | AFCO declined because would not alleviate challenges |
| Company J | $6.00 | - | AFCO declined |
| **Average** | **$7.44** | **$7.13** | |
| **Farmland Partners** | **$8.35** | **$8.23** | |
| **Premium To Avg.** | **12%** | **15%** | |

Source: AFCO/FPI Merger Proxy

| 56. | To be clear, we do not believe that FPI overpaid for every property it purchased. However, we think it is highly likely that, in aggregate, FPI has paid an average of 5-15% above market price for its farms. Additionally, we think FPI has seen another 5% decrease across its portfolio, a reasonable assumption given Illinois land values (25% of FPI acres) have fallen approximately 15% (pg. 9) since 2014 and Nebraska farmland is down 24% over the same time. |
| --- | --- |

31

ny-1780116

| 57. | Finally, Pittman's valuation calculation assumes a buyer would purchase the entire company at net asset value. Given that only one other player was willing to acquire AFCO (which was less than half FPI's size), and that potential acquirer's offer was a 29% discount to AFCO's reported NAV (pg. 27), we think this assumption is highly unlikely.

More likely is a liquidation scenario, which would include transaction costs, operating expenses and capital expenditures during the liquidation. Evidence that these costs are very real and very material is the fact that the AFCO merger proxy (pg. 67) stated its investment bankers calculated the value of the company under a liquidation scenario. Their value was between $7.12 and $7.33 or 20% less than the $8.98 book value per share reported in the final 10-Q.

Notably, the only other offer for AFCO was at the low end of this range.

We think the best way to value FPI is to take book value per share, which represents what FPI actually paid for the properties (land has no depreciation) and make the following adjustments based on a liquidation scenario:

1. Add appreciation for the legacy properties (on the 1Q2017 call, Pittman stated the difference between book value and his NAV estimate is largely "30-ish" million dollars for the legacy properties, many of which Pittman acquired in the mid-2000s).

2. Subtract overpayment on the remainder of the portfolio (under four escalating scenarios)

3. Subtract 5% reduction in property values

4. Subtract transaction costs of 5% on the disposition of the portfolio

5. Subtract $30 Million in operating expenses and capital expenditures incurred during liquidation period (approximate 2 years)

Discount NAV back 1 year at 7.75% (assumes steady sales over 2 years)

Below is our valuation calculation under four scenarios: a 15%, 10%, 5% and 0% overpayment for the post-IPO acquisitions. Using an average of the four scenarios, and assuming normal circumstances, we think FPI would be worth $4.85 per share (note, diluted share count is based on 1Q2018 Supplemental Package pg. 1 2).

And even if we assume FPI did not overpay for properties, FPI would still only be worth $6.39. |

| NAV Calculation | Scenario #1 (15% Overpay) | Scenario #1 (10% Overpay) | Scenario #2 (5% Overpay) | Scenario #3 (No Overpay) |
|---|---|---|---|---|
| Land Value at Cost | 975,107 | 975,107 | 975,107 | 975,107 |
| - Legacy Propert Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| Post IPO Acquisitions at Cost | 936,692 | 936,692 | 936,692 | 936,692 |
| - Overpayment | -140,504 | -93,669 | -46,835 | 0 |
| Market Value of Post IPO Acquisitions (when purchased) | 796,188 | 843,022 | 889,857 | 936,692 |
| - 5% Reduction in Value | 39,809 | 42,151 | 44,493 | 46,835 |
| **Today's Market Value of Post IPO Acquisitions** | **756,378** | **800,871** | **845,364** | **889,857** |
| + Legacy Properties at Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| + Legacy Property Appreciation | 30,000 | 30,000 | 30,000 | 30,000 |
| **Market Value of FPI Land Portfolio** | **824,794** | **869,287** | **913,780** | **958,272** |
| - 5% Transaction Costs | -41,240 | -43,464 | -45,689 | -47,914 |
| - Operating Expenses Over 2 Years | -30,000 | -30,000 | -30,000 | -30,000 |
| **Net Value of FPI Land Portfolio After Dispotiion** | **753,554** | **795,822** | **838,091** | **880,359** |
| Book Value As of 1Q2018 | 357,350 | 357,350 | 357,350 | 357,350 |
| - Net Value After Dispotion vs. Land Value at Cost | -221,553 | -179,285 | -137,016 | -94,748 |
| **Post Disposition NAV** | **135,797** | **178,065** | **220,334** | **262,602** |
| Post Disposition NAV *(Discounted 1.5 yrs @ 7.5%)* | 126,323 | 165,642 | 204,961 | 244,281 |
| *Post Disposition NAV / Share* | *$3.31* | *$4.34* | *$5.37* | *$6.39* |
| *Diluted Share Count* | *38,200* | *38,200* | *38,200* | *38,200* |

*Source: Chart By Author, Using Author Estimates*

| 58. | We valued FPI under normal circumstances, but we think FPI's financials are anything but normal. As the old saying goes, there is never just one cockroach. We have no faith that FPI's financials are showing investors the true picture. Accordingly, we think FPI's shares are uninvestible. |
|---|---|