# EXHIBIT 49

<u>Print</u>   |   <u>Close Window</u>

**Subject:** CONFIDENTIAL WORK PRODUCT
**From:** Quinton Mathews <quintonmathews@gmail.com>
**Date:** Wed, Jun 20, 2018 3:52 pm
**To:** Dad Mathews <gary@garymathewsjd.com>
**Attach:** FPI v9.docx

Still working on the last piece. But most is substantially complete. Please give legal review.

Copyright © 2003-2020. All rights reserved.

**GM_010**

# Farmland Partners: Undisclosed Loans To Management Make Shares Uninvestible

*Summary*

- *ABD*
- *DEF*
- *HIF*
- *UFI*
- *IFO*

### Introduction

When a company abruptly enters into a new business, it is often an indication that all is not well at its main line operation. And what often follows is accounting chicanery used to obscure the business' financial deterioration. We believe this is what is occurring at Farmland Partners (NYSE FPI).

Farmland Partners is the largest farmland real estate investment trust (REIT) in the country. The company went public in April 2014 after CEO Paul Pittman and his business partner (and FPI consultant), Jesse Hough, put up their personal farmland holdings as the initial portfolio. Since then, FPI has acquired nearly a billion dollars of farmland into the worst ag economy in decades.

Judged by cash returns, the investments have been an unmitigated disappointment. Thru 2017, FPI generated *negative $3.1 Million* in cumulative free cash flow (operating cash flow – preferred dividends – depletion/depreciation). And this figure presumes an additional $69 Million in capital expenditures was all growth related, an incredulous assumption given the lack of organic growth.

In simple terms, millions in executive pay (including $0.5 Million for leasing Pittman's personal jet) and $27 Million in dividends, has been funded, not by profits, but by a hamster wheel of increasingly expensive debt and equity raises. While investors have not turned a blind eye to FPI's performance, we think they have overlooked potentially catastrophic risks lurking in FPI's mortgage lending business.

Introduced in August 2015, the FPI Loan Program offers working capital financing to tenant and non-tenant farmers who "maintain solid balance sheets," but who are unable to obtain traditional funding. Off the bat, we saw a risk that the program could be used to artificially stabilize revenues by propping up struggling tenants. So when FPI recently dismissed its auditor, we reviewed hundreds of deed records in dozens of counties across the country.

**We found that that FPI has made over $9 Million in loans to Jesse Hough and Ryan Niebur (both FPI tenants and members of FPI's management team). Our research leads us to believe that not only has FPI propped up a now bankrupt tenant (Niebur), the company has misstated its SEC financials and used the loan program to artificially inflate revenues thru round-trip transactions.**

Evidence supporting our opinion includes a $960 Thousand loan to Ryan Niebur that FPI stated was "renegotiated" but deed records explicitly state was actually in default. And after Niebur defaulted, FPI stated that it leant Niebur an additional $2.2 Million, but deed records show that transaction was actually the acquisition of Niebur's properties.

GM_011

But the most damning piece is that part of the new "loan" was promptly returned to FPI and, we believe, used to report interest revenue amounting to over 8% of that quarters operating income. We believe this is the type of non-economic transaction that led the SEC and DOJ to charge Homestore executives in 2003, and is particularly concerning given the loans made the Pittman's business partner, Jesse Hough.

**We found that FPI has leant over $6 Million to Jesse Hough thru a web of entities that have direct business dealings with Paul Pittman. Included in the list is a $5.2 Million loan that was signed by Hough as the president of an inactive entity, that corporate records show he was never the president of, and that is secured by land that deed records show he does not own. Days later, entities affiliated with Paul Pittman and Jesse Hough co-signed on a bank loan using the same address as the properties collateralized by the FPI loan.**

While we are unsure how the loans to Hough have been used, our opinion that something is amiss is strengthened by the exodus of FPI insiders. Since making the first loan to Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed its long-time auditor PWC.

We also believe there is a motive to play accounting games. We found a UCC filing that shows Hough (and we believe Pittman) pledged shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. Instead the stock tanked over the following months. And shortly after the stock made an all-time low, FPI made its first loan to Hough.

The most obvious risk we see is that FPI is using the loan program to artificially increase revenue and earnings. We see three ways this could occur. First, loans to Hough could be roundtripped back to the income statement thru rental income. Second, loans for "infrastructure projects" could be moving property-level operating expenses off FPI's incomes statement. Third, the loans create interest and fee revenue.

But the most troubling aspect of the loans is that they need not be paid off. Of the five FPI loans that have been "paid-off," two (and we think three) were settled when FPI either acquired the property collateralizing the loan or refinanced it. This again introduces the risk that FPI is entering into non-economic transactions for the purpose of artificially improving its financials.

Regardless of what exactly is occurring, we think the facts introduce two significant and systemic risks. First, if FPI's financials have been misreported, the company may quickly find itself in a liquidity trap if the capital markets turn against it. FPI only has $19.6 Million in cash (excluding any 2Q stock buybacks) and in 2017 the company burnt thru $44.7 Million after all preferred/common dividends and capex. If FPI runs out of cash, we think the company would be forced to liquidate properties to survive.

Second, the loan against FPI shares risks driving FPI's stock price lower if the shares are sold to meet margin demands. In a classic case of reflexivity, the stock price declines would in turn make it more difficult to raise money, which in turn would drive the stock price even lower.

But even if the loans, insider departures, dismissed auditor, pledged shares and potential liquidity trap turn out to be benign risks, we still think FPI's shares carry significant downside. We found deed records that lead us to believe FPI has significantly overpaid for properties, in some instances paying over two times what the seller paid for the same land a year earlier. Using comps, USDA data and AcreValue estimates and assuming conservative transaction costs, we calculate FPI's net asset value per share to be $5.30, 40% below the current stock price.

In the end, we think FPI's shares are uninvestible.

**GM_012**

### The FPI Loan Program

In August 2015, Farmland Partners introduced the FPI Loan Program to "address a market need created by short term cash flow pressure on farmers who otherwise maintain solid balance sheets" but cannot get traditional funding. The press release promoted FPI's quick underwriting abilities and conservative loan-to-value criteria. Further details were given in the 3Q2015 10-Q (pg. 21):

> "The Company intends to make loans to **third-party** farmers (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects."

In total, FPI has made nine loans totaling $15.4 Million. Of those nine, we found five loans totaling $9.2 Million have been made to Ryan Niebur and Jesse Hough.

| FPI Loans | Borrower | 3Q2015 | 4Q2015 | 1Q2016 | 2Q2016 | 3Q2016 | 4Q2016 | 1Q2017 | 2Q2017 | 3Q2017 | 4Q2017 | 1Q2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan #1 | | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Loan #2 | Ryan Niebur | | 980,000 | 980,000 | 980,000 | 980,000 | 980,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| Loan #3 | | | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan #4 | Ryan Niebur | | | | | | | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 |
| Loan #5 | | | | | | | | | 1,647,000 | 1,647,000 | 1,647,000 | 1,647,000 |
| Loan #6 | Jesse Hough | | | | | | | | | 100,000 | 100,000 | 0 |
| Loan #7 | Jesse Hough | | | | | | | | | 669,000 | 669,000 | 0 |
| Loan #8 | | | | | | | | | | | 2,700,000 | 0 |
| Loan #9 | Jesse Hough | | | | | | | | | | | 5,250,000 |

*Source: Chart By Author, Using SEC Filings and Deed Records*

While we will not discuss the other loans in detail, we see additional red flags. FPI's 1Q2018 10-Q (pg. 16) states Loan #1 is in default but collectability is "reasonably assured." However, Van Buren County, MI deed records (search Grantee: Farmland Partners) show the loan is with Boersen Land Co., a large farming operation that is on brink of bankruptcy and was sued by its largest creditor for allegations of fraudulently inflating crop values and diverting funds intended to pay down debt..

The 10-Q disclosures also states Loan #8 was "settled on the closing of a property in North Carolina on January 12, 2018." We found the acquisition in Pasquine County, NC deed records (search Grantee: FPI Carolinas) with Justice Farms of North Carolina. This leads us to believe the loan was made with Justice Farms, which is owned by James C. Justice, the billionaire governor of West Virginia, who according to SEC filings owns 7.3% of FPI thru various entities. Justice Farms of North Carolina, was also sued for allegations of "fraudulently transferring or liquidating valuable real estate" to avoid paying debts.

And this loan has a characteristic we will see in other FPI loans, it was "settled" when FPI purchased the property. We estimate this loan, which was only outstanding for a matter of months, resulted in $300 Thousand (pg. 37) of interest and fee income or over 6% of 1Q0218 operating income.

We were unable to find Loan #3 or #5.

### The Ryan Niebur Loans

On November 16th, 2015, just three months after introducing the loan program, FPI leant $980 Thousand (Loan #2) to a tenant farmer (pg. 51). The only other disclosure (pg. F-23) was that the loan was collateralized by a first mortgage on farm real estate and the first year of interest was paid up front, which we think means it was paid out of the loan proceeds and allowed FPI to report immediate interest revenue.

What was not disclosed, is that this loan was made to Ryan Niebur, who according to LinkedIn has been FPI's Director of Acquisitions/Farm Manager since September 2015 and according to this December 2015 investor slide deck (pg. 7) is part of the FPI's management team.

---

863631
Page 1 of 7
Garland Wahl, Clerk & Recorder
Washington County, CO       RP $0.00
11-16-2015  01:43 PM  Recording Fee $41.00

### DEED OF TRUST AND SECURITY AGREEMENT

THIS DEED OF TRUST is made effective this 30th day of October 2015.

The parties to this Deed of Trust are:  **RYAN NIEBUR**, also known as Ryan B. Niebur, an individual, whose address is 411 West 4th, Wray, Colorado 80758, (the "GRANTOR"), and the Public Trustee of the County of Washington, State of Colorado, (the "PUBLIC TRUSTEE").

**AMOUNT AND TERMS**
The GRANTOR has made a promissory note payable to the order of **FARMLAND PARTNERS OPERATING PARTNERSHIP, LP,** a Delaware limited partnership, which has an address of 4600 S. Syracuse Street, Suite 1450, Denver, CO 80237, as beneficiary of this Deed of Trust (together with its successors and assigns) (the "BENEFICIARY"). The promissory note is dated October 30, 2015. The Deed of Trust secures the payment of $980,000.00 of the original principal sum and is payable with interest as shown in the promissory note and if not sooner paid, shall be due and payable in full on October 30, 2017, subject to extensions thereof. The promissory note states the interest rate on the principal sum, and also provides for future changes in the interest rate. The Deed of Trust secures the repayment of the principal sum with interest, and any additional indebtedness arising under the terms and conditions of this Deed of Trust.

*Source: Washington County, CO Clerk's Office*

---

It was also not disclosed that the loan was not used for farming operations but rather to pay off part of an existing mortgage (see Addendum A-1), which taken together with the following facts suggests Niebur was already in a financially precarious situation.

In the 1Q2017 10-Q (pg. 16), FPI disclosed that it "renegotiated" Niebur's loan while simultaneously entering into a new $2.194 Million loan (Loan #4) collateralized by two additional properties.

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
|---|---|---|---|---|
| | | March 31, 2017 | December 31, 2016 | |
| Mortgage Note (1) | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note (2) | Principal & interest due at maturity | 240 | 980 | 3/16/2022 |
| Mortgage Note (2) | Principal & interest due at maturity | 2,194 | - | 3/16/2022 |
| Total outstanding principal | | 4,234 | 2,780 | |
| Points paid, net of direct issuance costs | | (3) | (4) | |
| Interest receivable (net prepaid interest) | | 16 | 67 | |
| Total notes and interest receivable | | $ 4,247 | $ 2,843 | |

(1) In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. The Company is currently in negotiations to extend the terms with the borrower.

(2) The original note was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

*Source: FPI 1Q2017 10-Q (pg. 16)*

**But this is not the entire story. On March 16th, 2017, Niebur deeded a property to FPI. The deed specifically states that Niebur was in default on the loan and that he was still obligated to pay the remaining $240 Thousand balance (Loan #2's new balances).**

---

### DEED
#### (Washington County)

KNOW ALL MEN BY THESE PRESENTS:

     This Deed is made and entered into as of the 16th day of March, 2017 between Ryan B. Niebur ("Grantor") whose legal address is 411 W. 4th Street, Wray, CO 80758 and FPI Burlington Farms LLC, a Delaware limited liability company ("Grantee") whose legal address is 4600 S. Syracuse St., Suite 1450, Denver, CO 80237.

#### RECITALS

     WHEREAS, Grantor has reviewed the Grantee's lien secured by the Property set forth below, and Grantor desires to deed the Property to Grantee.

#### WITNESSETH

     NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantor acknowledges that Grantee's loan secured by the Property in default, that Grantor is aware of its rights regarding cure and redemption under Colorado and federal law, including any rights of redemption, leaseback, first refusal, continued possession, homestead under C.R.S. §§ 13-54-102 and 38-41-201 et seq. or 11 U.S.C. § 522 or any other homestead right, reversion, or abandonment under 11 U.S.C. § 554 or otherwise to all or any part of the Property, and Grantor does hereby bargain, sell, transfer, assign, convey to Grantee its successors and assigns forever all of Grantor's right, title and interest in and to the Property, together with all crops, mineral rights and improvements, if any, situate, lying and being in the County of Washington State of Colorado described as follows:

---

     Grantor acknowledges that after this conveyance, Grantor shall continue to be obligated for a deficiency of $240,000 plus accruing interest on the Promissory Note secured by the Grantee's Deed of Trust.

*Source: Washington County, CO Clerk's Office*

Then in January 2018, Neibur filed for bankruptcy. Court filings shows that the remaining $240 Thousand owed is collateralized by a property worth $192 Thousand, resulting in a loan-to-value ratio of 125%. We hardly call this conservative.



*Source: Pacer – Case #1:2018bk10568 – Document #17 Schedule A/B*

We believe the loans the Niebur show FPI's willingness to make loans outside of the programs stated parameters and stabilize rental income by making risky loans to struggling tenants.

But there are other aspects of the Niebur loans that we find more troubling and, in our opinion, suggest a willingness by FPI to engage in aggressive accounting and to use the loan program to artificially increase revenues.

### *Was It A Loan Or An Acquisition*

It turns out that the $2.194 Million loan to Niebur was not actually a loan, but an acquisition of three properties. FPI acquired one of the properties collateralizing Niebur's original loan (shown above) for $801 Thousand (Addendum A-1). The other two properties are the same properties that are purportedly collateralizing the new loan. Deed records show FPI acquired these properties for $1.392 Million (Addendum A-1).

**Low and behold, the total acquisition price is $2.194 Million (= 0.801 + 1.392), the same amount as Loan #4. Further proof there was no loan, is that FPI did not list the loan in Niebur's bankruptcy.**

So in fact, FPI reported a loan on its financial statements when it actually was an acquisition. We think FPI will argue that the accounting is correct because of the disclosure that Niebur has the right to repurchase the properties (see 10-Q disclosure above). But we found deed records between FPI and James Justice and Jesse Hough that contain a right to repurchase, yet those acquisitions were not recorded as loans.

But that is not all. We believe FPI reported $61 Thousand in interest revenue that was paid using the proceeds from Niebur's new "loan." Evidence supporting our opinion, can be seen in the cash flow statement.

| CASH FLOWS FROM INVESTING ACTIVITIES | | |
|---|---:|---:|
| Real estate acquisitions, net of cash acquired | (79,220) | (93,187) |
| Real estate and other improvements | (3,947) | (698) |
| Principal receipts on notes receivable | 801 | 50 |
| Issuance of note receivable | (2,255) | — |
| Net cash used in investing activities | (84,621) | (93,835) |

*Source: FPI 1Q2017 10-Q*

Principle receipts on notes receivable of $801 Thousands matches the acquisition of the first property mentioned above. But that would leave the original $980 Thousand loan (Loan #2) with a balance of $179 Thousand vs. the reported $240 Thousand. The $61 Thousand difference is the same as the difference between the $2.255 Million Issuance of Note Receivable reported in the cash flow statement and $2.194 Million loan.

Finally, the 10-Q states (pg. 38) that "other revenue" included $57 Thousand in interest net of fees, which we estimate is the $61 Thousand minus fees. This net interest, which we believe has a 100% contribution margin, represented 8.8% of 1Q2017 operating income.

We know this was a mountain of numbers, so let us summarize.

**After Ryan Niebur defaulted on his loan, FPI settled part of the loan by purchasing the property and added $61 Thousand to the purchase price that we believe was returned to FPI and reported as interest revenue. In our opinion, this describes a non-economic transaction used to artificially inflate revenues and is eerily similar to the type of transactions that caused the SEC and DOJ to charge Homestore Executives in 2003.**

Given what we see as a willingness to use the loan program to artificially increase revenues, we think the loans to Jesse Hough are highly troubling. But before we get there, we must provide a short history of Paul Pittman and Jesse Hough's outside business activities.

### Pittman and Hough's Web Of Entities

From the beginning, FPI has been entangled with the web of entities that made up Paul Pittman and Jesse Hough's personal farming operations. Thirty-six of the original thirty-eight farms were put up by Pittman-Hough Farms, which was formed when Pittman and Hough merged their respective farmland holdings.

Pittman-Hough Farms also held interest in a number of other entities, including Astoria Farms and Hough Farms, which were FPI's first tenants and are still FPI tenants controlled by Jesse Hough (pg. ?).

Using SEC filings and corporate records, we put together the list of relevant entities, their affiliation with FPI and the ownership structure (where known) that existed after FPI went public.



*Source: Chart By Author, Using SEC and Corporate Filings*

This ownership structure remained intact until March 2016 when Pittman-Hough Farms was restructured.

### The Restructuring

The 2015 10-K (pg. 35) contained one sentence that revealed a change in the ownership structure of Pittman and Hough's outside entities:

> "On March 11, 2016, Mr. Pittman and Jesse J. Hough entered into an agreement pursuant to which, effective December 31, 2015, Mr. Pittman ceased to hold any direct or indirect interests in, or have control of, Astoria Farms, Hough Farms and American Agriculture Corporation."

Another clue was in a March 31st, 2016 Form 4 that disclosed that Hough Holdings, LLC gave Paul Pittman 233,400 shares of common stock (valued at $2.56 Million) in connection with the restructuring of Pittman-Hough Farms. And that Paul Pittman increased his pecuniary interest in Pittman-Hough farms to 78%.

Based on this disclosure and this <u>August 2016 investor presentation</u>, we believe Paul Pittman is still an owner of Pittman-Hough Farms and that Jesse Hough is an owner and its CFO.

Around the same time, Jesse Hough relocated Pittman-Hough Farms, Hough Farms, American Agriculture, and PHS Holdings to a new office (<u>900 E. Louisiana, Suite 209, Denver, CO</u>).  Prior to this, all the entities shared <u>FPI's corporate address</u>.

We visited this rather non-descript office, located just a few miles up the road from FPI, but in the middle of the afternoon no one was there.



*Source: Site Visit To Hough Farms New Office*

With this background, we can now review the loans to Jesse Hough.

### *The Jesse Hough Loans (Loan #6)*

In <u>July 2017 (pg. 17)</u>, FPI made a $100 Thousand loan (Loan #6) to PHS Holdings.

| TRUST DEED | |
|---|---|
| **WITH POWER OF SALE** | |
| This Trust Deed made July 25, 2017, by and among the following: | |
| DATE: | July 25, 2017 |
| TRUSTOR: | PHS HOLDINGS, LLC. an Illinois Limited Liability Company 900 E Louisiana Avenue, Suite #209 Denver, Colorado 80210 |
| TRUSTEE: | ANDREW J. HOFFMAN ATTORNEY AT LAW PO Box 910 47640 E. HWY 20, Ste #1 Atkinson, Nebraska 68713 |
| BENEFICIARY: | Farmland Partners Inc., a Maryland Corporation 1519 York Road Lutherville, Maryland 21093 |
| CONSIDERATION: | $100,000.00 |

*Source: <u>Butler County, NE Deed Records (Search Grantor: PHS Holdings)</u>*

According to <u>2014 SEC filings (pg. F-63)</u>, Pittman-Hough Farms owned a 30% interest in PHS Holdings. We do not know if the aforementioned restructuring resulted in Paul Pittman no longer having an interest in PHS Holdings; however, we have reason to believe he is still involved. Leading us to this opinion are details in the deed records for a <u>sale of an Illinois farm by PHS Holdings in December 2017</u>.

The records show that Jesse Hough signed the deed, but the document lists the address for PHS Holdings as 4600 South Syracuse (FPI's corporate headquarters) even though PHS Holdings purportedly moved to 900 E. Louisiana nearly two year prior to this.



*Source: Schuyler County, IL Clerks Office*

**If Paul Pittman still has an interest in PHS Holdings, then FPI made an undisclosed loan to its CEO. But there is more. FPI acquired this property from PHS Holdings on January 12th, 2018 (Addendum B-1).**

*Source: Butler County, NE Deed Records (Search: Grantor: PHS Holdings)*

And, in what may fit the reoccurring pattern, the loan was paid off right around when the property was acquired by FPI. While we cannot be sure of this, we note that there is an inconsistency in the SEC disclosure. The 1Q2018 10-Q (pg. 16) states the loan was settled on "the maturity date of January 1, 2018," (before the acquisition closed) but the maturity date listed right above this disclosure states it is January 31st, 2018, two weeks after the property was acquired.

As of March 31, 2018 and December 31, 2017, the Company had the following notes receivable:

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
| | | March 31, 2018 | December 31, 2017 | |
|---|---|---|---|---|
| Mortgage Note [1] | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note [2] | Principal & interest due at maturity | 240 | 240 | 3/16/2022 |
| Mortgage Note [3] | Principal due at maturity & interest due monthly | 2,194 | 2,194 | 3/16/2022 |
| Mortgage Note [3] | Principal & interest due at maturity | 1,647 | 1,647 | 4/27/2018 |
| Mortgage Note [3] | Principal & interest due at maturity | - | 100 | 1/31/2018 |
| Mortgage Note [4] | Principal due at maturity & interest paid in advance | - | 669 | 2/15/2018 |
| Mortgage Note [5] | Principal due at maturity & interest paid in advance | - | 2,700 | 1/29/2018 |
| Mortgage Note | Principal & interest due at maturity | 5,250 | - | 8/19/2020 |
| Total outstanding principal | | 11,131 | 9,350 | |
| Points paid, net of direct issuance costs | | (1) | (6) | |
| Interest receivable (net prepaid interest) | | 609 | 461 | |
| Provision for interest receivable | | (91) | (45) | |
| Total notes and interest receivable | | $ 11,648 | $ 9,760 | |

(1) In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. On July 28, 2017, the Company notified the borrower of default under the Promissory Note. The Company currently believes that collectability is reasonably assured as the fair value of the mortgaged farm is greater than the amount owed under the loan.

(2) The original note was renegotiated and a second note was entered into simultaneously with the borrower during the three months ended March 31, 2017. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

(3) The note was fully settled and outstanding amounts paid on the maturity date of January 1, 2018.

(4) The note was fully settled and outstanding amounts paid on the maturity date of February 2, 2018.

(5) The note was fully settled and outstanding amounts paid on the closing of an acquisition in North Carolina, which was completed on January 12, 2018.

(6) On April 17, 2018, the Company amended the loan to extend the term of the loan through March 1, 2020 and increased the interest rate to 7.5% per annum.

*Source: 1Q2018 FPI 10-Q*

### The Jesse Hough Loans (Loan #7)

In August 2017 (pg. 16), FPI made a $669 Thousand loan (Loan #7) to Hough Farms.

---

**TRUST DEED**

**WITH POWER OF SALE**

This Trust Deed made August 25, 2017, by and among the following:

DATE:              August 25, 2017

TRUSTOR:           **HOUGH FARMS,**
                   **a Nebraska General Partnership**
                   **810 Montgomery Street**
                   **Bellwood, Nebraska 68624**

TRUSTEE:           **ANDREW J. HOFFMAN**
                   **ATTORNEY AT LAW**
                   **PO Box 910**
                   **47640 E. HWY 20, Ste #1**
                   **Atkinson, Nebraska 68713**

BENEFICIARY:       **FARMLAND PARTNERS OPERATING**
                   **PARTNERSHIP, LP**
                   **a Delaware Limited Partnership**
                   **4600 S. Syracuse St., #1450**
                   **Denver, CO 80237**

CONSIDERATION:     **$669,000.00**

---

*Source: Butler County, NE Deed Records (Search: Grantor Hough Farms)*

While Paul Pittman may no longer have an interest in Hough Farms, it does not mean he does not do business with Hough Farms. Inf act, we found that just three months before FPI made this loan, Paul Pittman, thru an entity called Pine Ridge Holdings, obtained a $21.9 Million bank loan with Hough Farms that was collateralized by the exact same property FPI leant against (addendum B-2).

## DEED OF TRUST

**MAXIMUM LIEN.** The lien of this Deed of Trust shall not exceed at any one time $21,977,403.00.

THIS DEED OF TRUST is dated May 25, 2017, among HOUGH FARMS, A NEBRASKA GENERAL PARTNERSHIP, whose address is 4291 H ROAD, BELLWOOD, NE 686242457 ("Trustor"); FIRST MIDWEST BANK, whose address is GALESBURG, ONE PIERCE PLACE, SUITE 1500, ITASCA, IL 60143 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and BRIAN F. BECKNER, whose address is P.O. BOX 1185, COLUMBUS, NE 68602 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Trustor conveys to Trustee in trust, WITH POWER OF SALE, for the benefit of Lender as Beneficiary, all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in BUTLER County, State of Nebraska:

   See EXHIBIT "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

Borrower. The word "Borrower" means HOUGH FARMS, A NEBRASKA GENERAL PARTNERSHIP; and PINE RIDGE HOLDINGS, INC..

Note. The word "Note" means the promissory notes or credit agreements dated February 14, 2017 in the original principal amounts of $5,350,000.00, $360,105.00 and $225,000.00 from Borrower to Lender and the promissory notes or credit agreements dated February 14, 2017 in the original principal amounts of $431,250.00, $219,446.00 and $750,000.00 from Astoria Farms, an Illinois General Partnership to Lender together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the promissory notes or credit agreements.

Joint and Several Liability. All obligations of Borrower and Trustor under this Deed of Trust shall be joint and several, and all references to Trustor shall mean each and every Trustor, and all references to Borrower shall mean each and every Borrower. This means that each Trustor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

*Source: Butler County, NE Deed Records (Search: Hough Farms)*

Pine Ridge Holdings is a Wyoming LLC. Corporate filings show after the 2016 reorganization, Paul Pittman's name was removed from the corporate records. However, when in January 2018 Jesse Hough filed for a foreign LLC in Nebraska, Pittman's name reappears as both an officer and a director of Pine Ridge Holdings. Strangely, it lists his address in a Denver high rise that we believe is Jesse Hough's apartment.

| OFFICERS: | | | DIRECTORS: | | |
|---|---|---|---|---|---|
| Jesse J. Hough/President and Treasurer | | | Jesse J. Hough | | |
| Name/Title | | | Name | | |
| 1920 17th Street #1208 | | | 1920 17th Street #1208 | | |
| Street Address | | | Street Address | | |
| Denver | CO | 80210 | Denver | CO | 80210 |
| City | State | Zip | City | State | Zip |
| Paul Pittman/Vice Pres and Secretary | | | Paul Pittman | | |
| Name/Title | | | Name | | |
| 1920 17th Street #1208 | | | 1920 17th Street #1208 | | |
| Street Address | | | Street Address | | |
| Denver | CO | 80210 | Denver | CO | 80210 |
| City | State | Zip | City | State | Zip |

*Source: Nebraska Secretary of State*

**Here again, we believe we have a potential undisclosed related party transaction. While Pittman may not be involved with Hough Farms on paper, there are very conceivable situations where he could personally benefit from FPI's loan to Hough Holdings. For instance, if the bank required further collateral, how are shareholders to know if the FPI loan was used as said collateral.**

And more broadly, why would Pittman agree to put one of his entities in a position to be joint and severally liable with Hough Farms if he did not have some sort of pecuniary interest in its business?

### *The Jesse Hough Loans (Loan #9)*

Finally, on January 18th, 2018 (pg. 16) FPI made a $5.25 Million loan to Siffring Farms.



*Source: Butler County, NE Deed Records (Search: Siffring Farms)*

We searched corporate filings and found that Siffring Farms is an inactive LLC whose president is Duane R. Siffring. However, the deed of trust was signed by Jesse Hough as President of Siffring Farms. And Butler County appraisal records (search: Siffring Farms) show that Siffring Farms has owned the properties for years.



*Source: Butler County, NE Deed Records (Search: Siffring Farms)*

**We ask, why is Jesse Hough signing on a loan for an inactive entity, that corporate records show he was never the president of, and that is collateralized by land that deed records show he does not own?**

We also wonder why days later Pine Ridge Holdings co-signed on another bank loan with H-KO Land & Cattle Company (an entity formed by Jesse Hough on January 9th, 2018) and with Hough Farms using an address that Butler County Appraiser shows as the mailing address for the properties owned by Siffring Farms.



*Source: Nebraska UCC Filings & Butler County Appraiser*

Are shareholders supposed to believe that all these entities, that share the same address and are co-signing loans are unrelated parties?

### Insider Departures & Auditor Dismissal

While we are unsure how the Hough loans are being used, our opinion that something is amiss is strengthened by the exodus of FPI insiders. Since the first loan to Jesse Hough in July 2017, four board members and FPI's president have announced resignations. Below we detail each of the departures.

| Date | Name | Position | Reason |
|------|------|----------|--------|
| 8/28/17 | John Conrad | Director; Forsythe Farms nominee | Personal reasons |
| 12/5/17 | Dixon Boardman | Director, former Chairman of AFCO | Pursue other business interests |
| 1/18/18 | Darell Sarff | Director, father of FPI VP | Pursue other business interests |
| 3/19/18 | Thomas Gimbel | Director, former CEO of AFCO | Pursue other business interests |
| 4/10/18 | Robert Cowan | President, former | Pursue other business interests |

Three of the directors and the president came from FPI's two largest acquisitions (Forsythe Farms and American Farmland Company). We think this is notable because these are individuals with significant experience in farmland investing who sold their holdings to FPI and are now leaving.

In the case of Forsythe, the 2018 proxy states (pg. 14) the Forsyth Sellers own 23.59% of the diluted shares and have to right to a nominate a board seat as long as they own 10%. In August, their representative resigned and Forsyth has yet to nominate another, which may indicate their intention to liquidate their stake below 10%.

In the case of AFCO, its former Chairman and hedge fund manager, Dixon Boardman, had already sold the majority of his position by the time he resigned in December 2017.

Then on March 10th, 2018, FPI dismissed PWC as its independent auditor. The same day, the company engaged EKS&H, who investors may recognize MusclePharm and Heska. Muscle Pharm's founder

resigned in 2016 after the SEC charged the company with accounting and disclosure violations. Heska was written up on SA for alleged related-party transactions.

In light of the insider departures and auditor dismissal, we think there is a significant risk that FPI is engaging in aggressive accounting. Our opinion is further bolstered by the fact that we believe there is a motive to play accounting games.

### *Hough Holdings' FPI Share Pledge*

According to a February 13th, 2017 Colorado UCC filing, Hough Holdings put up its equity interest in Farmland Partners for a loan. Notable, at the bottom of the document is a line that states **"Optional filer reference: BOTW (Bank of the West)/Pittman Hough."** Being that Pittman-Hough Farms disclosed in a 2016 Form 4 that it distributed its shares to its members, we think it is likely that the UCC filings is referring to Pittman and Hough personally.



*Source: Colorado UCC Filings*

The timing of this loan is interesting because just days later, on February 18th, 2017, FPI entered into a termination agreement with Prudential as part of its acquisition of American Farmland Co. And on the 1Q2017 conference call, Pittman stated:

> *"We frankly expected substantial stock price appreciation based on the AFCO acquisition and the termination of Prudential and all of that, and frankly none of which we got."*

Instead of going up, FPI's stock price declined 30% over the following months.

Further evidence suggesting Pittman's involvement in the loan is that on July 9th, 2017, he converted 531,827 OP units to common shares. July 9th (a Sunday) came after FPI's stock closed at a new all-time low that Friday. Seeing that Pittman has not sold any shares, we question why he would be willing to convert OP Units, whose primary purpose is to delay having to pay capital gains taxes. We think the bank may have required the conversion of OP units because it wanted liquid collateral.

### *What Do We Think Is Happening?*

Given the totality of the evidence, we believe there is a significant risk that the loans to Jesse Hough are being used to artificially improve FPI's financials. We see three ways in which FPI can do this, two of which we believe we have already proven.

First, FPI could loan money out thru investing cash flows and bring it back on the income statement thru rental income. We think this happened (at least indirectly) thru the loans to Ryan Niebur. Second, it could loan money out for "farming infrastructure projects" that are actually property-level operating expenses. Third, the loans create interest and fee revenue.

And if FPI ends up acquiring the properties collateralizing the loans or rolling the loans over, we think there is a risk that FPI regulators would view the loans as non-economic transactions for the purpose of artificially improving its financials.

Regardless of exactly how the loans are being used, we think they introduce two systemic risks.

### *The Liquidity Trap*

First, if FPI's financials have been misreported, the company may quickly find itself in a liquidity trap if the capital markets turn against it. FPI only has $19.6 Million in cash (excluding any 2Q stock buybacks) and in 2017 the company burnt thru $44.7 Million after all preferred/common dividends and capex. If FPI runs out of cash, we think the company would be forced to liquidate properties to survive.

Second, the loan against FPI shares risks driving FPI's stock price lower if the shares are sold to meet margin demands. In a classic case of reflexivity, the stock price declines would in turn make it more difficult to raise money, which in turn would drive the stock price even lower.

But even if the loans, insider departures, dismissed auditor, pledged shares and potential liquidity trap turn out to be benign risks, we still think FPI's shares carry significant downside.

### *Calculating Net Asset Value*

Paul Pittman spends a significant amount of time on each conference trying to convince shareholders that the net asset value (NAV) of FPI is between $11.50 and $12.50 per share. On the most recent call, he stated this value is based on what FPI paid for the assets and adjusting for modest increases and decreases in value across different regions of the portfolio.

The problem with Pittman's calculation is that he ignores the old adage that "you make your money when your buy." In fact, Pittman had this to say on the 1Q2016 conference call:

GM_025

> *"I don't put a lot of stock in annual appraisals... not because appraisers are bad, but you have to understand, they are forced to perform a certain process and their charge is to do a process based on that set of rules and regulations. It is not really answering the question what farms are worth, it's actually answering a question of what farms are worth under this very mechanical valuation approach, which has a whole set of errors embedded in it."*

He then states:

> *"Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgement of value."*

**To put it bluntly, we think these comments are absurd. First, the appraisal process is apparently a poor judgement of value, despite its widely expected use across every real estate asset class. Second, what you pay, even if you over pay, is the safest judgement of value."**

This is akin to saying that if someone paid $1 Million for a house in a neighborhood filled with $500 Thousand houses, true value is $1 Million because one person was willing to pay that. And in fact, we have evidence that suggests FPI has overpaid for properties.

Below we present evidence of overpayment using three methods. The first is to find what parties paid for the same property in a 1-3 year time frame before FPI acquired it. Second, is to use comparable sales. Third, is to use aggregated data from the USDA and AcreValue (a subscription service that is akin to Zillow for farmland and values land based on crop history and comparable sales).

### *McDonough County, IL*

On July 15th, 2015, FPI acquired the Tomasek Farm from Paul Pittman (disclosed on pg. ?). The acreage and price are disclosed in both the 10-K and in McDonough County property records (search: PH Holdings).

FPI acquired the property for $11,991 per acre. This price was 2.5% above the $11,700 per acre Paul Pittman paid for it in 2014 while USDA data (pg. 8) shows Illinois farmland had actually declined slightly over this period.

However, we believe a better comp than what Pittman paid is the Howe Farm that FPI acquired in December 2015 for $10,449. This suggests FPI paid a 14.8% premium to Pittman.

Book value per share, which is represents what FPI actually paid for the properties (land has no depreciation), is $9.54 per share (based on fully diluted share count of 37.451 Million shares). On the 1Q2017 call, Pittman stated the difference between book value and his NAV estimate is largely "30-ish" million dollars for the legacy properties (owned by Pittman and Hough) that GAAP required be marked to the purchase price instead of market price (which in 2014 was the market peak).

So what matters most is not what has happened to prices since you bought but at what price you bought. And we found evidence that suggests FPI has significantly overpaid for properties.

Valuing a portfolio of farmland is significantly more challenging than valuing a portfolio of, say, single family homes. Unlike homes, which are generally comparable across a neighborhood, the value of one piece of farmland may differ widely from an adjacent parcel based on the percentage of tillable acres, soil quality or irrigation.

*Note: because different states and counties provide different levels of transparency into actual real estate transactions (e.g. pricing disclosure and searchability), we reviewed records in dozens of counties across the country. Below is a sample of our findings and links to the databases for investors to recreate our work.*

**Morehouse County, Louisiana**

In October 2014, FPI acquired Bonita Brake. The 1,088 acre farm was purchased for $5.151 Million or $4,735 per acre. We found the following comps of similar property types (classified as Ag Lands Class I, II and III) from 2014 to 2016. Throwing away obvious outliers where price per acre was well below average.

The average price per acre was $4,209, implying FPI paid a 12.5% premium to market value.

On the 1Q2018 conference call, Paul Pittman stated that the net asset value (NAV) of FPI's farmland, based on market price per acre, is $14 per share. Our recreation of his calculation, which is based on data provided in the quarterly slide deck (pg. 13) is shown below.

There are a couple major flaws in this calculation:

1. Because FPI is so levered, tiny moves in the cap rate produce huge swings in NAV (see below)
2. If revenues are overstated by
3.

We found deed records that lead us to believe FPI has significantly overpaid for properties.

, in some instances paying over two times what the seller paid for the same land a year earlier. Using comps, USDA data and AcreValue estimates, we calculate FPI's net asset value per share to be $5.30, 40% below the current stock price. This does not account for the costs to liquidate the portfolio or any discount from a fire sale.

*Disclaimer*

IMPORTANT - Please read this Disclaimer in its entirety before continuing to read our research opinion. Investors are encouraged to conduct their own due diligence into these factors. This article represents the opinion of the author as of the date of this article. This article expresses the author's investment opinions, which are based upon interpretation of certain facts and observations, all of which are based upon publicly available information. The information set forth in this article does not constitute a recommendation to buy or sell any security. This article contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "think," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This article is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this article and undertakes no duty to update its contents. You should assume that as of the publication date the author (possibly along with or through our members, partners, affiliates, employees, and/or consultants) and clients have a short position in all stocks (and are long/short combinations of puts and call options of the stock) covered herein, including without limitation Farmland Partners, Inc. and therefore stand to realize significant gains in the event that the price of its stock declines. The author may also cover his/her short position at any point in time without providing notice. The author encourages all readers to do their own due diligence.

GM_028